

**SEALED**

ORDERED UNSEALED on 11/22/2022   s/ franciscor

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>Robert LAZERUS<br><br>Defendant. | Magistrate's Case No. **22-MJ-391**<br><br>COMPLAINT FOR VIOLATION OF<br><br>Title 18, U.S.C., Section 1349 –<br>Attempt to Commit Securities Fraud |

The undersigned complainant being duly sworn states:

### COUNT ONE

Beginning on or about February 1, 2020 and continuing through at least on or about January 31, 2022, in the Southern District of California and elsewhere, defendant ROBERT LAZERUS knowingly and intentionally attempted to commit Securities Fraud, in violation of Title 15, United States Code, Sections 1348, and did something that was a substantial step toward committing the crime and that strongly corroborated his intent to commit the crime. All in violation of Title 18, United States Code, Sections 1349.

And the complainant states that this complaint is based on the attached affidavit, which is incorporated herein by reference.

David Patterson
Special Agent, FBI

Attested to by the complainant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone, this 1st day of February, 2022.

Hon. Mitchell D. Dembin
United States Magistrate Judge

## **AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, David K. Patterson, Special Agent, Federal Bureau of Investigation ("FBI"), being duly sworn, hereby depose and state:

## I.    **INTRODUCTION**

1.    I make this probable cause statement in support of a criminal complaint against and warrant for the arrest of Robert LAZERUS for attempting to commit securities fraud through insider trading, in violation of 18 U.S.C. §§ 1348 and 1349 ("Securities and commodities fraud" and "Attempt and conspiracy," respectively).

2.    My knowledge of the facts alleged in this probable cause statement arises from my training, experience, personal observations, my review of records and documents obtained during this investigation, witness interviews, reports written by me and other agents, and discussions with other law enforcement agents involved in the investigation, including (i) an FBI agent who has had communications with LAZERUS in an undercover capacity since February 2020, and (ii) members of the staff of the United States Securities and Exchange Commission ("SEC") who have been conducting a parallel investigation surrounding many of the facts described below.  I am familiar with the facts set forth below based upon my own investigative findings and conversations with these and other participating law enforcement agents and investigators. Since the purpose of this probable cause statement is limited to establishing a foundation for the requested arrest warrant, I have not included every fact about this investigation. Dates and dollar amounts are exact or best approximations.

3.    I am a Special Agent ("SA") with the FBI and have been so employed for approximately eight years.  My training includes a 21-week FBI new agents' class, during which I received instruction on various aspects of federal investigations.  I am currently assigned to the Criminal Division, White Collar Crime – Financial Fraud squad. I have participated in numerous complex financial fraud investigations. As a result of my training and experience, I am familiar with the federal laws relating to financial fraud, and common financial fraud techniques and schemes, including wire fraud, mail fraud,

securities fraud, investment fraud and a variety of other financial crimes. Before becoming an FBI agent, I worked for approximately ten years as a finance analyst at a large financial institution. My duties included accounting for the corporate securities portfolio, capital budgeting, and financial reporting. The opinions I have formed and set forth are based on my experience and training, as well as consultation with other experienced investigators and agents.

## II.     **PROBABLE CAUSE OF CRIMINAL ACTIVITY**

### A.     **Overview**

4.     Based on evidence I have reviewed, much of which is described herein, I believe that Robert LAZERUS provided an undercover FBI agent with inside information about a publicly-traded company with which LAZERUS is connected. LAZERUS did so with the expectation that the undercover agent would trade in the securities of the company, make a profit, and then share a portion of the insider trading profits with LAZERUS. The evidence presented below consists largely of (1) communications between the undercover agent and LAZERUS, and (2) evidence indicating that others with apparent connections to LAZERUS have also made timely (and potentially illegal) trades in the subject company's stock.

### B.     **Insider Trading Schemes, Generally**

5.     Based on my training and experience, and discussions with other law enforcement personnel and others experienced in investigating or prosecuting wire and securities fraud crimes, I know that the federal securities laws prohibit insider trading, that is, undisclosed securities trading based on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage.

6.     Two well-established theories – the "classical theory" and the "misappropriation theory" – underpin liability in insider trading cases, as summarized in *Salman v. United States*, 137 S. Ct. 420 (2016).

> *Dirks v. SEC*, 463 U.S. 646 (1983), established the personal-benefit framework in a case brought under the classical theory of insider-trading

liability, which applies 'when a corporate insider' or his tippee 'trades in the securities of [the tipper's] corporation on the basis of material, nonpublic information.' *United States v. O'Hagan*, 521 U. S. 642 –652 (1997). In such a case, the defendant breaches a duty to, and takes advantage of, the shareholders of his corporation. By contrast, the misappropriation theory holds that a person commits securities fraud 'when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information' such as an employer or client. *Id.*, at 652. In such a case, the defendant breaches a duty to, and defrauds, the source of the information, as opposed to the shareholders of his corporation.

*Salman*, 137 S. Ct. at 425, n.2.

7.    Those engaged in illegal insider trading often fall into two groups – "tippers" and "tippees."  Tippers come into possession of, and then convey, material non-public information to tippees; tippees misuse the information to buy and sell securities.

8.    Based on my training and experience, I am aware that information is "material" if there is a substantial likelihood the information would affect the judgment of a reasonable investor; information is "non-public" if it is not publicly available or is substantially more detailed or reliable than publicly available information on the same topic.  Material non-public information is valuable to those seeking to commit insider trading in part because they can use the information to buy or sell stocks or other securities before the investing public is aware of the information, resulting in the fraudulent obtaining of profits (or avoidance of losses) before the stock price is affected by the news.  Once material information is disclosed to the investing public, it often results in a significant change in the price of the related stock and an increase in trading volume.

## C.    Background of This Investigation

9.    In November of 2019, the FBI received a referral from the SEC regarding a suspected market manipulation scheme involving Loop Industries, Inc. ("LOOP"). The Financial Industry Regulatory Authority ("FINRA") made the original referral to the SEC, who then passed it on to the FBI.   According to LOOP's public filings with the SEC, LOOP was a technology and licensing company incorporated in the state of

3

Nevada, with its principle executive offices located in Terrebonne, Quebec, Canada. The company's common stock began trading on the NASDAQ stock exchange in November 2017 and traded under the ticker symbol LOOP. LOOP's common stock represents the security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934 and/or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934. The company's purported business focused on developing new technologies to efficiently and profitably recycle plastic. Daniel Solomita ("Solomita") was listed as the founder and CEO of LOOP. The SEC noted concerns regarding the timing of press releases issued by LOOP and corresponding increases in market activity related to shares of LOOP stock; more specifically, the concerns surrounded increased market activity on certain occasions before LOOP publicly announced material information. The report noted that LOOP's co-founder and Director, Donald Danks ("Danks"), was identified in a previous referral from FINRA to the SEC as having made timely trades, *i.e.*, trades potentially made on the basis of material non-public information, in shares of a NYSE listed corporation, iMergent, Inc. According to filings with the SEC and his own LinkedIn profile, Danks served on the Board of Directors of LOOP until May of 2018.

10. The SEC referral to the FBI noted that an individual investor, "AB", purchased a substantial number of shares of LOOP stock during the period of the suspected market manipulation. Further investigation revealed that AB is an 86-year-old retiree living in Carlsbad, California. Based on information obtained from "BF," AB's financial advisor, AB appeared to be taking investment direction from Robert LAZERUS. LAZERUS told BF that LAZERUS was on LOOP's board of directors. LAZERUS appeared to be very involved in AB's financial life, even driving AB and AB's wife to the TD Ameritrade office where BF worked and AB held his investment accounts. AB began disregarding BF's advice and instead bought LOOP stock. These purchases included buying LOOP stock "on margin," *i.e.*, AB borrowed funds from his brokerage firm in order to purchase LOOP stock, which is an approach that can

4

significantly increase the risk associated with an investment in stock. BF believed that AB's purchases of LOOP accounted for the majority of the market activity in LOOP stock during portions of the relevant period. Records gathered during the SEC's investigation surrounding LOOP indicate that as of May 31, 2021, AB held significant blocks of LOOP stock[1] as well as shares in other companies controlled by Jonathan Destler ("Destler"), who was a founding investor of LOOP.

11.     FBI agents spoke to AB's son, "GB", on January 31, 2020. GB expressed concerns about his father's decision-making and the seeming influence LAZERUS had over AB. In February of 2020, GB agreed to assist the FBI's investigation, and introduced an FBI undercover employee ("UCE-1") to LAZERUS. GB described UCE-1 to LAZERUS as a friend looking for good investment opportunities. After the introduction, LAZERUS began communicating directly with UCE-1 on a regular basis.

12.     Based on the evidence set forth below, I respectfully submit that there is probable cause to believe that LAZERUS provided UCE-1 with material non-public information concerning LOOP, in exchange for a portion of the proceeds that LAZERUS believed UCE-1 would generate from trades in LOOP stock based on the material non-public information that LAZERUS provided.

**D.     Relevant Individuals and Entities**

**i.     Robert LAZERUS**

13.     According to public databases, LAZERUS is an American citizen residing in Rancho Santa Fe, California. LAZERUS is a realtor at Rancho Pacific Realty, which is located in Encinitas, California. SEC documents and a review of LAZERUS's emails (which were obtained pursuant to search warrants authorized in this District, *see* Case Nos. 21MJ2130 and 21MJ2116) indicate that LAZERUS helped Destler and Danks raise capital for LOOP. Based on these documents and emails, and my training and

---

[1] SEC trading detail indicates AB may have sold approximately 150,000 shares of LOOP stock in June or July of 2021, but this information is still being verified.

experience, I believe that LAZERUS operated as a "finder" who helped to identify and solicit investors for companies controlled by Danks and Destler.

14. On a recorded call with UCE-1 on May 6, 2020, LAZERUS described himself as follows:

> "....I do IPO. Okay? So um I bring in to the market after we, you know, engineer a company and-and put together the product…….. And then engineer the financing of it. Um but um the last one I had public um was Loop Industries. Um and that right now I think is closing at 8 or something like that. Um we started that company 5 years ago."

15. Based on my training and experience, I believe that LAZERUS's statement about "closing at 8" refers to LOOP's stock being valued at approximately $8.00 per share at the end of the trading day.

16. Also, on December 9, 2021, LAZERUS met in person with UCE-1, and confirmed that LAZERUS acted as a "finder", had served in that capacity for six or seven years for Destler, and Destler generally paid LAZERUS 20%, which I believe means 20% of the funds raised by LAZERUS.

17. I have reviewed an online analyst report compiled by Hindenburg Research and published on October 13, 2020, with the headline, *"Loop Industries: Former Employees and Plastics Experts Blow The Whistle On This 'Recycled' Smoke And Mirrors Show."* The report alleged that LOOP's technology claims were "technically and industrially impossible." I note that, during the relevant period, (i) Hindenburg Research regularly published stock analyst reports; (ii) its reports often highlighted negative information about a particular stock and/or the related company, and (iii) owners and/or affiliates of the website disclosed that they were shorting the stock (*i.e.*, they traded in such a way as to generate gains if and when the price of the subject stock decreased). Indeed, Hindenberg Research's report about LOOP disclosed that "[a]fter extensive research, we have taken a short position in shares of Loop Industries."

ii.    **UCE-1**

18.    UCE-1 is an FBI undercover employee who was presented to LAZERUS as a friend of GB.  UCE-1 explained to LAZERUS that UCE-1 had family money to invest and was looking for good investment opportunities.  Based on recorded calls and in-person meetings, UCE-1 told LAZERUS that GB wanted UCE-1 to talk to LAZERUS because LAZERUS was someone with good contacts and could recommend investments in companies about to release big news.

iii.    **Jonathan Destler**

19.    According to SEC records and his own LinkedIn profile, Destler described himself as the Founder and CEO of Opti-Harvest, and was also one of the initial investors in LOOP.  In addition, documents filed with the SEC indicate that Destler controls a company called Touchstone Advisers, Inc., which acquired a significant number of shares of LOOP stock, which Destler then sold to AB.

20.    Agents in the FBI's Los Angeles Field Office previously investigated Destler for insider trading.  Destler was not ultimately charged as a result of that investigation.  Destler resides in Southern California.

iv.    **Donald Danks**

21.    According to SEC records and his own LinkedIn profile, Danks was a co-founder and CEO of Opti-Harvest, a co-founder and director of LOOP and, along with Destler, controlled Touchstone Advisors, Inc.  Charles Schwab brokerage records show that while Danks was an officer of LOOP, he had power of attorney over a trading account held by Ventanas Capital, LLC.  The Power of Attorney form on file with Charles Schwab – which bears Danks' signature – indicates that his email address is ddanks@touchstonecorp.com, and he has trading authority over the Ventanas Capital brokerage account.  The form also represents that Danks is not a "director, 10% shareholder or policy making officer of a publicly held company."  The Charles Schwab brokerage records also indicate that Danks used this Ventanas Capital brokerage account to trade shares of LOOP in the name of Michelle Fiore.  Based on my training and

experience, I know that those who engage many forms of securities fraud, including insider trading, often attempt to disguise their activities by utilizing a trading account in the name of another person or entity, which I believe Danks was doing by trading LOOP not through an account in his own name but, rather, an account in the name of Ventanas Capital.

22.    According to LOOP filings with the SEC, Danks was also formerly the CEO of iMergent, Inc.  A June 2008 FINRA Insider Trading Section referral report to the SEC noted potential timely trading activity concerning a November 6, 2007 iMergent, Inc. news announcement.  The report identified timely sales of iMergent Inc. shares through several accounts with potential ties to Danks.

**E.    Timeline of Events**

23.    Emails obtained by SEC staff members show that LAZERUS was actively involved in raising money for LOOP as far back as 2016.  In a September 22, 2016 email, Danks stated to Solomita: "Coach and Robert LAZERUS are just doing stock.  They are both sending invoices."  Based on my training and experience, and on LAZERUS's description of his role to UCE-1, as set forth herein, I believe that this email pertains to efforts by Danks to raise cash for LOOP and that "Coach and Robert LAZERUS" were being compensated for their efforts in doing so.

24.    In February 2020, LAZERUS emailed UCE-1 and provided his contact information, telephone number and email address.[2]  The phone number provided by LAZERUS was 619-813-5575 (also referred to herein as the "SUBJECT TELEPHONE").  LAZERUS soon thereafter began providing UCE-1 with information about investment opportunities, including Opti-Harvest, a company controlled by Destler, and LOOP.

---

[2] A search warrant was obtained for the email address rlazerus@gmail.com; a review of the results is currently on-going.

### i.    First LOOP Tip

25.    During a consensually recorded May 6, 2020 telephone call, LAZERUS told UCE-1 that LOOP had news coming out in six weeks.

26.    During a consensually recorded May 7, 2020 call between UCE-1 and LAZERUS, LAZERUS offered to put UCE-1 in touch with his partner, Jonathan Destler, to discuss "his baby" Opti-Harvest.  LAZERUS also reiterated to UCE-1 that he should expect news to be released by LOOP in six weeks and advised UCE-1 to purchase shares of LOOP in small amounts.  In an email sent on the same day, LAZERUS forwarded UCE-1 an email from jdestler@touchstonecap.com, dated April 24, 2020, about an Opti-Harvest patent filing.

27.    During a consensually recorded in-person meeting in Del Mar, California on June 16, 2020, LAZERUS advised UCE-1 to start buying shares of LOOP because the company would be announcing a new contract in two months.  LAZERUS and UCE-1 discussed the possibility that LAZERUS would be compensated 10% of the gross profits in return for this information.

*UCE-1: Um, and how do we, I mean, I want to make this a good situation for you, how do we do that?*

*LAZERUS: Well look, I mean I trust you, if you want more, I'll have more information for you down the road.*

*UCE-1: Okay*

*LAZERUS: If you want to keep making money, you're just going to keep coming back.* **All I ask is that maybe we just do like ten percent of your profits***.*

*UCE-1: Okay*

*LAZERUS: That's fair, um.*

*UCE-1: But after that news you would say do a little profit taking and then we can take care of that.*

*LAZERUS: I'll just be suggesting.*

*UCE-1:  I guess it just depends on what you know is coming, if there is more good stuff coming.*

*LAZERUS: Yeah , if if If there is a time to get out temporarily, then fine, ok.*

(Emphasis added.)

28.     Training and experience indicate that, through the foregoing conversation, LAZERUS was looking to be compensated based on the profits earned by UCE-1 from trading on the material non-public information LAZERUS provided regarding LOOP.

29.     During a consensually recorded June 18, 2020 WhatsApp telephone call, LAZERUS told UCE-1 that LOOP was going to sign a two-million-dollar contract with Coke in six weeks.[3]  LAZERUS also told UCE-1 that he talks to Danny Solomita, CEO of LOOP.  During this call, LAZERUS explained to UCE-1 that he preferred to use WhatsApp to communicate.  Based on my training and experience, I believe that in order to avoid law enforcement scrutiny, individuals attempting to commit securities fraud, among other crimes, often utilize WhatsApp and other encrypted texting platforms to communicate because they believe law enforcement is unable to access those communications.

30.     During a consensually recorded June 24, 2020 WhatsApp call, UCE-1 asked LAZERUS how he preferred to be paid.  LAZERUS told UCE-1 that he is looking for 10% of the UCE's gross profits.  During this call, LAZERUS and UCE-1 used the language set forth below to discuss this topic.

UCE-1:  *Um, I was gonna ask you, in case-in case this was um something that would take me some time on-on Loop, and I hope-I hope this uh, we get to this point. When, do-do you have a preference on how I make sure you get taken care of, cause if it's-if it's a little more conflict then?*

RL:     *Well, well yeah it is but I'm gonna you know I'm gonna believe you on what you tell me and you can just show me your statement and we'll [UI].* **I'm just looking you know, for ten percent of the gross of your profit, gross.**  (Emphasis added.)

31.     Based on my training and experience, and my conversations with UCE-1, I believe that UCE-1 was offering to pay LAZERUS for the material non-public

---

[3] According to a November 2018 press release, Coca-Cola and LOOP entered into an agreement in that same month.  The agreement stated that starting in 2020, LOOP would begin supplying recycled plastic for use in Coca-Cola packaging.  According to plasticstoday.com, as well as other publications, in November of 2020, Coca-Cola terminated the agreement because LOOP did not satisfy its first production milestone.

10

information LAZERUS provided with respect to LOOP. I also believe that LAZERUS's response again indicates that he would like to be paid 10% of the profit UCE-1 purportedly made trading based on the information LAZERUS provided UCE-1.

32. On the same June 24, 2020 WhatsApp call, LAZERUS explained to UCE-1 that he preferred to be compensated in cash, as follows:

> UCE-1:   Well I mean are you-are you a cash guy? Like do you want, I mean if it's uh, I just wanna make sure?
>
> RL:      I'm a cash guy, but that's- that's nice to have cash,
>
> UCE-1:   Be better?
>
> RL:      It's nice.
>
> UCE-1: Okay.
>
> RL:      Okay, I really appreciate that.
>
> UCE-1: Of course!
>
> RL:      And-and it makes it easier, because I get taxed on that.

33. On September 8, 2020, in a WhatsApp chat, LAZERUS told UCE-1 to "watch LOOP this week."

34. On September 9, 2020, in a WhatsApp chat, LAZERUS told UCE-1, "news tomorrow on LOOP."

35. Based on my training and experience, I believe that through both the September 8 and 9, 2020 chats, LAZERUS was communicating an expectation that LOOP would make public material information about the company and/or that LOOP's stock price would go up.

36. On September 10, 2020, LOOP issued a press release entitled "LOOP Industries and Suez Announce Strategic Partnership to Build First Infinite LOOP Facility Producing 100% Recycled and Infinitely Recyclable Plastic in Europe."

37. On September 9, 2020, shares of LOOP closed at $12.46 per share. On September 10, 2020, following the press release, shares of LOOP closed at $12.98 per share. Thus, LOOP's stock price had a one-day increase of $0.52 per share, or approximately 4%.

38.    On September 14, 2020, in a WhatsApp chat, UCE-1 thanked LAZERUS and asked if UCE-1 should keep buying LOOP stock or take some profit (meaning sell some stock).    LAZERUS replied, "[t]here is more news forthcoming over the next 30 days. I would acquire."

39.    On September 22, 2020, in a WhatsApp chat, LAZERUS stated, "SYNC By [sic] as soon as possible I should've called you last week in reference to this."    Based on my training and experience, I believe that LAZERUS was "tipping" UCE-1 to buy stock in Syncona Ltd., the stock ticker symbol for which is SYNC, and which LAZERUS expected to increase in value.

40.    During a consensually recorded in-person meeting between UCE-1 and LAZERUS on December 4, 2020, UCE-1 told LAZERUS that UCE-1 made a profit on the LOOP tip and paid LAZERUS $4,150 in cash, which purportedly represented 10% of UCE-1's profit.

**ii.    Second LOOP Tip**

41.    LAZERUS continued to make UCE-1 aware of other investment opportunities.    On a May 5, 2021 WhatsApp chat, LAZERUS told UCE-1 that LOOP continued to be a good buy while also touting Cooling Technologies, Inc (stock ticker symbol: WARM) and UiPath, Inc. (stock ticker symbol: PATH).    A relevant portion of the WhatsApp exchange appears below:



42.    During a consensually recorded in-person meeting on May 20, 2021, LAZERUS told UCE-1 that LOOP signed an agreement with SK Group[4] that would be announced around June 1, 2021.    LAZERUS stated that the agreement included processing plants in Seoul, South Korea, and a licensing agreement.    LAZERUS told UCE-1 that Solomita told this information to Destler, who then told LAZERUS.    During this meeting, UCE-1 and LAZERUS agreed to increase LAZERUS's compensation for the inside information from 10% to 20% and discussed setting up an offshore brokerage account to facilitate stock trading and the transfer of funds.    LAZERUS stated that he was interested in this idea to avoid government scrutiny.

43.    During a consensually recorded May 21, 2021 WhatsApp call, LAZERUS told UCE-1 that Destler used to write press releases for LOOP, but he was unsure if that

---

[4] According to the company website, SK Group is a South Korean Conglomerate with 95 subsidiary companies.  SK Group engages primarily in the energy and chemical industries.

was still the case.  LAZERUS said that he knew Solomita still talked to Destler.[5]  UCE-1 asked LAZERUS if Destler got nervous when LAZERUS asked him questions or if Destler was confident that LAZERUS would keep things confidential.  LAZERUS responded that Destler tells LAZERUS things in confidence.  LAZERUS told UCE-1 that the SK deal was a "done deal", and that the companies were planning to issue a press release during the first week of June.  LAZERUS told UCE-1 that the deal had a licensing agreement and SK would be buying equity in LOOP at $12 per share.  The relevant portion of a related WhatsApp chat appears below.



44.    According to UCE-1, he understood LAZERUS's reference to "Jon" in this chat to mean Jonathan Destler.

45.    On June 23, 2021, LOOP issued a press release entitled, "SK Global Chemical to Acquire 10% Equity Stake in Loop Industries, Companies Announce Strategic Partnership to Bring Sustainable and Circular Plastics to Asian Market."

---

[5] A search warrant was executed on Jonathan Destler's email account in 2021.  A review of the results is ongoing.

46.    On June 22, 2021, LOOP's stock closed at $13.19 per share.  On June 23, 2021, after the public announcement referenced directly above, LOOP closed at $15.90 per share, which represents a one-day increase of nearly 21%.

### iii.    Continued LOOP Tipping

47.    LAZERUS met with UCE-1 in the Southern District of California on December 9, 2021.    LAZERUS provided additional information about LOOP. LAZERUS told UCE-1 that:  (1) More LOOP news was expected; (2) LOOP expected to "break ground" on a new processing facility in Canada; (3) LOOP was in discussions about financing this new facility; and (4) LOOP would issue a press release about this new processing facility, and perhaps the financing, but the timing of that/those press release(s) was uncertain.

48.    LAZERUS and UCE-1 also spoke again about the proceeds that LAZERUS could expect based on the purported profits that UCE-1 would make based on the LOOP trades made on the basis of inside information.  UCE-1 referenced the 20% that he would pay LAZERUS, which LAZERUS acknowledged.   At the meeting, UCE-1 handed LAZERUS an envelope containing $5,000 in cash, and stated to LAZERUS that this payment represented a portion of the proceeds from UCE-1's recent sale of LOOP stock.

49.    LAZERUS and UCE-1 also exchanged WhatsApp messages from December 9-14, 2021, in which LAZERUS referred to anticipated LOOP news releases, and payments he received from UCE-1.  Relevant portions of these messages are set forth below.  (Content from LAZERUS appears in white blocks, and UCE-1's in green.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28





50.        During the same meeting, LAZERUS also shared with UCE-1 non-public information Opti-Harvest and its plans, and continued to encourage UCE-1 to invest in Opti-Harvest.

**F.    Other Potential Tippees of LAZERUS**

51.    According to SEC staff members with whom I have communicated, the SEC has identified evidence that other potential tippees have been in extensive contact with LAZERUS and made timely trades in LOOP stock.

52.    _Mitchell Lazerus_ - During the time period that LAZERUS was in contact with UCE-1, the SEC became aware of suspicious trading activity by Mitchell Lazerus in shares of LOOP.  I believe, based on the common surnames, that LAZERUS and Mitchell Lazerus are family members. Based on toll records related to the SUBJECT TELEPHONE obtained by the SEC, from January 1, 2020 through September 8, 2020, there were approximately 52 phone contacts between Mitchell Lazerus and LAZERUS, including at least five contacts on September 8, 2020.  Based on trade history detail obtained by the SEC, Mitchell Lazerus entered a buy order to purchase call options[6] on September 9, 2020 at approximately 11:33 PM, the trade was executed at market open on September 10, 2020.  September 10, 2020 was the same day LOOP issued a press release entitled "LOOP Industries and Suez Announce Strategic Partnership to Build First Infinite LOOP Facility Producing 100% Recycled and Infinitely Recyclable Plastic in Europe."  SEC records indicate that Mitchell Lazerus executed the call options at $12.50 per share on September 18, 2020 and on the same day sold approximately 4,350 shares at $13.38 per share.  On September 29, 2020, Mitchell Lazerus sold another 6,090 shares of LOOP at $12.90 per share.  The September 2020 phone calls followed nearly four months without evidence of phone contacts between the SUBJECT TELEPHONE and Mitchell Lazerus in toll records obtained by the SEC.

53.    _Chanthy Walsh_ - Since March of 2020, Chanthy Walsh has accumulated approximately 28,000 shares of LOOP for $256,000, with a $50,000 investment coming in the final five days of August 2020.  Based on toll records related to the SUBJECT

---

[6] The call options purchased by Mitchell Lazerus enabled him to purchase shares of LOOP stock at $12.50 per share at a later date, regardless of market price.  Training and experience would indicate call options are utilized when the investor believes the value of the stock will increase in the future.

TELEPHONE obtained by the SEC, LAZERUS had frequent contact with Walsh dating back to at least 2001. The $50,000 investment by WALSH preceded the September 10, 2020 LOOP press release that LAZERUS tipped UCE-1 before it was became public. According to SEC trading data, Walsh sold approximately 15,600 shares of LOOP stock for over $150,000 between September 10, 2020 and April of 2021. Walsh and LAZERUS appear to have had a relationship as far back as 2001 when Walsh was identified as a referral on LAZERUS's TD Ameritrade account application.

54. *Lawrence Yuen* – Since June 1, 2020, Yuen has accumulated over 15,900 shares of LOOP for $148,314, including an investment of $55,000 on September 4, 2020. Based on toll records related to the SUBJECT TELEPHONE obtained by the SEC, LAZERUS and Yuen were in contact 12 times on September 3 and September 4. The contacts and $55,000 LOOP purchase on September 4, 2020 were done approximately one week before the September 10, 2020 press release entitled "LOOP Industries and Suez Announce Strategic Partnership to Build First Infinite LOOP Facility Producing 100% Recycled and Infinitely Recyclable Plastic in Europe". Between November of 2018 and June of 2021, Yuen has purchased approximately 77,000 shares of LOOP stock and profited over $88,000 from trading shares of LOOP.

## G.    **LAZERUS's and/or Destler's Position of Trust and Confidence**

55. Based on my training and experience, and the facts set forth herein, I have probable cause to believe that LAZERUS or Destler, or both of them, was/were under a duty of trust and confidence to LOOP, its shareholders, and its executives. The evidence on this point is somewhat inconsistent, but nevertheless supports the same conclusion. On the one hand, on May 21, 2021, LAZERUS stated to UCE-1 that Destler was confident that LAZERUS would keep LOOP information confidential. However, on December 9, 2021, LAZERUS called Destler, stated that he was present with UCE-1, and asked for information about LOOP and Opti-Harvest. Either way, based on my training and experience, corporate officers, directors, executives, employees, and consultants operate under a duty of confidentiality owed to the corporation to refrain from disclosing

19

material, non-public information to outside third parties, particularly those who may trade in the corporation's stock.  Therefore, I believe that LAZERUS, and likely also Destler, violated a duty of trust and confidence to LOOP, its shareholders, and its executives by disclosing material non-public information to others for the purpose of trading LOOP securities on the basis of such information.

* * *

56.     Based on the foregoing, I submit that there is probable cause to believe that Robert LAZERUS has attempted to commit securities fraud, in violation of, *inter alia*, 18 U.S.C. §§ 1348 and 1349.

DAVID PATTERSON, SPECIAL AGENT
Federal Bureau of Investigation