UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,          )   Case No. 22-cr-2701-BAS
                                   )
                    Plaintiff,     )   Thursday, August 1, 2024
        vs.                        )
                                   )   Trial Testimony of
DONALD DANKS, JONATHAN DESTLER,    )   Jeremy Tarwater, Vol. 3
and ROBERT LAZERUS,                )
                                   )
                    Defendants.    )
_____)


REPORTER'S TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CYNTHIA A. BASHANT
UNITED STATES DISTRICT JUDGE

VOLUME 3, PAGES 1 - 101


(APPEARANCES ON PAGE 2)


REPORTED BY:

ANNE MARIE ROLDAN, RMR, CRR, CSR 13095
U.S. OFFICIAL COURT REPORTER
U.S. District Court Clerk's Office
333 West Broadway, Suite 420
San Diego, California  92101

Reported stenographically; transcribed with CAT software.

```
 1     APPEARANCES:

 2     FOR THE PLAINTIFF:        UNITED STATES ATTORNEY'S OFFICE
                                 880 Front Street, Suite 6293
 3                               San Diego, California  92101
                                 By:  JANAKI G. CHOPRA, AUSA
 4                                    NICHOLAS W. PILCHAK, AUSA

 5     FOR DEFENDANT             LAW OFFICES OF PATRICK Q. HALL
       DONALD DANKS:             501 West Broadway, Suite 730
 6                               San Diego, California  92101
                                 By:  PATRICK Q. HALL, ESQ.
 7
       FOR DEFENDANT             SNELL & WILMER
 8     JONATHAN DESTLER:         12230 El Camino Real, Suite 300
                                 San Diego, California  92130
 9                               By:  ANDREW P. YOUNG, ESQ.

10                               MILLER BARONDESS, LLP
                                 2121 Avenue of the Stars, Suite 2600
11                               Los Angeles, California  90067
                                 By:  LOUIS "SKIP" MILLER, ESQ.
12
       FOR DEFENDANT             LAW OFFICE OF MARTHA M. HALL
13     ROBERT LAZERUS:           555 West Beech Street, Suite 508
                                 San Diego, California  92101
14                               By:  MARTHA M. HALL, ESQ.

15                               LAW OFFICE OF ADAM F. DOYLE
                                 444 West C Street, Suite 310
16                               San Diego, California  92101
                                 By:  ADAM F. DOYLE, ESQ.
17

18

19

20

21

22

23

24

25
```

I N D E X

E X A M I N A T I O N S

| WITNESS | VOL. | PAGE | LINE |
|---|---|---|---|

**FOR THE GOVERNMENT:**

JEREMY TARWATER

| | VOL. | PAGE | LINE |
|---|---|---|---|
| Direct by Ms. Chopra ......................3 | | 4 | 3 |
| Cross by Ms. Hall ........................3 | | 65 | 11 |

E X H I B I T S

| ADMITTED | VOL. | PAGE | LINE |
|---|---|---|---|

**FOR THE GOVERNMENT:**

| | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 328 ..................................3 | | 15 | 14 |
| Ex. 331 – 334 ............................3 | | 15 | 14 |
| Ex. 336 – 338 ............................3 | | 15 | 14 |
| Ex. 340 – 341 ............................3 | | 15 | 14 |
| Ex. 343 ..................................3 | | 15 | 14 |
| Ex. 346 ..................................3 | | 15 | 14 |
| Ex. 351 ..................................3 | | 15 | 14 |
| Ex. 353 ..................................3 | | 15 | 14 |
| Ex. 369 – 370 ............................3 | | 15 | 14 |
| Ex. 375 – 376 ............................3 | | 15 | 14 |
| Ex. 384 ..................................3 | | 15 | 14 |
| Ex. 391 ..................................3 | | 15 | 14 |
| Ex. 547 ..................................3 | | 58 | 1 |
| Ex. 629 ..................................3 | | 59 | 11 |
| Ex. 630 ..................................3 | | 60 | 9 |
| Ex. 631 – 632.............................3 | | 62 | 14 |
| Ex. 637 ..................................3 | | 62 | 14 |
| Ex. 657 ..................................3 | | 63 | 18 |
| Ex. 725 ..................................3 | | 26 | 11 |
| Ex. 732 ..................................3 | | 30 | 8 |
| Ex. 754 ..................................3 | | 32 | 15 |
| Ex. 2021 .................................3 | | 7 | 13 |

**FOR THE DEFENSE:**

| | VOL. | PAGE | LINE |
|---|---|---|---|
| Ex. 3407 .................................3 | | 85 | 13 |
| Ex. 3410 .................................3 | | 86 | 15 |
| Ex. 3452 .................................3 | | 74 | 22 |

1       ***TUESDAY, AUGUST 6, 2024, 9:18 A.M.***

2                          ***

3              *DIRECT EXAMINATION (RESUMED)*

4       **BY MS. CHOPRA:**

5       *Q.* Agent Tarwater, before we move on to a different topic,

6       there are two things to bring up related to Friday's testimony.

7       **A.  Okay.**

8            **MS. CHOPRA:** Can you turn to Exhibit 413, please?

9       **BY MS. CHOPRA:**

10      *Q.* If you recall, on Friday, we talked about this exhibit.  It

11      was admitted into evidence.

12      **A.  Yes.**

13      *Q.* Do you recall?

14      **A.  I do.**

15      *Q.* Okay.  And then related to this email that was admitted, was

16      there an attachment to the topmost email?

17      **A.  There was.**

18            **MS. CHOPRA:** Okay.  Can we turn to Exhibit 414, please?

19            And, Your Honor, I believe we admitted this during one

20      of the breaks.

21            **THE COURT:** We did.

22      **BY MS. CHOPRA:**

23      *Q.* Is this the attachment related to 413?

24      **A.  Yes.**

25      *Q.* And what is the date of this letter?

1    *A.   At the top, it says, December 23, 2015.*

2    *Q.   Okay.  And is this a letter that Mr. Destler sent in the*

3    *prior email chain?*

4    **A.   Correct.**

5    *Q.   And who was the letter addressed to?*

6    **A.   Stephen Mills.**

7    *Q.   Is he an attorney?*

8    **A.   He is.**

9    *Q.   And below that, in the body of this email, what does it say?*

10   **A.   It says "Please find below the answers to your questions.**

11   **Solomon AG is a Marshall Islands corporation controlled by**

12   **Kenneth Ciapala.**

13       **"Solomon AG has never served as an officer, director, or**

14   **control person of any type for First American Group, Inc. or**

15   **Loop Holdings, Inc.  Solomon AG has never owned more than**

16   **5 percent of the outstanding shares of either First American**

17   **Group, Inc. or Loop Holdings, Inc."**

18   *Q.   And I think you previously testified that you recognize*

19   *"Solomon AG."*

20   **A.   I do.**

21   *Q.   How do you recognize it?*

22   **A.   It's a Blacklight entity.**

23   *Q.   And there's a signature line below.*

24       *What's the name below that signature line?*

25   **A.   "Kenneth Ciapala."**

1  *Q.*  And I think you testified that you recall that name, too?

2  **A.  I do.**

3  *Q.*  Okay.  Who is that?

4  **A.  He was a founder and principal of Blacklight.**

5  *Q.*  Thank you.

6      On Friday, you also testified about a consulting agreement

7  between Loop Industries and Touchstone.

8      Do you recall that?

9  **A.  Yes.**

10  *Q.*  And related to that, do you -- following the entry of that

11  consulting agreement, was there a termination to that agreement

12  at some point?

13  **A.  I understand there was, yes.**

14          *MS. CHOPRA:*  Can we pull up Defense Exhibit 2021?

15          *THE COURT:*  It has not been admitted.

16          *MS. CHOPRA:*  It has not been admitted.

17  *BY MS. CHOPRA:*

18  *Q.*  Do you recognize this document?

19  **A.  I do.**

20  *Q.*  Is this the termination?

21  **A.  Yes.**

22  *Q.*  Okay.  And if we scroll through the various pages, whose

23  signatures do you see on this document?

24  **A.  For Loop Holdings, I see "Daniel Solomita" as president.**

25  *Q.*  Can we go to the next page.

1    And then?

2    **A.  For Touchstone Advisors, Inc., I see "Donald Danks, Managing**

3    **Director."  And then I see the signature block, "Jonathan**

4    **Destler, Managing Director," with no signature above it.**

5    *Q.*  I think there's one more page.

6    **A.  Ah, there's the signature for Jonathan Destler.**

7    *MS. CHOPRA:*  Your Honor, we'd like to move this into

8    evidence.

9    *THE COURT:*  Any objection?

10   *MR. HALL:*  No objection, Your Honor.

11   *MR. MILLER:*  No objection.

12   *THE COURT:*  2021 may be admitted.

13   *(Exhibit 2021 admitted.)*

14   *MS. CHOPRA:*  And can we go to the first page again,

15   please?

16   *BY MS. CHOPRA:*

17   *Q.*  In the -- in the first and second line of the first

18   paragraph, I think there's a date of this agreement.

19   Can you tell us that date?

20   **A.  "Termination agreement is entered into this 7th day of**

21   **June, 2015."  And, again, it's between Loop Holdings and**

22   **Touchstone Advisors, Inc., not Loop Industries.**

23   *Q.*  And is that about two or so weeks before Mr. Danks goes on

24   the board of Loop?

25   **A.  Correct.**

1          *MS. CHOPRA:*  Thank you.  You can take that down.

2     *BY MS. CHOPRA:*

3     *Q.*  Okay.  Turning to a different topic, did this investigation

4     include an undercover operation?

5     **A.  It did.**

6     *Q.*  Okay.  When did that undercover operation start?

7     **A.  Approximately February of 2020.**

8     *Q.*  Why did you choose to insert an undercover?

9     **A.  Gather evidence, corroborate evidence we'd already gathered,**

10    **try to ascertain the roles of different players in the alleged**

11    **scheme, try to ascertain if there's other depositories of**

12    **evidence that we should try to obtain, such as emails or cell**

13    **phones.**

14    *Q.*  Were you the undercover?

15    **A.  I was.**

16    *Q.*  Did you use a different name or your true name?

17    **A.  A cover identity, yes.**

18    *Q.*  What was the name?

19    **A.  J. Taylor.**

20    *Q.*  Before you decided to insert the undercover, how long had

21    you or other agents been investigating this case?

22    **A.  We opened the case, I think, in late 2019.**

23    *Q.*  And so how did you insert yourself as an undercover?

24    **A.  Through Gary Brennan, the son of Allan Brennan.**

25    *Q.*  How did you meet Gary Brennan?

1   **A.  We interviewed him in January of 2020.**

2   *Q.*  So what did you have Gary Brennan do?

3   **A.  He referred the undercover to Robert Lazerus.**

4   *Q.*  How did he do that?

5   **A.  Through an email.**

6   *Q.*  Do you know approximately when that email was?

7   **A.  February 2020.**

8   *Q.*  So what happened after that?

9   **A.  A few emails were exchanged, and then I first called Robert**

10  **Lazerus in May of 2020.**

11  *Q.*  So in addition to emailing, what other forms of

12  communication did you use, if any, to speak with Mr. Lazerus?

13  **A.  Telephone calls, in-person meetings, some emails, I believe**

14  **a few iMessages, and then WhatsApp was the primary chat**

15  **communication.**

16  *Q.*  Why was that?

17        ***MS. HALL:***  Objection as to --

18        ***THE COURT:***  Overruled.

19        ***THE WITNESS:***  We discussed that it was encrypted and

20  safer.

21  ***BY MS. CHOPRA:***

22  *Q.*  Do you recall how many phone calls, approximately, you had

23  with Mr. Lazerus?

24  **A.  Seven phone calls.**

25  *Q.*  And you said you met in person, too?

1    *A.*  **We did.**

2    *Q.*  Do you recall how many in-person meetings there were?

3    *A.*  **Four in-person meetings.**

4    *Q.*  Okay.  And then between that, you also had chats, it sounds

5    like?

6    *A.*  **We did, yes, ma'am.**

7    *Q.*  Were all of these communications recorded?

8    *A.*  **They were.**

9    *Q.*  And when was the last contact you had with Mr. Lazerus?

10   *A.*  **I believe the last undercover contact, February 3rd, 2022.**

11   *Q.*  So between about 2020 and February of 2022, you had seven

12   phone calls, is that what you said?

13   *A.*  **Yes, ma'am.**

14   *Q.*  How many in-person meetings?

15   *A.*  **Four in-person meetings.**

16   *Q.*  Okay.  Were all of those in-persons with Mr. Lazerus only?

17   *A.*  **All but one.**

18   *Q.*  And that one, who was it with?

19   *A.*  **The one -- other one was Robert Lazerus, Jonathan Destler,**

20   **and a second undercover agent.**

21   *Q.*  So there were four of you?

22   *A.*  **Yes, ma'am.**

23   *Q.*  How about all the calls, were they only with Mr. Lazerus?

24   *A.*  **They were all with just Robert Lazerus, yes, ma'am.**

25   *Q.*  What about the chats?

1    **A.   Just with Robert Lazerus.**

2    *Q.*   When you met with Mr. Lazerus in person, where did you

3    usually meet him?

4    **A.   Del Mar.**

5    *Q.*   At a specific place in Del Mar?

6    **A.   Pacific Breeze Café in Del Mar.**

7    *Q.*   A restaurant?

8    **A.   A restaurant, yes, ma'am.**

9    *Q.*   And when you met in person at the restaurant, did you order

10   food?

11   **A.   Yes.**

12   *Q.*   Okay.  Who paid for the food?

13   **A.   I did.**

14   *Q.*   Every time?

15   **A.   Yes.**

16   *Q.*   What about the dinner with Mr. Destler?

17   **A.   That was paid for by Mr. Destler.**

18   *Q.*   Okay.  So you paid for each meal during your in-person

19   meetings except that one?

20   **A.   Yes, ma'am.   Three lunches.**

21   *Q.*   Do you know the approximate cost of those lunches total?

22   **A.   A lunch entree approximated $15, and then a beverage might**

23   **be another $9.  And if you had a coffee or something, that would**

24   **be another four- or $5.**

25   *Q.*   Was it under about $300?

1    *A.*  **For total?**

2    *Q.*  Mm-hmm.

3    *A.*  **Yeah, that sounds right.**

4    *Q.*  In addition to paying for most of the meals, did you pay

5    Mr. Lazerus as part of the UC operation?

6    *A.*  **I did.**

7    *Q.*  How much did you pay in total?

8    *A.*  **$9,150.**

9    *Q.*  In what form?

10   *A.*  **Cash.**

11   *Q.*  Was that in one lump sum or more than one lump sum?

12   *A.*  **Two payments.**

13   *Q.*  What was the payment for?

14   *A.*  **Per an arrangement, we discussed it was profits -- purported**

15   **profits based on inside information.  I purportedly traded on**

16   **it, and it was a portion of those profits.**

17   *Q.*  Did he accept the cash that you gave him?

18   *A.*  **He did.**

19   *Q.*  So for your testimony today, have we selected certain clips

20   from the UC recordings and chats to present to the jury?

21   *A.*  **Yes, ma'am.**

22   *Q.*  And are these clips taken from the calls and in-person

23   meetings?

24   *A.*  **Yes.**

25   *Q.*  Were there transcriptions made of these calls and in-person

1    meetings?

2    **A.  Yes, ma'am.**

3    *Q.*  Have you reviewed the transcriptions and compared them to

4    the recordings?

5    **A.  I have.**

6    *Q.*  Do the transcriptions accurately transcribe the recorded

7    conversations?

8    **A.  They do.**

9    *Q.*  And are the transcriptions overlaid on the recordings to

10   assist the jury in understanding the recordings?

11   **A.  Yes.**

12   *Q.*  Can you turn to Exhibit 327 in your binder?

13   **A.  Okay.  I'm there.**

14   *Q.*  What do you see there?

15   **A.  A thumb drive.**

16   *Q.*  Does this thumb drive contain select clips from your

17   meetings and phone calls with Mr. Lazerus?

18   **A.  Yes.**

19   *Q.*  Does it also include some clips from that dinner between

20   Mr. Lazerus, Mr. Destler, and the other undercover?

21   **A.  Yes.**

22   *Q.*  Have you reviewed all the clips on there?

23   **A.  I have.**

24   *Q.*  How do you know you reviewed it?

25   **A.  I see my signature and the date when I reviewed it.**

1    *Q.* What's the date?

2    **A. Looks like July 31, 2024.**

3    *Q.* And are the recordings on there fair and accurate recordings

4    of the various calls and meetings you had as an undercover in

5    this case?

6    **A. Yes.**

7        ***MS. CHOPRA:*** Your Honor, at this point, I'd like to

8    admit certain recordings from that set that I previously

9    disclosed to the defense.

10       ***THE COURT:*** Are you going to specify as we go along

11   what you're admitting?

12       ***MS. CHOPRA:*** I have the full list of 20 here.  I can

13   say if it's helpful, or I can say as I go along.  Either way.

14       ***THE COURT:*** Okay.  Any objection -- you're only

15   admitting those clips, not all the clips on 327?

16       ***MS. CHOPRA:*** Yes.  Only 20 of them.  They're all

17   individual exhibit numbers and I can list them.

18       ***THE COURT:*** Yeah, why don't you?

19       ***MS. CHOPRA:*** 328, 331, 332, 333, 334, 336, 337, 338,

20   340, 341, 343, 346, 351, 353, 369, 370, 375, 376, 384, and 391.

21       ***THE CLERK:*** 394?

22       ***MS. CHOPRA:*** 391.

23       ***THE COURT:*** I've got 384 and 391?

24       ***MS. CHOPRA:*** Yes.  Those are the last two, Your Honor.

25       ***THE COURT:*** Okay.  Any objection to those being

1    admitted into evidence?  Not the -- not 327, but the other clips

2    that she just identified.

3           MR. HALL:  Your Honor, I just want to preserve an

4    objection that we had raised previously in motions.

5           THE COURT:  Okay.  Any previous objections may be

6    preserved.  Any other objections?

7           MR. HALL:  No, Your Honor.

8           MR. YOUNG:  No, Your Honor.

9           MS. HALL:  No, Your Honor.

10           THE COURT:  Okay.  They may be admitted.  So that would

11    be not 327, but the other ones:  328, 331 through 334, 336

12    through 338, 340, 341, 343, 346, 351, 353, 369 and 70, 375

13    and 76, 384, and 391 may be admitted.

14           *(Exhibits 328, 331, 332, 333, 334, 336, 337, 338, 340, 341,*

15           *343, 346, 351, 353, 369, 370, 375, 376, 384, and 391*

16           *admitted.)*

17    BY MS. CHOPRA:

18    Q.  So Agent Tarwater, when was your first call with

19    Mr. Lazerus?

20    A.  I believe on or about May 6, 2020.

21    Q.  And have we selected two clips from that call to play for

22    the jury?

23    A.  Yes, ma'am.

24           MS. CHOPRA:  Can we play Exhibit 328, please?

25           THE COURT:  And you said there are -- there's a

1  transcript with it?

2              **MS. CHOPRA:**  There are, Your Honor.

3              **THE COURT:**  Okay.  Ladies and gentlemen, I think I gave

4  you this instruction before the last time we heard one of these.

5  The transcription is just to aid you in trying to hear what's on

6  the tape.  If what you hear is different than what is

7  transcribed, it's what you hear that is the evidence, not the

8  transcription.  Okay.

9      **(Audio recording played.)**

10 **BY MS. CHOPRA:**

11 **Q.**  During this initial call, did Mr. Lazerus discuss more than

12 one company with you?

13 **A.  He did.**

14 **Q.**  How many companies?

15 **A.  Two.**

16 **Q.**  Which two?

17 **A.  Loop Industries and Opti-Harvest.**

18 **Q.**  During this call, there was a discussion about engineering a

19 company, and the financing of it, and putting together a

20 product.

21     What did that mean to you?

22 **A.  That Mr. Lazerus was involved in the company from the**

23 **beginning.**

24              **MS. HALL:**  Your Honor, I'll object as to what it meant

25 to him.  We have the tape.

1          **THE COURT:**  Sustained.

2    **BY MS. CHOPRA:**

3    **Q.**  Did Mr. Lazerus talk to you about engineering a company, and

4    the financing of it, and putting together a product?

5    **A.  He did.**

6          **MS. CHOPRA:**  I'd like to play 331.

7          **(Audio recording played.)**

8    **BY MS. CHOPRA:**

9    **Q.**  During that clip, there was discussion about Mr. Lazerus

10   being involved with both of these from the beginning.

11        What did you mean by that?

12   **A.  From the very early concept of the companies, he was**

13   **involved.**

14   **Q.**  Which companies?

15        **MS. HALL:**  I'll object, Your Honor, as to irrelevant

16   and speculation.

17        **THE COURT:**  Overruled.

18        **THE WITNESS:**  Loop Industries and Opti-Harvest.

19   **BY MS. CHOPRA:**

20   **Q.**  Did you have another call with Mr. Lazerus the following

21   day, on May 7th of 2020?

22   **A.  Yes.**

23   **Q.**  Have we selected some clips from that call as well?

24   **A.  Yes, ma'am.**

25        **MS. CHOPRA:**  Can you please play 332?

1    *(Audio recording played.)*

2    *BY MS. CHOPRA:*

3    *Q.*   In this clip, you discussed Gary and Allan.

4       Is that Gary and Allan Brennan?

5    *A.*   Yes, ma'am.

6          *MS. CHOPRA:*   Can we turn to Exhibit 333?

7       *(Audio recording played.)*

8    *BY MS. CHOPRA:*

9    *Q.*   During this call, did Mr. Lazerus mention that Loop shares

10   could be priced at over a hundred dollars a share in about two

11   to three years?

12   *A.*   Yes, ma'am.

13   *Q.*   Okay.  So two to three years from this call would be

14   approximately 2022 to 2023; is that right?

15   *A.*   Yes, ma'am.

16          *MS. CHOPRA:*   Can we go to Exhibit 308, please, which

17   has previously been admitted?

18          *MS. HALL:*   Your Honor, I'll object to using this in

19   this context since there are several intervening events.

20          *THE COURT:*   Overruled.

21   *BY MS. CHOPRA:*

22   *Q.*   Can you please tell us approximately the price of Loop stock

23   at the end of this chart, which would be February 3rd of 2022?

24   *A.*   **It appears to be around $8 per share.**

25          *MS. CHOPRA:*   Can we turn to Exhibit 334?

1    *(Audio recording played.)*

2    *BY MS. CHOPRA:*

3    *Q.* In this conversation, Mr. Lazerus mentioned engineering a

4    company for someone named Danny.

5        Who did you understand Danny to be?

6    *A.* **Daniel Solomita.**

7    *Q.* Later in this conversation, did Mr. Lazerus describe for you

8    his role in working with companies like Loop and Opti-Harvest?

9    *A.* **Yes.**

10   *Q.* What did he describe his role as?

11           *MS. HALL:* Objection. The transcript speaks for

12   itself.

13           *THE COURT:* Sustained.

14   *BY MS. CHOPRA:*

15   *Q.* After that transcript that we just heard, later in your

16   conversation with Mr. Lazerus, did he describe his role with

17   you?

18   *A.* **He did.**

19   *Q.* What did he describe your role to be?

20   *A.* **Bring in investors.**

21   *Q.* Did he tell you that he had worked with other companies in

22   the past?

23   *A.* **Yes.**

24   *Q.* Approximately how many companies?

25   *A.* **Approximately 10 companies.**

1          **MS. CHOPRA:**  I'd like to turn to Exhibit 336.

2      **(Audio recording played.)**

3  **BY MS. CHOPRA:**

4  *Q.*  During this call, did you offer to pay Mr. Lazerus?

5  **A.  I told him I didn't expect him to work for free, and how**

6  **would that work.**

7  *Q.*  And there's also some discussion in this call about a

8  long-term play.

9      Did that have any meaning to you?

10          **MS. HALL:**  I'll object as --

11          **THE COURT:**  Overruled.

12          **THE WITNESS:**  That the investment over long term would

13  be lucrative.

14  **BY MS. CHOPRA:**

15  *Q.*  After this May 7th call, did you have your first in-person

16  meeting with Mr. Lazerus?

17  **A.  Yes.**

18  *Q.*  Was that on June 16th of 2020?

19  **A.  Yes.**

20  *Q.*  Did you meet at a restaurant in Del Mar?

21  **A.  Yes, ma'am.**

22  *Q.*  And do we have clips from that in person meeting as well?

23  **A.  We do.**

24          **MS. CHOPRA:**  Okay.  Can we play 337?

25      **(Audio recording played.)**

1    **MS. CHOPRA:**  Your Honor, that was a little fainter than

2    the prior ones.  Can we make sure the jury heard that?  Did

3    everyone hear that?  Okay.

4    **THE COURT:**  They're giving a thumbs up.

5    **MS. CHOPRA:**  Thank you.

6    **BY MS. CHOPRA:**

7    **Q.**  Agent Tarwater, in these transcripts, I see an "OV" in

8    parentheses and a "UI" in parentheses.

9    What does that represent?

10   **A.  If we're talking over each other, the transcriber can't**

11   **figure out what was said.**

12   **MS. HALL:**  Objection as to "the transcriber."

13   **THE COURT:**  Sustained.

14   **MS. HALL:**  No objection as to what the initials stand

15   for.

16   **THE COURT:**  I'll strike "the transcriber can't figure

17   out what was said," but I'll leave the rest of the answer.

18   **MS. HALL:**  Thank you.

19   **MS. CHOPRA:**  Can we turn to Exhibit 338, please?

20   *(Audio recording played.)*

21   **BY MS. CHOPRA:**

22   **Q.**  During this conversation, Mr. Lazerus mentioned a contract

23   that would be announced soon.

24   Do you know whether Loop announced any contracts after

25   June 16th of 2020?

1    *A.  **They did.***

2    *Q.*  When?

3    *A.  **They had a significant contract they announced in June 2021.***

4    *Q.*  Was there any in June 2020 -- sorry -- in 2020, the

5    year 2020?

6    *A.  **Not that I recall.***

7         *MS. CHOPRA:*  Can we turn to Exhibit 624 real quick?

8    *BY MS. CHOPRA:*

9    *Q.*  I'm showing you an exhibit that hasn't been admitted into

10   evidence.

11       Can you see if that refreshes your memory on whether there

12   was an announcement in 2020?

13        *MR. YOUNG:*  Objection, Your Honor.  Improper refresh.

14        *MS. HALL:*  Agreed.

15        *MS. CHOPRA:*  I can ask the question again, Your Honor.

16        *THE COURT:*  Sustained.

17   *BY MS. CHOPRA:*

18   *Q.*  Would a press release from that year help refresh your

19   memory?

20   *A.  **I do recall this press release.  That was discussed later***

21   *with Robert Lazerus, but I don't know that that's what he was*

22   *discussing that day.*

23   *Q.*  Okay.

24   *A.  **It's hard to tell.  But I do recall this press release.***

25        *MS. CHOPRA:*  So let's go back to 340, please.

1        *(Audio recording played.)*

2             MS. CHOPRA:  Next, could we play 341, please?

3        *(Audio recording played.)*

4    *BY MS. CHOPRA:*

5    *Q.*  During this conversation, did you and Mr. Lazerus talk about

6    Mr. Lazerus potentially getting some type of profit?

7    **A.  Yes.**

8    *Q.*  And was it about 10 percent?

9    **A.  Yes, ma'am.**

10   *Q.*  Okay.  And did he bring up 10 percent or did you bring

11   up 10 percent?

12   **A.  He brought up 10 percent after I asked how to do the**

13   **arrangement.**

14           *MS. HALL:*  Your Honor, I'll object to just reiterating

15   the tape.

16           *THE COURT:*  Sustained.  Tape speaks for itself.  We

17   don't need to repeat everything that's in the tape.

18           *MS. CHOPRA:*  I'd like to turn to 343, please.

19       *(Audio recording played.)*

20   *BY MS. CHOPRA:*

21   *Q.*  During that conversation, you used the words "pretty tight

22   float."

23       What does that mean?

24   **A.  The number of shares out there in the market that can be**

25   **publicly traded.**

1    *Q.*  What does it mean in terms of the number of shares?

2    **A.  If it's a tight float, there's not that many shares out**

3    **there in the market, so there wasn't a lot of volume in the**

4    **stock being traded.**

5            *MS. HALL:*  Objection as to any expert testimony.

6            *THE COURT:*  Overruled.

7    *BY MS. CHOPRA:*

8    *Q.*  Following that in-person meeting, did you have another phone

9    call with Mr. Lazerus on June 18th of 2020?

10   **A.  Yes, ma'am.**

11   *Q.*  During that call, did Mr. Lazerus talk to you about

12   Mr. Destler?

13   **A.  Yes.**

14   *Q.*  And did he say that he was willing to set up a meeting with

15   Mr. Destler?

16   **A.  Yes.**

17           *MS. CHOPRA:*  I'd like to play 346, please.

18       **(Audio recording played.)**

19   *BY MS. CHOPRA:*

20   *Q.*  Following this phone call, did you have an in-person meeting

21   with Mr. Lazerus on June 23rd of 2020?

22   **A.  Yes.**

23   *Q.*  Okay.  And was that the dinner that also included

24   Mr. Destler and another UC?

25   **A.  Yes, ma'am.**

1  *Q.*  During that meeting, did Mr. Destler talk to you about his

2  role, if any, in the formation of Loop?

3  *A.*  **Yes.**

4       *MS. CHOPRA:*  I'd like to play 351, please.

5  *(Audio recording played.)*

6       *MS. CHOPRA:*  And can we play 353, please?

7  *(Audio recording played.)*

8  *BY MS. CHOPRA:*

9  *Q.*  And then after that dinner meeting, did you have a phone

10  call with Mr. Lazerus on June 24th of 2020?

11  *A.*  **Yes, ma'am.**

12  *Q.*  During that phone call, did you discuss possibly paying him

13  a higher amount?

14  *A.*  **Yes.**

15  *Q.*  How much did you discuss?

16  *A.*  **I believe there was mention of 20 percent.**

17  *Q.*  And do you recall Mr. Lazerus' response?

18  *A.*  **I think he was appreciative.**

19  *Q.*  So we mentioned that you also messaged each other.

20       *MS. CHOPRA:*  Can we turn to Exhibit 725, please?

21       *THE CLERK:*  You said 725?

22       *MS. CHOPRA:*  725.  This is not in evidence yet.

23  *BY MS. CHOPRA:*

24  *Q.*  Do you recognize these chats?

25  *A.*  **I do.**

1    *Q.* What are they?

2    **A. They're chats between myself, using the cover identity, and**

3    **Robert Lazerus.**

4          *MS. CHOPRA:* Your Honor, I'd like to admit these chats

5    into evidence.

6          *THE COURT:* Any objection to 725?

7          *MS. HALL:* No, Your Honor.

8          *MR. HALL:* No, Your Honor.

9          *MR. YOUNG:* No.

10          *THE COURT:* 725 may be admitted.

11     *(Exhibit 725 admitted.)*

12    *BY MS. CHOPRA:*

13    *Q.* Okay. Looking at these, can you read these, Agent Tarwater?

14    Let's blow them up.

15    **A. Yes.**

16    *Q.* What's the date -- if you can see that -- of the first chat?

17    **A. September 8, 2020.**

18    *Q.* Okay. And are you -- I think there's green boxes and blue

19    boxes.

20          Who's who?

21    **A. Robert Lazerus is in green.**

22    *Q.* So can we walk through this, please? Can you read for us

23    these chats?

24          *THE COURT:* They've been admitted into evidence,

25    Counsel.

1        *MS. CHOPRA:*  Okay.

2   *BY MS. CHOPRA:*

3   *Q.*  During these chats, did Mr. Lazerus tell you to keep

4   watching Loop?

5   **A.  He did.**

6           *MS. HALL:*  I'll object to reiterating the evidence.

7           *THE COURT:*  Sustained.

8   *BY MS. CHOPRA:*

9   *Q.*  Let's move on to another meeting you had.

10       Was there another meeting on December 4th of 2020?

11  **A.  Yes, ma'am.**

12  *Q.*  Was that in person or by phone?

13  **A.  I believe that was in person.**

14  *Q.*  And have we picked out certain conversations from that

15  in-person meeting to play for the jury?

16  **A.  Yes, ma'am.**

17          *MS. CHOPRA:*  Can we please play Exhibit 369?

18      *(Audio recording played.)*

19          *MS. CHOPRA:*  Then can we play 370, please?

20      *(Audio recording played.)*

21  *BY MS. CHOPRA:*

22  *Q.*  So a few months later, was your next meeting with

23  Mr. Lazerus in May of 2021?

24  **A.  Yes, ma'am.**

25  *Q.*  And was that in person?

1    *A.  I believe so, yes.*

2           *MS. CHOPRA:*  And can we please play 375?

3       *(Audio recording played.)*

4    *BY MS. CHOPRA:*

5    *Q.*  During that conversation, there was a mention of a deal with

6    the Koreans.

7    *A.  Yes, ma'am.*

8    *Q.*  Was there later news released by Loop about a deal with the

9    Koreans?

10   *A.  Yes, the next month.*

11   *Q.*  So after this conversation?

12   *A.  Yes.*

13          *MS. CHOPRA:*  Could we please play 376?

14      *(Audio recording played.)*

15   *BY MS. CHOPRA:*

16   *Q.*  There was mention of the SK deal.

17      Is that the deal with the Koreans that you were just talking

18   about?

19   *A.  Yes, ma'am.*

20   *Q.*  Later on in this conversation, after these clips that we've

21   played, did Mr. Lazerus talk to you about Allan Brennan?

22   *A.  Yes.*

23   *Q.*  Okay.  Did he tell you to tell Allan Brennan to just hold

24   his stock?

25   *A.  Yes.*

1    *Q.*  And did that mean anything to you?

2    **A.  He didn't want Allan Brennan selling stock.**

3    *Q.*  During --

4            *MS. HALL:*  Objection as to what it meant to him.

5            *THE COURT:*  Sustained.

6            *MS. HALL:*  Move to strike.

7            *THE COURT:*  It will be stricken.

8    *BY MS. CHOPRA:*

9    *Q.*  During your conversations overall with Mr. Lazerus, did he

10   tell you more than once to hold onto stock?

11   **A.  Yes.**

12   *Q.*  Later on in this conversation, did you offer to pay

13   Mr. Lazerus 20 percent as a commission?

14   **A.  Yes.**

15   *Q.*  Okay.  Did he accept that offer?

16   **A.  Yes.**

17   *Q.*  The following day, on May 21st of 2021, do you have a text

18   conversation with Mr. Lazerus?

19   **A.  Yes.**

20           *MS. CHOPRA:*  Can we pull up 732, which is not in

21   evidence yet?

22   *BY MS. CHOPRA:*

23   *Q.*  Is this that text conversation?

24   **A.  This is.**

25   *Q.*  Is it between you and Mr. Lazerus?

1    *A.  It is.*

2            *MS. CHOPRA:*  Your Honor, move to admit this.

3            *THE COURT:*  Any objection to 732?

4            *MR. HALL:*  No, Your Honor.

5            *MR. YOUNG:*  No.

6            *MS. HALL:*  No.

7            *THE COURT:*  732 may be admitted.

8        *(Exhibit 732 admitted.)*

9    *BY MS. CHOPRA:*

10   *Q.*  In this conversation, did he say he just got off the phone

11   with Jon?

12   *A.  Yes.*

13           *MS. HALL:*  Objection.  Just restating the text message.

14           *THE COURT:*  Sustained.  But if you're going to do that,

15   we need to blow it up higher.  I mean, I don't think everyone

16   can see.

17           *MS. CHOPRA:*  Your Honor, I'm setting up the call that

18   is to come.

19   *BY MS. CHOPRA:*

20   *Q.*  Did you end up getting on the phone with Mr. Lazerus after

21   this text conversation?

22   *A.  Yes.*

23   *Q.*  Okay.  And was that call the same day, May 21st of 2021?

24   *A.  Yes.*

25   *Q.*  Okay.  During that call, did he talk to you about

1    information he had received from Jon?

2    **A.  Yes.**

3         *MS. CHOPRA:*  Can we play 384, please?

4    *(Audio recording played.)*

5         *THE COURT:*  Okay.  Would now be a good time to take a

6    break?

7         *MS. CHOPRA:*  Sure, Your Honor.

8    *(Colloquy; reported but not transcribed herein.  Recess*

9    *taken.)*

10        *THE COURT:*  Okay.  We are back on the record.  All

11   jurors are present.  All lawyers are present.  And the

12   defendants are present.  Sir, you're reminded you're still under

13   oath to tell the truth.

14        Ms. Chopra.

15   *BY MS. CHOPRA:*

16   *Q.*  Agent Tarwater, before the break, we played a clip that

17   discussed a deal with SK.

18        Do you recall that?

19   **A.  Yes, ma'am.**

20   *Q.*  And was that the SK Global deal that you were talking about?

21   **A.  It was.**

22   *Q.*  Okay.  And around when did that deal -- or was that press

23   release released?

24   **A.  On or about June 23rd, 2021.**

25        *MS. CHOPRA:*  Can we turn to Exhibit 754, which is not

1    yet in evidence?

2    *BY MS. CHOPRA:*

3    *Q.*  Do you recognize this document?

4    *A.*  **I do.**

5    *Q.*  What is it?

6    *A.*  **It's a Loop Industries Price Volume Chart for the year 2021.**

7         *MS. CHOPRA:*  I believe, Your Honor, we had a prior

8    agreement with the defense about this chart.

9         *THE COURT:*  Any objection to 754 coming into evidence?

10        *MR. HALL:*  None, Your Honor.

11        *MR. YOUNG:*  No, Your Honor.

12        *MS. HALL:*  No, Your Honor.

13        *THE COURT:*  Okay.  754 may be admitted and may be

14   displayed to the jury.

15       *(Exhibit 754 admitted.)*

16   *BY MS. CHOPRA:*

17   *Q.*  All right.  So what are we looking at in this chart?

18   *A.*  **This is Loop Industries.  It's a Price Volume Chart for the**

19   **year 2021.**

20   *Q.*  Okay.  And is there -- are there lines for the price per

21   share during that time period?

22   *A.*  **There are.**

23   *Q.*  Okay.  And can you see on this chart the approximate

24   timeframe for when the SK Global deal was announced?

25   *A.*  **Yes.**

1    *Q.* Okay. Where is that, if you can kind of point us in that

2    direction?

3    **A. It's almost right in the middle of the chart where the --**

4    **there's a spike in the amount of volume getting up**

5    **near 9 million shares.**

6    *Q.* Okay. That tallest bar right there in the middle?

7    **A. Yes, ma'am.**

8         *MS. CHOPRA:* We can take that down. Thank you.

9    *BY MS. CHOPRA:*

10   *Q.* Did you next have a meeting with Mr. Lazerus on December 9th

11   of 2021?

12   **A. Yes, ma'am.**

13   *Q.* And was that in person?

14   **A. Yes.**

15   *Q.* During that meeting, did Mr. Lazerus receive a phone call

16   from Jonathan Destler?

17   **A. He did.**

18   *Q.* And then did he get on the phone with Mr. Destler while

19   sitting next to you?

20   **A. He did.**

21   *Q.* Is there a clip that kind of captures that phone call as you

22   were sitting next to Mr. Lazerus?

23   **A. Yes.**

24        *MS. CHOPRA:* Can we play 391, please?

25        *(Audio recording played.)*

1           *MS. CHOPRA:*  We can stop it there.

2   *BY MS. CHOPRA:*

3   *Q.* During that meeting as well, later on after that clip, did

4   Mr. Lazerus talk to you about bringing in shareholders to

5   companies?

6   *A.* **Yes.**

7   *Q.* Did he tell you that that was some of his role?

8   *A.* **Yes.**

9   *Q.* Okay.  Did he tell you if he got paid for that role?

10  *A.* **Yes.**

11  *Q.* Did he tell you how much he got paid?

12  *A.* **Somewhere between 10 and 20 percent.**

13  *Q.* Okay.  Earlier in your testimony, a few days ago, you

14  mentioned whether the FBI interviewed Allan Brennan.

15       Do you recall that?

16  *A.* **Yes, ma'am.**

17  *Q.* Did Allan Brennan unfortunately pass away during the time

18  that you were engaging in your undercover work?

19  *A.* **Yes.**

20  *Q.* And do you remember approximately when he passed away?

21  *A.* **I believe it was October 31, 2021.**

22          *MS. CHOPRA:*  And, Your Honor, I'd like to read a

23  stipulation into the record.

24          *THE COURT:*  Okay.

25          *MS. CHOPRA:*  The parties stipulate that Allan Brennan

1  died on October 31st of 2021.

2            *MR. HALL:*  So stipulated, Your Honor.

3            *MR. YOUNG:*  So stipulated.

4            *MS. HALL:*  So stipulated.

5            *THE COURT:*  Okay.  You must accept that as true.

6  *BY MS. CHOPRA:*

7  *Q.*  And there was some conversation between you and Mr. Lazerus

8  about Gary Brennan and Allan Brennan; is that right?

9  **A.  Yes, ma'am.**

10  *Q.*  Okay.  So during this period that you were having these

11  conversations, did you ask Mr. Brennan to submit to an interview

12  with the FBI?

13            *THE COURT:*  I think we should make it clear for the

14  record, since you've mentioned both Gary and Allan, who you mean

15  by Mr. Brennan.

16  *BY MS. CHOPRA:*

17  *Q.*  I'm sorry.  I meant Allan Brennan.

18       Did you ask Mr. Allan Brennan to submit to an interview with

19  the FBI?

20  **A.  We did not.**

21  *Q.*  Why not?

22            *MS. HALL:*  Objection.

23            *THE COURT:*  Overruled.

24            *THE WITNESS:*  As I testified to earlier, we had first

25  attempted to interview Allan Brennan, and then about a week

1   later, we interviewed Gary Brennan, his son, and his financial

2   advisor from --

3           **MS. HALL:**  I'll object as to any hearsay.

4           **THE COURT:**  Well, at this point, I haven't seen any or

5   heard.  So you made an attempt to interview Allan Brennan, and

6   why did you not interview Allan Brennan I think is the question.

7           **THE WITNESS:**  Based on what they told us, we didn't

8   think --

9           **MS. HALL:**  Objection.  Hearsay.

10          **THE COURT:**  I will admit the answer based only on the

11   effect on the listener, not for the truth of the matter.  So

12   ladies and gentlemen, whatever he said Gary Brennan told him is

13   not being admitted for the truth.  It's only being admitted, and

14   you should consider it only for the limits purpose of what that

15   caused this witness to do, the effect on him.

16          **THE WITNESS:**  May I continue?

17          **THE COURT:**  You may answer.

18          **THE WITNESS:**  Okay.  Thank you, Your Honor.

19          Based on what both those people said, they indicated

20   that Robert Lazerus was exercising --

21          **MS. HALL:**  Objection.  Motion to strike.  Previous

22   ruling of the Court.

23          **THE COURT:**  I think we need to take it up outside the

24   presence of the jury, so why don't you move on.

25          **MS. CHOPRA:**  Your Honor, I have a separate question

1    that may address this issue.

2            **THE COURT:**  Okay.

3    **BY MS. CHOPRA:**

4    **Q.**  Okay.  Was there anything that you understood during your

5    investigation between the interactions between Mr. Lazerus and

6    Mr. Brennan that caused you, the FBI, not to interview

7    Mr. Brennan?

8    **A.  If you mean Allan Brennan, yes.**

9    **Q.**  Allan Brennan, yes.

10   **A.  Yes, ma'am.**

11   **Q.**  Okay.  What was that issue in terms of their interactions

12   that caused you concern?

13           **MS. HALL:**  Objection as to what the issue is.  I think

14   the answer was sufficient.

15           **THE COURT:**  Overruled.  You may answer.

16           **THE WITNESS:**  The issue was the level of control

17   Robert --

18           **MS. HALL:**  Objection.  Motion to strike.  And also

19   based on hearsay.

20           **THE COURT:**  It seems like it's the same issue.  We

21   should take it up outside the presence of the jury.

22           **MS. CHOPRA:**  Okay.  I believe the answer will be

23   different, but we can address that afterwards.

24           **THE COURT:**  Okay.

25   *///*

1    **BY MS. CHOPRA:**

2    *Q.*  During this case, did Mr. Destler agree to sit down with the

3    FBI and the prosecutors to provide a statement?

4    **A.  Yes.**

5    *Q.*  Do you remember approximately when that was?

6    **A.  October 2022, approximately.**

7    *Q.*  Was he accompanied by his attorneys when he made this

8    statement?

9    **A.  Yes.**

10   *Q.*  Okay.  So let's walk through his statement.

11       During the time that you talked to Mr. Destler -- actually,

12   were you present during that statement?

13   **A.  I was.**

14   *Q.*  Did Mr. Destler provide a professional background for

15   himself?

16   **A.  He did.**

17   *Q.*  What did he say?

18   **A.  He said words to the effect of he'd been in the capital**

19   **markets arena for 25 years, including investor relations work.**

20   **And that for the last 10 or so years, he'd been focused more on**

21   **early-stage technologies.**

22           *MR. HALL:*  Your Honor, might this be an appropriate

23   time for an instruction regarding this testimony?  I can be more

24   specific.

25           *THE COURT:*  Yes, it would be helpful.

1          **MR. HALL:**  A limiting instruction regarding the

2     admission of these statements.

3          **THE COURT:**  Ladies and gentlemen, this statement is

4     being admitted solely against Mr. Destler.  It should not be

5     construed against any of the other defendants.  So you may only

6     consider any statements that Mr. Destler made with respect to

7     his culpability and not for any culpability of either of the

8     other two defendants.

9     *BY MS. CHOPRA:*

10    *Q.*  I think you started to say that he stated that he was in

11    capital markets for 25 years; is that right?

12    **A.  Yes, ma'am.**

13    *Q.*  Can you complete your answer?

14    **A.  That included investor relations work, and that for the**

15    **last 10 or so years, he'd been more focused on early-stage**

16    **technologies.**

17    *Q.*  Did he tell you if and how he got involved in Loop?

18    **A.  He did.**

19    *Q.*  What did he say?

20    **A.  He said he was introduced to Loop when he met Daniel**

21    **Solomita around approximately September 2014.**

22    *Q.*  Did he talk to you about how Loop Holdings was formed?

23    **A.  Yes.**

24    *Q.*  What did he say?

25    **A.  He said that he and Solomita and another person wanted to**

1  move forward with the Loop project, and they formed Loop

2  Holdings.

3  *Q.* Did he talk to you about the role that Solomita wanted to

4  take in Loop?

5  **A. Yes.**

6  *Q.* What did he say?

7  **A. Solomita wanted to be the CEO and he wanted help raising**

8  **capital.**

9  *Q.* Did he talk to you about whether and how many shares

10  Solomita received?

11  **A. A majority of the stock.**

12  *Q.* And did Mr. Destler say that he received any shares of Loop?

13  **A. He did.**

14  *Q.* How many?

15  **A. He said he received founder shares at less than a penny a**

16  **share.**

17  *Q.* Did he say whether he received a million founder's shares?

18            *MR. YOUNG:* Objection.  Leading.

19            *THE COURT:* I'll allow it.

20            *THE WITNESS:* Yes.

21  *BY MS. CHOPRA:*

22  *Q.* Did Mr. Destler talk to you about a reverse merger involving

23  Loop Holdings?

24  **A. He did.**

25  *Q.* What did he say?

1    **A.   The project needed more capital, and so the group discussed**

2    **doing a reverse merger for Loop Holdings.   And Mr. Destler**

3    **stated he was familiar with taking a company public through**

4    **reverse merger, so he brought his expertise to bear.**

5    *Q.*  And then did he talk to you about David Stephens at all?

6    **A.   He did.**

7    *Q.*  What did he say?

8    **A.   Around the same time period, he had done other projects with**

9    **David Stephens, so he was aware that David Stephens had**

10   **connections to other public companies that might be open to**

11   **doing a reverse merger.   He thought he had met David Stephens**

12   **about a year prior, possibly through Tom Puzzo.**

13        **And do you want me to go on, on David Stephens?**

14   *Q.*  Yes, please.

15   **A.   Okay.   And then he told David Stephens about the Loop**

16   **project.   David Stephens was interested.   And so he introduced**

17   **David Stephens to Daniel Solomita.   And then David Stephens**

18   **got -- is the one that brought the FAMG shell to the project.**

19   *Q.*  What else did he say about FAMG, if anything?

20   **A.   He, Mr. Destler, stated that he assessed the FAMG shell,**

21   **including the shareholder list, and did recall that all the**

22   **free-trading shares were held in about 10 to 11 accounts, that**

23   **the majority of the shares were held by insiders.**

24   *Q.*  Did he say whether he knew if the shares were controlled by

25   one or more people as a group?

1  **A.  He stated he did not believe there was an affiliation**
2  **between the sellers of the shares.**
3  *Q.*  Did he talk about any efforts to avoid disclosures?
4  **A.  He stated he did not try to avoid the 5 percent disclosure**
5  **rule.**
6  *Q.*  Did he discuss Mr. Allan Brennan?
7  **A.  He did.**
8  *Q.*  What did he say?
9  **A.  He stated he met Allan Brennan on one occasion to tell him**
10  **about an investment opportunity in Opti-Harvest, and couldn't**
11  **recall if he discussed Loop or not with him.**
12  *Q.*  Did he discuss with you trading in Loop stock?
13  **A.  He did.**
14  *Q.*  What did he say?
15  **A.  He stated that at times, the market for Loop was illiquid.**
16  **I'm trying to remember some of the other things he said.**
17  *Q.*  Did he talk about Loop up-listing?
18  **A.  He stated that it was a hope that Loop would up-list.**
19  *Q.*  Did he talk about if he tried to help with the fact that the
20  Loop stock was illiquid?
21  **A.  Mr. Destler stated he made introductions to institutional**
22  **investors and research analysts to try to -- to help.**
23  *Q.*  Did he talk about introducing Loop to new investors?
24  **A.  Yes.**
25  *Q.*  What did he say in that vein?

1   **A.   He stated he was one of several people who were introducing**

2   **potential investors to Loop.**

3   *Q.*   Was another person James Harrison?

4   **A.   Yes.**

5   *Q.*   Among others?

6   **A.   Yes.**

7   *Q.*   Did he talk about giving commissions to any other person to

8   help him place Loop stock?

9   **A.   People who were bringing investors to Loop were compensated.**

10  *Q.*   And did he talk about margin loans?

11  **A.   He did.**

12  *Q.*   What did he say?

13  **A.   Mr. Destler confirmed he got -- he had Loop stock deposited**

14  **in brokerage accounts, and he took margin loans off that stock,**

15  **and received both cash and used the margin loans to buy other**

16  **stocks in his brokerage account.**

17  *Q.*   So in connection with this case, turning back to Mr. Lazerus

18  now, towards the end of your time as an undercover, did you set

19  up a meeting with Mr. Lazerus in February of 2022?

20  **A.   Yes, ma'am.**

21  *Q.*   And what date was that in February?

22  **A.   February 3rd, 2022.**

23  *Q.*   And did Mr. Lazerus agree to meet with you that day?

24  **A.   He did.**

25  *Q.*   Where did you guys agree to meet?

1    *A.   The Snooze Eatery.   It's a, like, breakfast/lunch place in*

2    *Del Mar.*

3    *Q.*   Around what time of day was that?

4    *A.   You're testing my memory.   I think 10:00 a.m.*

5    *Q.*   Okay.   The morning time.

6    *A.   Yes, ma'am.*

7    *Q.*   Okay.   And was a meeting set up under the pretext of your

8    undercover operation?

9    *A.   Yes.*

10   *Q.*   How did you set it up?

11   *A.   I believe via WhatsApp chat, asked if he could meet at that*

12   *time and place.*

13   *Q.*   What was your actual intended plan that day?

14   *A.   Our actual plan was to tell Mr. Lazerus that we were, in*

15   *fact, FBI agents and see if he would cooperate with the*

16   *Government.*

17   *Q.*   So you planned to go overt with him?

18   *A.   Yes.*

19   *Q.*   Okay.   So did you arrive at Snooze that morning?

20   *A.   Yes, ma'am.*

21   *Q.*   Were you by yourself or with other agents?

22   *A.   With other agents.*

23   *Q.*   How many?

24   *A.   I was with one agent at the table.   There were two other*

25   *agents inside the restaurant.   And then approximately four*

1    **agents outside the restaurant --**

2    *Q.*  Why so many?

3    **A.  -- is my memory.**

4        **It's standard.  It's for safety concerns.**

5    *Q.*  And were you all in plain clothes or were you wearing some

6    type of FBI jacket or gear?

7    **A.  All plain clothes.**

8    *Q.*  Were you armed?

9    **A.  I was not armed, no.**

10   *Q.*  You were not.

11   **A.  I was not.**

12   *Q.*  What about other agents?

13   **A.  They were.  Not visibly armed, but they were armed.**

14   *Q.*  And did Mr. Lazerus arrive at Snooze as agreed upon?

15   **A.  He did.**

16   *Q.*  Who arrived first, the agents or Mr. Lazerus?

17   **A.  The agents.**

18   *Q.*  And so what happened when he arrived?

19   **A.  He came into the restaurant and saw me sitting at a table**

20   **with one other agent.  When he walked to the table, the other**

21   **agent got up.  We were in a booth.  The other agent got up.**

22   **Mr. Lazerus slid in so he was directly across from me, and then**

23   **the other agent sat down next to him.**

24   *Q.*  Okay.  So there were three of you at the booth?

25   **A.  Yes, ma'am.**

1    *Q.* And you on one side and Mr. Lazerus and an agent on the
2    other side?
3    **A. Yes, ma'am.**
4    *Q.* Who was the other agent?
5    **A. David Patterson.**
6    *Q.* Was there a reason that Mr. Lazerus was on the inside part
7    of the booth versus the outside part of the booth?
8    **A. Well, he slid over to choose that seat, but we were hoping**
9    **he would pick that seat, just because for safety, he would be --**
10   **he wouldn't be able to sort of run out into the public without**
11   **another agent at least in his way.**
12   *Q.* So you were also making some safety assessments at that
13   time?
14   **A. Yes.**
15   *Q.* Okay.  And so when Mr. Lazerus sat down, what happened next?
16   **A. Then he ordered a hot chocolate, and we waited many minutes**
17   **for the hot chocolate to be delivered.**
18   *Q.* And what did you talk about during that time?
19   **A. Just the weather.  I mean, nothing of substance.**
20   *Q.* Okay.  Were you able to assess his demeanor as you sat with
21   him?
22   **A. Yes.**
23   *Q.* What was his demeanor like?
24   **A. Relaxed.**
25   *Q.* Did the hot chocolate eventually arrive?

1  *A.* **Yes.**

2  *Q.* Okay.  And what happened after that?

3  *A.* **Then we told him that we were FBI agents.  So we went overt**

4  **and showed him our identification.**

5  *Q.* What was his reaction?

6  *A.* **He didn't really have any visible reaction, just listening.**

7  *Q.* And then what happened after that?

8  *A.* **Then we explained his options, and that there was a criminal**

9  **complaint and an arrest warrant.  And he could -- it was up to**

10  **him, but he could listen to what we had to say about the**

11  **opportunity to cooperate and not be arrested and not have a**

12  **complaint go through, or he could be arrested and go that route.**

13  *Q.* Did he respond after you gave him those options?

14  *A.* **We actually asked him not to respond.  We told him we don't**

15  **want him to make any statements at all.  We just wanted to**

16  **explain how the process would work for both sort of options, and**

17  **then he could choose.**

18  *Q.* What happened after that?

19  *A.* **Then we explained each fact and the options.**

20  *Q.* Did he eventually choose a path?

21  *A.* **He did.**

22  *Q.* What did he choose?

23  *A.* **He chose to cooperate.**

24  *Q.* Okay.  So what happened after that?

25  *A.* **Then we got up from the table and told him we should --**

1    **we're not going to be arresting him.  We're going to be talking**

2    **about what cooperation could look like.  And we left the**

3    **restaurant together.**

4    *Q.*  And before we get to the next part, was any part of your

5    restaurant conversation recorded, like, audio recorded?

6    *A.*  **No.**

7    *Q.*  Why not?

8    *A.*  **At that time, we don't -- we didn't record any operation**

9    **that we thought could end up in an arrest.  And we also**

10   **weren't -- we don't arrest -- we don't record arrest operations.**

11   **At that time, we didn't.**

12   *Q.*  And so you mentioned that you walked out with Mr. Lazerus.

13      Was he in handcuffs?

14   *A.*  **No, at no time that day.**

15   *Q.*  So when you walked out of the restaurant, how many -- it was

16   Mr. Lazerus and how many agents?

17   *A.*  **Agent Patterson and I walked out with him.  And then two**

18   **other agents eventually joined us by Mr. Lazerus' car.**

19   *Q.*  Okay.  Then what happened after that?

20   *A.*  **We asked him where he would be comfortable talking, and he**

21   **said his home.  We gave him numerous options, but let him pick,**

22   **and he said his home.  And then we asked him -- we don't want to**

23   **just leave his car there.  That would be not a place he wanted**

24   **it.  So I asked him if he would like us to drive his car back to**

25   **his house so he wouldn't be stuck there.  And he said, yes,**

1  **please do.**

2  *Q.*  What kind of options did you give him?

3  **A.  We said we can go to the FBI offices.  We can go to your**

4  **house.  We can go to a Starbucks where we can have some privacy.**

5  **It really doesn't matter.  It's up to you, just somewhere with**

6  **some privacy.**

7  *Q.*  And then he picked his home?

8  **A.  Correct.**

9  *Q.*  And up until this point while you were outside, were you

10  able to observe his demeanor?

11  **A.  Yes.**

12  *Q.*  What was it like?

13  **A.  He was calm.**

14  *Q.*  And so once he picked his home, then what happened?  Did you

15  guys get into a car?

16  **A.  We did.**

17  *Q.*  Whose car?

18  **A.  I think it was Special Agent David Patterson's car, and he**

19  **drove.**

20  *Q.*  He drove?

21  **A.  Agent Patterson, yes.**

22  *Q.*  Okay.  And then what happened to Mr. Lazerus' car?

23  **A.  Another agent drove it to Mr. Lazerus' residence.**

24  *Q.*  Why did another agent drive Mr. Lazerus' car?

25  **A.  We asked him if he wanted us to do that rather than leave it**

1    in the parking lot, and he said yes.

2    *Q.*  Why couldn't he drive his own car?

3    **A.  I suppose he could have, but we -- we wanted to drive over**

4    **there with him.**

5    *Q.*  Why is that?

6    **A.  Again, for safety concerns.**

7    *Q.*  So you got into Agent Patterson's car.

8        How many of you were there in his car?

9    **A.  Agent Patterson was driving, and then Mr. Lazerus and I were**

10   **in the back seat together.**

11   *Q.*  So three of you total?

12   **A.  Total, yes, ma'am.**

13   *Q.*  Is there a reason you sat in the back seat with him and not

14   in the front seat?

15   **A.  It's required by policy, in case he reached for the driver,**

16   **we'd have an agent in the back who can try to stop it.**

17   *Q.*  So it's for safety concerns?

18   **A.  Yes, ma'am.**

19   *Q.*  Okay.  How long was the drive from Snooze Eatery to

20   Mr. Lazerus' residence?

21   **A.  Ten to 15 minutes.**

22   *Q.*  Okay.  What did you talk about during those 10

23   to 15 minutes, if anything?

24   **A.  Nothing of substance.**

25   *Q.*  Were you able to observe Mr. Lazerus' demeanor in the car as

1    you sat next to him?

2    **A.  Yes.**

3    *Q.*  What was it like?

4    **A.  Calm.**

5    *Q.*  At any point, did he say he wanted to get out of the car?

6    **A.  No.**

7    *Q.*  At any point, did he say he didn't want to talk to you?

8    **A.  No.**

9    *Q.*  And eventually, did you arrive at his residence?

10   **A.  We did.**

11   *Q.*  Okay.  Once you arrived at his residence, did you sit down

12   with him to conduct an interview with him?

13   **A.  We did.**

14   *Q.*  Where did you sit in his residence?

15   **A.  At his dining room table.**

16   *Q.*  And how many agents were present during the interview?

17   **A.  Two.**

18   *Q.*  Before the interview started, were there other agents

19   present at some point?

20   **A.  There were.**

21   *Q.*  And they left by the time the interview started?

22   **A.  They did.**

23   *Q.*  So were you present during the interview?

24   **A.  I was.**

25   *Q.*  Who was the other agent?

1    **A.  Agent Patterson.**

2    *Q.*  So it was you, Agent Patterson, and Mr. Lazerus?

3    **A.  Yes.**

4    *Q.*  Okay.  And when you sat down with Mr. Lazerus, did you read

5    him his *Miranda* rights?

6    **A.  We did.**

7    *Q.*  And did you read that to him from a form that the FBI has?

8    **A.  Yes, ma'am.**

9    *Q.*  It's a written form --

10   **A.  It is.**

11   *Q.*  -- that contains his rights?

12   **A.  Yes.**

13   *Q.*  Okay.  And did you read each one to him?

14   **A.  I did.**

15   *Q.*  Okay.  And did he sign that advice of rights form waiving

16   his rights?

17   **A.  He did.**

18   *Q.*  Did you witness him sign it?

19   **A.  I did.**

20   *Q.*  During the time that you explained his rights to him, did he

21   express any hesitation?

22   **A.  No.**

23   *Q.*  Any confusion?

24   **A.  No.**

25   *Q.*  Did he ask any questions?

1    *A.*  **No.**

2    *Q.*  What was his demeanor like?

3    *A.*  **Relaxed.**

4    *Q.*  Approximately, how long -- actually, before I say that, did

5    you then interview him?

6    *A.*  **Yes.**

7    *Q.*  Approximately, how long did the interview last?

8    *A.*  **I'm not certain.  I could give an educated guess.**

9    *Q.*  Okay.  Was it more than 20 minutes?

10    *A.*  **Yes.**

11    *Q.*  Okay.  Was it more like an hour or so?

12    *A.*  **Yes.**

13    *Q.*  Or more?

14    *A.*  **Yeah.**

15          *MS. CHOPRA:*  Your Honor, at this point, I'm going to

16    proceed on with the statements of Mr. Lazerus.

17          *THE COURT:*  You may.

18          *MR. HALL:*  Your Honor, same request for a limiting

19    instruction.

20          *THE COURT:*  Same ruling.  Any statements that are made

21    by Mr. Lazerus are admissible only with respect to Mr. Lazerus,

22    not with respect to any other defendant.  So limiting the use of

23    that information.

24    *BY MS. CHOPRA:*

25    *Q.*  So during the statements Mr. Lazerus made, did he tell you

1    about how Loop was formed?

2    **A.  Yes.**

3    *Q.*  What did he say?

4    **A.  He said that Daniel Solomita came to San Diego and gave his**

5    **story about Loop, and that Lazerus and others decided to move**

6    **forward with the project.**

7    *Q.*  Did he talk about how he and -- had gotten the corporate

8    shell for Loop?

9    **A.  He said two others had gotten the corporate shell for Loop.**

10   *Q.*  Did he talk to you about a template the group used for

11   Loop's formation?

12   **A.  Yes.**

13   *Q.*  What did he say?

14   **A.  He said the group had a template they used.  Something**

15   **around 23 or 26 million shares.  That they'd like to keep it**

16   **tight, meaning not a lot of stock out in the hands of other**

17   **people.  And that they they'd like to build out the stock chart**

18   **selling shares judiciously, as he put it, to retain control.**

19   *Q.*  Did he talk about up-listing to the NASDAQ at all?

20   **A.  He said that was the plan from the beginning.**

21   *Q.*  And did he talk at all about the roles of other people

22   involved in this template?

23   **A.  Yes.**

24   *Q.*  What did he say?

25   **A.  Another person had the obligation to promote Loop.  When the**

1    stock price of Loop would go down, that person would call

2    Lazerus and ask him to get people to buy the stock to bring the

3    stock price back up.  And Mr. Lazerus' role was to get people to

4    buy stock.

5    Q.  And did he talk about Mr. Allan Brennan?

6    A.  He did.

7    Q.  What did he say?

8    A.  He said he met Allan Brennan at an open house in Encinitas.

9    That he put Allan Brennan -- that he put Allan Brennan into

10   Trilogy, and he clarified that meant got him to buy stock in

11   Trilogy.  He stated he got Allan Brennan to buy Loop out in the

12   market.

13   Q.  And going back to the topic of roles, did Mr. Lazerus talk

14   about whether the other investors would buy directly from him?

15   A.  From Allan Brennan?  Sorry, I missed that.

16   Q.  I'm sorry.

17       Going back to the roles, when Mr. Lazerus talked about --

18   did he talk about whether other investors bought stock directly

19   from him, Mr. Lazerus?

20   A.  Sometimes they would, yes.

21   Q.  And did Mr. Lazerus talk about nonpublic information

22   relating to Loop?

23   A.  Yes.

24   Q.  What did he say?

25   A.  He confirmed that he had given the undercover agent, myself,

1    **nonpublic information, generally from another person who was**

2    **getting it from Daniel Solomita.  He confirmed that was the**

3    **case, including for SK Global, another French contract, and**

4    **information regarding a Canadian Government funding.**

5    **    He stated he would pass on that same information to others**

6    **when he was telling them about upcoming news, including for the**

7    **September 2020 and he said May 2021 press releases or news.**

8    *Q.*  And what was the date again of that interview of

9    Mr. Lazerus?

10   **A.  February 3, 2022.**

11   *Q.*  How did you and Agent Patterson leave it with Mr. Lazerus

12   that day?

13   **A.  We told him we'd be in touch about next steps, and we talked**

14   **to him about how to get his phone back to him.**

15   *Q.*  Had you taken his phone?

16   **A.  We did.**

17   *Q.*  Did he consent to that?

18   **A.  He did.**

19   *Q.*  And did he seem agreeable to talking again later on?

20   **A.  Yes.**

21   **    MS. CHOPRA:**  I'd like to show Agent Tarwater

22   Exhibit 656, which is not in evidence.  Is this 656?

23   **    THE CLERK:**  I think 656 has been admitted.

24   **    THE COURT:**  656 is in evidence.

25   **    MS. CHOPRA:**  Sorry.  I'm thinking of a different one,

1  then.

2  **BY MS. CHOPRA:**

3  *Q.* Turning real quickly, during this investigation, did you

4  execute a search warrant of Mr. Danks' residence?

5  **A. Yes.**

6  *Q.* And when was that?

7  **A. My memory is on or about September 27, 2022.**

8  *Q.* Were you present for that search?

9  **A. I was.**

10 *Q.* Do you recall the address?

11 **A. You're testing my memory again.  I think 6 Pacific Winds,**

12 **Newport Coast, California.**

13       **MS. CHOPRA:** Can we pull up Exhibit 547, please, which

14 is not in evidence?

15 **BY MS. CHOPRA:**

16 *Q.* Do you recognize what's depicted there?

17 **A. I do.**

18 *Q.* What is it?

19 **A. That's the residence of Donald Danks that we were at for the**

20 **search warrant.**

21       **MS. CHOPRA:** Your Honor, move to admit 547.

22       **THE COURT:** Any objection?

23       **MR. HALL:** No objection, Your Honor.

24       **MR. YOUNG:** No objection.

25       **THE COURT:** 547 may be admitted.

1          *(Exhibit 547 admitted.)*

2     *BY MS. CHOPRA:*

3     *Q.*  Is that the residence we're talking about?

4     *A.*  Yes, ma'am.

5          *MS. CHOPRA:*  Now I'd like to pull up 657, which is not

6     in evidence.

7     *BY MS. CHOPRA:*

8     *Q.*  Before we zoom in, real quick, Agent Tarwater, do you

9     recognize --

10         *MS. HALL:*  Your Honor, I'm going to object to the

11    introduction of this, because within the line of direct, I think

12    that its use and implication may be improper.  I would ask to

13    bring it up at the break.

14         *THE COURT:*  Okay.  We can discuss it at the break.

15    *BY MS. CHOPRA:*

16    *Q.*  In the days following the search of his residence, do you

17    know if Mr. Danks exchanged text messages with Ms. Michelle

18    Fiore?

19    *A.*  Yes.

20    *Q.*  Have you seen some of those text messages?

21    *A.*  I have.

22         *MS. CHOPRA:*  Can we turn to Exhibit 629, please?  Can

23    we scroll through it for Agent Tarwater?

24    *BY MS. CHOPRA:*

25    *Q.*  Are these some of those messages?

1    *A.  Yes.*

2          *MS. CHOPRA:*  Your Honor, move to admit 629 into

3    evidence.

4          *THE COURT:*  Any objections?

5          *MR. HALL:*  May I have one second, Your Honor?

6          *THE COURT:*  Sure.

7       *(Pause.)*

8          *MR. HALL:*  No objection, Your Honor.

9          *MR. YOUNG:*  No objection.

10          *THE COURT:*  629 may be admitted.

11       *(Exhibit 629 admitted.)*

12          *MS. CHOPRA:*  Can we scroll to the next page, please?

13    *BY MS. CHOPRA:*

14    *Q.*  Can you tell the jury which box -- there's a dark gray and a

15    light gray.

16       Do you know which one is Mr. Danks and which one is

17    Ms. Fiore?

18    **A.  Mr. Danks is in the darker box there, shifted over to the**

19    **right a little bit more.**

20    *Q.*  Okay.

21          *MS. CHOPRA:*  And then can we scroll down, please?  And

22    then can we please go to Exhibit 630?

23    *BY MS. CHOPRA:*

24    *Q.*  Is this another clip from messages between Ms. Fiore and

25    Mr. Danks?

1  **A.  Yes.**

2        *MS. CHOPRA:*  Your Honor, I'd like to admit this into

3  evidence.

4        *THE COURT:*  Any objection to 630?

5        *MR. HALL:*  No objection, Your Honor.

6        *MR. YOUNG:*  No objection.

7        *MS. HALL:*  None.

8        *THE COURT:*  630 may be admitted.

9     *(Exhibit 630 admitted.)*

10        *MS. CHOPRA:*  Please scroll down.

11  *BY MS. CHOPRA:*

12  *Q.*  Okay.  In these text exchanges, does Mr. Danks offer to get

13  Ms. Fiore an attorney?

14  **A.  Yes.**

15  *Q.*  And is this on the heels of the search of Mr. Danks'

16  residence?

17  **A.  It's about five days later.**

18        *MS. CHOPRA:*  Can we go back to 629 real quick?  On the

19  first page, yeah.

20  *BY MS. CHOPRA:*

21  *Q.*  What's the date of this first message?

22  **A.  September 29, 2022.**

23  *Q.*  And how many days after the search of Mr. Danks' residence

24  was this one?

25  **A.  Two days.**

1          **MS. CHOPRA:**  Turning now to Exhibit 631.

2     **BY MS. CHOPRA:**

3     **Q.**  Is this another clip of a conversation between Ms. Fiore and

4     Mr. Danks?

5     **A.  Yes.**

6     **Q.**  And what's the date of the topmost text?

7     **A.  October 3, 2022.**

8          **MS. CHOPRA:**  Your Honor, move to admit 631.

9          **THE COURT:**  Any objection?

10         **MR. HALL:**  No objection.

11         **MS. HALL:**  I would ask that this be considered at the

12    same time as the other exhibit during the break.

13         **THE COURT:**  Okay.

14         **MS. CHOPRA:**  Moving to 632, please.

15    **BY MS. CHOPRA:**

16    **Q.**  And is this another clip from the conversations between

17    Mr. Danks and Ms. Fiore?

18    **A.  Yes.**

19         **MS. HALL:**  Same request.

20         **THE CLERK:**  I think 632 is already in evidence.

21         **THE COURT:**  No, I have 633, but not 632.

22         **MS. CHOPRA:**  I believe Ms. Hall had the same request as

23    the prior one.

24         **THE COURT:**  Why don't we take this at sidebar?  Ladies

25    and gentlemen, if you could excuse us for a second, we'll

1    discuss 657, 631, and 632.

2         **(At sidebar:)**

3              **THE COURT:**  Counsel?

4         **MS. HALL:**  Yes.  The line of questioning preceding

5    these exhibits was regarding Mr. Lazerus' agreement to cooperate

6    with the agents.  Then they want to bring in text messages

7    showing Danks trying to get him an attorney.

8              **THE COURT:**  Trying to get Lazerus an attorney?

9         **MS. HALL:**  Yeah, requesting an attorney.  And

10   similarly, these text messages are regarding Danks looking for

11   an attorney, talking about how much for an attorney for

12   Ms. Fiore.  I think it's improper, Number 1, to bring in these

13   text messages about getting an attorney.  I think their argument

14   is going to be that the attorneys blocked the cooperation,

15   certainly of Mr. Lazerus, and possibly of Ms. Fiore.

16        **MS. CHOPRA:**  In terms of Mr. Lazerus, it's important

17   that it's right after he spoke to agents, he turned around,

18   contacted Mr. Danks, and Mr. Danks was trying to get him an

19   attorney.  So it shows their coordination right after he agreed

20   to cooperate with agents.

21        **MS. HALL:**  And I think that the implication is really

22   problematic, that now he is stated in trial, so he is not

23   cooperating.  I think there's a real problem with the

24   introduction of this evidence as an implication that somehow the

25   introduction of the attorney stopped the cooperation.

1          If they want, maybe we can talk about some sort of way

2    to bring in evidence that, you know, Lazerus contacted Danks

3    after the meeting.  But I think the injection of an attorney,

4    and especially when the direct was he cooperated with you at

5    that time.

6          **THE COURT:**  I'll allow it.

7          **MS. CHOPRA:**  What about the Fiore texts, same thing?

8          **THE COURT:**  Same thing.

9          **MS. CHOPRA:**  All of them?

10         **THE COURT:**  637, 631, and 632 may be admitted.

11         **MR. HALL:**  Just to be clear, I'm joining in those

12   objections.

13         **THE COURT:**  Okay.

14     **(Exhibits 631, 632, and 637 admitted.)**

15     **(End of sidebar; in open court:)**

16         **MS. CHOPRA:  Can we turn back to 657, please?**

17         **THE COURT:**  I'll admit 657 over objection.

18     **(Exhibit 657 admitted.)**

19         **MS. CHOPRA:**  Can you zoom in, please?  Thank you.

20   **BY MS. CHOPRA:**

21   **Q.**  Agent Tarwater, what's the date of this text message?

22   **A.  February 5, 2022.**

23   **Q.**  It was two days after your interview of Mr. Lazerus?

24   **A.  Yes, ma'am.**

25   **Q.**  And who was this text between?

1    *A.  Donald Danks and Chad Ruhle.*

2    *Q.*  In this, what does Mr. Danks say?

3    *A.  Do you want me to read it, ma'am?*

4    *Q.*  Yes, please.

5    *A.  "Chad, I'm looking for a criminal defense attorney in*

6    *San Diego to handle a securities issue for a friend of mine.  Do*

7    *you know anybody that's good?  It's a bullshit situation, but he*

8    *needs an attorney.  Thanks for feedback, brother."*

9            *MS. CHOPRA:*  And then turning to Exhibit 631, please.

10   *BY MS. CHOPRA:*

11   *Q.*  I think you previously said this is between Mr. Danks and

12   Ms. Fiore?

13   *A.  Yes, ma'am.*

14   *Q.*  And in this, can you read the large text right there in the

15   middle?

16           *THE COURT:*  It's been admitted into evidence, Counsel.

17           *MS. CHOPRA:*  Okay.  We can skip over that.

18           And then let's turn to Exhibit 632, please.

19   *BY MS. CHOPRA:*

20   *Q.*  Is this also between Ms. Fiore and Mr. Danks?

21   *A.  Yes, ma'am.*

22   *Q.*  And then which one is which?  Who is the light gray and who

23   is the dark gray?

24   *A.  The light is Ms. Fiore and the dark gray is Mr. Danks.*

25   *Q.*  And does Ms. Fiore reach out to Mr. Danks asking for help?

1    *A.  Yes.*

2        *(Pause.)*

3            *MS. CHOPRA:*  No further questions, Your Honor.

4            *THE COURT:*  Cross-exam?  Mr. Hall or --

5            *MR. HALL:*  I think Ms. Hall is going to start.

6            *THE COURT:*  Okay.  Ms. Hall?

7            *MS. HALL:*  Thank you.

8            *THE COURT:*  No relation.

9

10                   *CROSS-EXAMINATION*

11   *BY MS. HALL:*

12   *Q.*  Agent Tarwater, you happen to know that I'm Mr. Lazerus's

13   attorney; right?

14   *A.  Yes, ma'am.*

15   *Q.*  And you also know that I'm not being paid by Mr. Danks;

16   correct?

17   *A.  I'm not aware one way or another.*

18   *Q.*  You know that I'm court-appointed; correct?

19   *A.  That's my understanding, yes, ma'am.*

20   *Q.*  And a court-appointed attorney is not paid by a private

21   individual.

22   *A.  I'll take your word for it, ma'am.*

23   *Q.*  Well, you know that a CJA attorney is like a public

24   defender; correct?

25   *A.  Yes, ma'am.*

1   *Q.*  And you know that I'm a CJA attorney.

2   **A.  That's my understanding, yes, ma'am.**

3   *Q.*  Appointed to represent Mr. Lazerus.

4   **A.  Yes, ma'am.**

5   *Q.*  Not being paid by Mr. Danks.

6   **A.  I don't know either way.  I just know your appointment.**

7   *Q.*  Well, what's a CJA attorney?

8        *MS. CHOPRA:*  Your Honor, objection.  Relevance.

9        *THE COURT:*  Sustained.

10  *BY MS. HALL:*

11  *Q.*  Agent Tarwater, you never interviewed Allan Brennan, did

12  you?

13  **A.  That's correct.**

14  *Q.*  Your investigation started in late December -- I mean late

15  2019; correct?

16  **A.  Yes, ma'am.**

17  *Q.*  And your investigation continued for the next two years,

18  plus; correct?

19  **A.  Yes, ma'am.**

20  *Q.*  Until February 2022.

21  **A.  Yes, ma'am.**

22  *Q.*  Over two years.

23  **A.  Yes.**

24  *Q.*  Allan Brennan was alive for one year and ten months of your

25  investigation.

1    *A.* **Correct.**

2    *Q.* During that one year and ten months, you never interviewed

3    him.

4    *A.* **That's correct.**

5    *Q.* You never asked to interview him.

6    *A.* **No, we didn't ask.**

7    *Q.* You never asked him what Robert Lazerus said to him.

8    *A.* **Correct. We did not interview him.**

9    *Q.* You never got Allan Brennan's version of what happened

10   between him and Robert Lazerus.

11   *A.* **Correct.**

12   *Q.* Because you never interviewed him.

13   *A.* **Yes, ma'am.**

14   *Q.* You never tried to interview him.

15   *A.* **We did try to interview him.**

16   *Q.* Okay. So you -- you told us that you went to his house one

17   time; correct?

18   *A.* **Many times, but once with the intent to interview him.**

19   *Q.* Well, did you write a report about that?

20   *A.* **No.**

21   *Q.* You know the importance of writing reports; correct?

22   *A.* **We don't document a failed attempt to find someone for an**

23   **interview.**

24   *Q.* Well, this happened how many years ago, that you recall

25   having tried to interview him?

1  **A.   I recall because I found an email that put a date in my**

2  **brain of when we tried to interview him.**

3  *Q.*  No, I'm asking you when the event happened.

4  **A.   I'm sorry, I'm not following your question.**

5  *Q.*  Do you remember what day you went and knocked on the door?

6  **A.   January 23, 2020.**

7  *Q.*  Okay.  How many years ago is that?

8  **A.   Many years ago.**

9  *Q.*  Many years ago?

10  **A.   Yes, ma'am.**

11  *Q.*  And you have no report of what you did.

12  **A.   Correct.  Of that -- yes, that is -- yes, ma'am.**

13  *Q.*  And as an FBI agent, you're trained on the importance of

14  writing reports; correct?

15  **A.   Yes, ma'am.**

16  *Q.*  And you're trained on the importance of putting details in

17  the report.

18  **A.   Yes, ma'am.**

19  *Q.*  It's important to have those reports to give to the

20  prosecutor?

21  **A.   Yes.**

22  *Q.*  So they can document what happened?

23  **A.   Correct.**

24  *Q.*  And so that you can rely on that report if you have to

25  testify years later.

1    *A.*  **Yes, ma'am.**

2    *Q.*  And you have no report.

3    *A.*  **Of that attempted interview, no.**

4    *Q.*  And in fact, you were here when I made my opening statement;

5    right?

6    *A.*  **Yes, ma'am.**

7    *Q.*  And you recall in my opening statement, I emphasized that

8    you never interviewed Allan Brennan.

9    *A.*  **I recall that, yes.**

10   *Q.*  And then you got up on the stand and testified that you did

11   actually try.

12   *A.*  **We did try.**

13   *Q.*  Okay.  But you never spoke to him.

14   *A.*  **No.**

15   *Q.*  Now, as an FBI agent, your obligation is not to just take

16   the word of certain individuals as to what might be the case;

17   correct?

18   *A.*  **We want to corroborate all the information we can, yes,**

19   **ma'am.**

20   *Q.*  Right.  You want to actually investigate.

21   *A.*  **Yes, ma'am.**

22   *Q.*  And to go to the source as closely as you can.

23   *A.*  **Yes.**

24   *Q.*  Right.  But you never got to the source of Allan Brennan.

25   *A.*  **We never interviewed Allan Brennan.**

1    *Q.*  And you never found out from Allan Brennan what happened

2    between Allan Brennan and Robert Lazerus.

3    **A.  That's correct.**

4    *Q.*  I want to ask you about a letter that the FBI sent out in

5    February of 2024.  And I would ask that Defense Exhibit 3452 be

6    pulled up for identification.

7         *MS. HALL:*  Are you hooked in?

8    *(Pause.)*

9    *BY MS. HALL:*

10   *Q.*  While we're waiting for that to come up, you're the lead

11   agent on the case; is that right?

12   **A.  I was a co-case agent, yes, ma'am.**

13   *Q.*  On the reports you wrote, your name is in capitals; is that

14   right?

15   **A.  On some of the reports yes.**

16   *Q.*  What does that indicate?

17   **A.  I believe that indicates I at least started the draft.  It**

18   **might have been co-signed by someone.**

19   *Q.*  You said that you were co-lead agent, or you were lead

20   agent?

21   **A.  Co-case, meaning two of us are leading the investigation.**

22   *Q.*  And who is the other one?

23   **A.  David Patterson.**

24   *Q.*  Okay.  As lead agents in the case, you're responsible for

25   overseeing the case?

1    *A.*  **On the FBI side, yes, ma'am.**

2    *Q.*  Overseeing the investigation?

3    *A.*  **Yes.**

4    *Q.*  You coordinate the attempts to get evidence?

5    *A.*  **Yes.**

6    *Q.*  You also coordinate on searches?

7    *A.*  **Yes.**

8    *Q.*  You coordinate on search warrants?

9    *A.*  **Yes.**

10   *Q.*  You and Mr. Patterson coordinate on search warrants?

11   *A.*  **Ideally, we're coordinating in some regard on everything if**

12   **we're co-case.**

13   *Q.*  Because it's important that you each know everything that

14   the other person is doing.

15   *A.*  **Well, not everything, but update each other on any material**

16   **events, yes.**

17   *Q.*  And certainly that you know what is included in search

18   warrant affidavits.

19   *A.*  **You mean just generally speaking?  Yes.**

20   *Q.*  Do we have the Exhibit 3452?

21        *FEMALE SPEAKER:*  Almost.

22   *BY MS. HALL:*

23   *Q.*  Did you review the documents that were authored by Agent

24   Patterson?

25   *A.*  **You'd have to be more specific, ma'am.  If I signed, like, a**

1    **302 that he wrote, that means I've reviewed it.**

2    *Q.* Okay. I think we're having some technical difficulties.

3    There we go.

4        Okay. I'm showing you what's been identified as Defense

5    Exhibit 3452, 3452. Are you familiar with that letter?

6    **A. Yes.**

7    *Q.* That was a letter that was sent by the FBI?

8    **A. Yes, ma'am.**

9    *Q.* And it was sent to Loop investors; correct?

10   **A. That's correct.**

11   *Q.* I would move to --

12   **A. Certain Loop investors, yes, ma'am.**

13   *Q.* Okay. And in this letter, you tell the Loop investor that

14   there's an investigation of Loop that -- actually, you tell the

15   investor that there's an indictment against Don Danks, Jonathan

16   Destler, and Robert Lazerus; right?

17   **A. That's what the letter says, yes, ma'am.**

18   *Q.* And included with the letter is a copy of the indictment;

19   correct?

20   **A. I believe that was so, yes.**

21   *Q.* And in addition to the copy of the indictment, you also

22   included a copy of the press release from the U.S. Attorney's

23   Office.

24   **A. I think that's correct, yes.**

25   *Q.* And you're telling this investor, "We think you're a

1    victim."

2    **A.  That letter speaks for itself.**

3    *Q.*  I'm referring you to the second paragraph, the first

4    sentence.  You're telling the recipient of the letter that

5    they're been identified as a potential victim?

6          *MS. CHOPRA:*  Your Honor, this letter is not in evidence

7    yet.  To the extent Ms. Hall is going to read from it --

8          *MS. HALL:*  I'll move it into evidence.

9          *THE COURT:*  The only thing is I would like it redacted

10   before it gets moved into evidence, mentioning --

11         *MS. HALL:*  The name of the investor.

12         *THE COURT:*  Yeah.

13         *MS. CHOPRA:*  Your Honor, no objection as to the letter

14   with the redactions.  But I wanted to make sure there's no

15   attachments, because there's an unredacted indictment.

16         *MS. HALL:*  We're not going to introduce the

17   attachments.

18         *THE COURT:*  I was referring to the name, since I don't

19   think that's been admitted.

20         *MS. HALL:*  You're talking about the "Re" line,

21   your Honor?

22         *THE COURT:*  Yes.  And in the actual body of it, I think

23   there's a mention of the defendants' names as well.

24         *MR. YOUNG:*  Your Honor, we're fine with the names going

25   in.  It's relevant to the line of questioning, I think.

1          **THE COURT:**  Including all the names?  I thought there

2      was some --

3          **MS. HALL:**  Just the first -- just redact the first.

4          **THE COURT:**  Yep.

5          **MS. HALL:**  Unless you wanted it.

6          **MR. YOUNG:**  Yeah.

7          **MS. HALL:**  And to redact also the name of the investor.

8      Can you do that?

9          If I can just confer?

10         **THE COURT:**  Sure.

11     **(Pause.)**

12         **THE COURT:**  And then in the body of it, there are the

13     names on the fourth line.

14         Any objection?

15         **MS. CHOPRA:**  No objection to the letter.  And I think

16     Ms. Hall --

17         **THE COURT:**  She said just the letter.

18         **MS. CHOPRA:**  Okay.

19         **THE COURT:**  Any objection from the defendants?

20         **MR. YOUNG:**  No.

21         **THE COURT:**  3452 may be admitted.

22     **(Exhibit 3452 admitted.)**

23     **BY MS. HALL:**

24     **Q.**  Agent Tarwater, just one other question.  In that same

25     paragraph when you tell the recipient of the letter that they've

1   been identified as a potential victim, you also state what your

2   theory of the case is; is that correct?

3   **A.  It states information that indicates "You may have purchased**

4   **shares of Loop during the time period."**

5   *Q.*  You're stating the theory of the Government with regard to

6   the manipulation of stock; correct?

7   **A.  I was just reading from the letter, ma'am.**

8   *Q.*  That states the Government's theory; is that correct?

9   **A.  I think the Government's theory is that you may have been a**

10  **victim if you bought stock of Loop during that time period.**

11  *Q.*  And then further down, the next line states, also, the

12  Government's theory.

13  **A.  The allegations from the indictment that the stock was**

14  **manipulated or fraudulently and/or artificially inflated.**

15  *Q.*  The Government's theory.

16  **A.  Yes, ma'am.**

17  *Q.*  And that is contained in a letter that went out to

18  investors; correct?

19  **A.  Certain people who had purchased Loop stock during a certain**

20  **time period, yes, ma'am.**

21  *Q.*  Stating the Government's theory of what happened in this

22  case; correct?

23  **A.  Correct.**

24          *MS. HALL:*  You can take that down.

25  ///

1    *BY MS. HALL:*

2    *Q.* Let's move on to the statement of Mr. Lazerus on

3    February 3rd, 2022.  Is that the right date?

4    **A. Yes, ma'am.**

5    *Q.* Okay.  That was really two years after you first targeted

6    Mr. Lazerus; is that right?

7    **A. That was a little over two years from the date we started**

8    **the investigation.**

9    *Q.* It's a little over two years after you first reach out to

10   Mr. Lazerus as "Jay Taylor."

11   **A. That's correct.**

12   *Q.* And began your undercover sting of Mr. Lazerus.

13   **A. We began the undercover, yes, ma'am.**

14   *Q.* So it's two years later that you sat down with him at

15   Susie's Restaurant; correct?

16   **A. Snooze.**

17   *Q.* Snooze.  Sorry.

18       Right?

19   **A. Yes, ma'am.**

20   *Q.* You had, by that point, recorded, I believe you said, seven

21   phone calls?

22   **A. Yes, ma'am.**

23   *Q.* Four in-person meets?

24   **A. Yes.**

25   *Q.* Over 12 hours of recordings.

1  **A.  I haven't aggregated the number of hours.**

2  *Q.*  You recorded long lunches; correct?

3  **A.  We recorded lunches, yes, ma'am.**

4  *Q.*  Hours long; correct?

5  **A.  I don't recall the length, but they weren't really short.**

6  *Q.*  They weren't short.

7  And you know that the dinner where you had the other

8  undercover and Mr. Destler and Mr. Lazerus, you know that was a

9  long dinner.

10  **A.  That was long, yes, ma'am.**

11  *Q.*  And you recorded that entire dinner.

12  **A.  Yes.**

13  *Q.*  But when it came to February 3rd, 2022, you did not record

14  it.

15  **A.  Correct.**

16  *Q.*  You didn't record your meeting in the restaurant.

17  **A.  Correct.**

18  *Q.*  You didn't record your meeting back at his house.

19  **A.  Correct.**

20  *Q.*  You didn't record your conversation in the car.

21  **A.  Correct.**

22  *Q.*  You certainly had the technology.

23  **A.  Yes.**

24  *Q.*  You could have recorded it.

25  **A.  Yes.**

1    *Q.* But instead, you chose to simply write a report.

2    **A. Yes.**

3    *Q.* Going to the actual restaurant, I believe that you said that

4    you had four officers inside the restaurant?

5    **A. Two at the table and two, sort of, off to the side at a**

6    **booth, stools, somewhere else, yeah.**

7    *Q.* An additional four officers outside in the parking lot?

8    **A. Approximately.  That's my memory, yes, ma'am.**

9    *Q.* And the four officers out in the parking lot were armed.

10   **A. Yes.**

11   *Q.* Were the other two officers in the restaurant, the ones not

12   in the booth, were they also armed?

13   **A. Yes.**

14   *Q.* And when Mr. Lazerus came and sat in the booth, the other

15   officer who was with you sat on the outside of Mr. Lazerus.

16   **A. Yes.**

17   *Q.* So that, effectively, Mr. Lazerus was pinned in by that

18   agent.

19   **A. Yeah.  He wouldn't be able to slide out without that agent**

20   **moving.**

21   *Q.* You began that -- your discussions with Mr. Lazerus at

22   12:00 o'clock p.m.; is that right?  Or was it earlier?

23   **A. No, that sounds right, because I think that's the time on**

24   **the *Miranda* waiver.**

25   *Q.* So you know because that's written on the *Miranda* waiver

1   that that's the time that it started.

2   **A.   There's a time and date, yes, ma'am.**

3   *Q.*   But you don't have any document that tells us when you

4   ended.

5   **A.   I don't think so, no.**

6   *Q.*   No.  But it was hours, wasn't it?

7   **A.   I mean, do you want me to guess?**

8   *Q.*   Could it have been hours?

9   **A.   My guess is it was probably two hours long.**

10  *Q.*   Well, you went back to Mr. Lazerus's -- first of all, you

11  spoke in the restaurant; right?

12  **A.   Yes, ma'am.   Yep.**

13  *Q.*   Then you drove over to Mr. Lazerus's house; right?

14  **A.   Yes.**

15  *Q.*   And first thing there is you did a search of the house.

16  **A.   We just went to render safe the weapons in the house.**

17  *Q.*   You searched through the house.

18  **A.   We didn't search the house.   We asked him where are the**

19  **weapons.**

20          *MS. HALL:*   I'll object to that as nonresponsive and

21  move to strike.

22          *THE COURT:*   Overruled.

23          *THE WITNESS:*   We only went to where those weapons were

24  to render them safe.

25  *///*

1  *BY MS. HALL:*

2  *Q.*  You searched through the house, and after that you spoke to

3  him.

4  **A.  After making the weapons safe, we spoke to him, yes, ma'am.**

5  *Q.*  There was nothing illegal about the weapons that Mr. --

6  well, I withdraw that question.

7      When you sat down to talk to him again, you were in the --

8  you were in the dining room; right?

9  **A.  Yes, ma'am.**

10  *Q.*  At that time, you did not record the conversation.

11  **A.  Correct.**

12  *Q.*  And as we discussed, you had the capability to record the

13  conversation.

14  **A.  Yes, we have the capability.**

15  *Q.*  During your discussion with Mr. Lazerus, he agreed to let

16  you have his phone?

17  **A.  Yes.**

18  *Q.*  He consented to a search of his phone.

19  **A.  Yes.**

20  *Q.*  He agreed to let you have his computer.

21  **A.  Consented to search of the computer, yes, ma'am.**

22  *Q.*  Right.  He consented to a search of his computer.

23      And he was generally cooperative?

24  **A.  Yes, very.**

25  *Q.*  So let's turn now to the incidents that you did record.  I'm

1   going to ask for Defense Exhibit 3003.  3003, the chart -- 3224,

2   yes.

3              **THE COURT:**  So 3224, not 3003?

4          **MS. HALL:**  Yes.  Thank you.

5          I'm showing you what's been marked just for

6   demonstrative purposes as Defendant's Exhibit 3224.  And

7   your Honor, I'd ask it to be published to the jury for

8   demonstrative purposes.

9              **THE COURT:**  Any objection?

10         **MS. CHOPRA:**  No objection, your Honor.

11         **MR. YOUNG:**  No objection.

12         **MR. HALL:**  No objection, your Honor.

13         **THE COURT:**  Okay.  It may be shown to the jury.  It's

14  not going to be admitted into evidence.  It's just for

15  demonstrative purposes.

16  **BY MS. HALL:**

17  **Q.**  Agent Tarwater, this is a summary of all the money you spent

18  during your targeting of Mr. Lazerus; correct?

19  **A.   May I read it for a moment?**

20  **Q.**  Sure.

21  **A.   Okay.**

22     **(Pause.)**

23         **THE WITNESS:**  Oh, it just disappeared, ma'am.

24         **MS. HALL:**  I think we have a glitchy connection.  Tell

25  me when you're ready.

1          **THE WITNESS:**  Okay.

2    **BY MS. HALL:**

3    *Q.*  This is the money that you paid for Mr. Lazerus; correct?

4    **A.  I don't know the meal exact amounts, but they look**

5    **approximately correct from my recollection.**

6    *Q.*  And let me just get this straight.  You always paid for the

7    meals with Mr. Lazerus, with one exception.

8    **A.  The three meals, yes, ma'am, I paid.**

9    *Q.*  You always paid for the lunches with Mr. Lazerus except for

10   the time that Mr. Destler came.

11   **A.  That's correct.**

12   *Q.*  The time that Mr. Destler joined you, Mr. Destler picked up

13   the tab.

14   **A.  Correct.**

15   *Q.*  But when it was just you and Mr. Lazerus, you always paid

16   for him.

17   **A.  I did.**

18   *Q.*  If we look at this chart -- and it actually goes in reverse

19   chronological order, so I'm going to start at the bottom.

20        June 16th of 2020, the total lunch bill was $125.49; is that

21   right?

22   **A.  That's what it says on the chart.**

23   *Q.*  And that is -- that sounds about right to you?

24   **A.  It does sound about right, yes, ma'am.**

25   *Q.*  On June 23rd, 2020, the in-person meeting, that was the one

1    time that you didn't pay; right?

2    **A.   Correct.**

3    *Q.*   And that was because Mr. Destler paid.

4    **A.   Correct.**

5    *Q.*   On December 4th, 2020, it's just you and Mr. Lazerus again;

6    right?

7    **A.   That's right.**

8    *Q.*   And so you paid.

9    **A.   Yes, ma'am.**

10   *Q.*   And that looks about right; is that correct?

11   **A.   It does.**

12   *Q.*   Total lunch bill, 39.98?

13   **A.   That looks correct.**

14   *Q.*   And on December 4th, 2020, that's when you gave Mr. Lazerus

15   an envelope with $4,000 -- $4,150; right?

16   **A.   Yes, ma'am.**

17   *Q.*   And on May 20th, 2021, again, an in-person lunch meeting,

18   and you paid for the lunch; right?

19   **A.   Yes.**

20   *Q.*   And again on December 9th, 2021, you paid for the lunch.

21   **A.   I did.**

22   *Q.*   About $74.53.

23   **A.   It sounds right.   I don't recall exactly.**

24   *Q.*   And then again at this in-person meeting, you gave

25   Mr. Lazerus an envelope with $5,000 cash in it; right?

1    **A.  Yes, ma'am.**

2    *Q.*  So you paid for his meals; right?

3    **A.  Three of the four, yes, ma'am.**

4    *Q.*  And you flattered him.

5    **A.  Yes.**

6    *Q.*  And you befriended him.

7    **A.  I tried.**

8    *Q.*  Let's talk about the very beginning of your operation back

9    in February.  Gary Brennan emails Robert to introduce you to

10   him; is that correct?

11   **A.  Correct.**

12   *Q.*  Were you on that email thread?

13   **A.  I don't recall, because I have it in my mind for from when**

14   **it got documented.**

15   *Q.*  I would ask that Defense Exhibit 3407 be pulled up.  And

16   while that's happening, again, this is -- this is 2020 --

17   **A.  Yes, ma'am.**

18   *Q.*  -- correct?  Two years before that 2022 lunch where you told

19   him you were an FBI agent.

20   **A.  Correct.  The emails at the start were February 2020.**

21   *Q.*  Can you take a look at what's been identified as Defendant's

22   Exhibit 3407, Agent Tarwater.

23   **A.  Yes, ma'am.**

24   *Q.*  Is that the email thread between Gary Brennan, Mr. Lazerus,

25   and you?

1    **A.   Looks like it starts out with Gary Brennan and Mr. Lazerus,**

2    **and then at the top I get introduced to him, and now I'm**

3    **emailing with Robert Lazerus.**

4    *Q.*  This is a fair and accurate representation of your

5    communication with him?

6    **A.  Yes.**

7              *MS. HALL:*  I would move it into evidence, your Honor.

8              *THE COURT:*  Any objection?

9         *MS. CHOPRA:*  No objection, your Honor.

10        *MR. HALL:*  No objection.

11        *MR. YOUNG:*  No, your Honor.

12        *THE COURT:*  It may be admitted.

13        *(Exhibit 3407 admitted.)*

14   *BY MS. HALL:*

15   *Q.*  The introduction of Gary to Robert, he introduces you under

16   your cover name of "Jay Taylor."  Right?

17   **A.  Yes, ma'am.**

18   *Q.*  And he introduces you as someone with family money to

19   invest.

20   **A.  Yes.**

21   *Q.*  And then Mr. Lazerus says for you to give him a call; right?

22   **A.  Correct.**

23   *Q.*  And then you tell him that you're off on a ski strip, but

24   you'll contact him when you got back in town.

25   **A.  Words to that effect, yes, ma'am.**

1    *Q.* Now, after that, there were several additional emails; is

2    that right?

3    **A. Over --**

4    *Q.* We can go through them.

5    **A. Okay.**

6    *Q.* We can go through them.

7    **A. Okay.**

8         ***MS. HALL:*** I would ask that Defense Exhibit 3410 be

9    pulled up. I would ask if there is any objection to moving this

10   into evidence.

11        ***MS. CHOPRA:*** No objection, your Honor.

12        ***MR. YOUNG:*** No, your Honor.

13        ***MS. HALL:*** So moved.

14        ***THE COURT:*** 3410 may be admitted.

15      ***(Exhibit 3410 admitted.)***

16   *BY MS. HALL:*

17   *Q.* This is on May 6th?

18   **A. Yes, ma'am.**

19   *Q.* And --

20   **A. May 6, 2020.**

21   *Q.* And Robert Lazerus -- is it just that one page or does it

22   go --

23      ***(Pause.)***

24   *BY MS. HALL:*

25   *Q.* In this email on May 6th, Robert is telling you, "Here's the

1  deck."  Correct?

2  **A.  That's what it says, yes, ma'am.**

3  Q.  And a "deck," you're familiar with that term, that's a term

4  that refers to information about a company or a stock?

5  **A.  In this context I would expect, like, a PowerPoint,**

6  **something that tells me about a company and its business or**

7  **prospects, *et cetera*.**

8        *MS. HALL:*  Can you scroll down?  Does it have the

9  additional pages, or is that just that one page?

10        *FEMALE SPEAKER:*  Just that one.

11  *BY MS. HALL:*

12  Q.  And the subject line is "Opti-Harvest."

13  **A.  Yes, ma'am.**

14  Q.  Not "Loop."

15  **A.  Correct.**

16  Q.  Can you pull up Exhibit -- Defense Exhibit 3408.

17      And this was -- it's dated July 26th, 2021.  Is that right?

18  7/26/2021?

19  **A.  Yes, ma'am.**

20  Q.  And the subject line is "Opti-Harvest Presentation."  Is

21  that right?

22  **A.  Subject line is "Forward new investor deck for EF Hutton."**

23  Q.  And then -- right.  "Investor deck for EF Hutton."

24      And then below that, "Opti-Harvest Presentation 7/21/2021."

25  **A.  That looks like the name of the attachment, yes, ma'am.**

1  *Q.* Right.  And the date of the email is after the date of the

2  presentation; right?

3  **A. Yes.  The dates on the document and the received are -- the**

4  **email, it would be five days later.**

5  *Q.* Five days later.

6     And this was a presentation about Opti-Harvest; right?

7  **A. I assume so from the title.**

8  *Q.* Not Loop.

9  **A. I assume not.  I believe it was about Opti-Harvest, is my**

10 **memory.**

11 *Q.* Right.  And in fact, all of the emails that Mr. Lazerus sent

12 you were about Opti-Harvest.

13 **A. That sounds correct.  I don't think there was emails --**

14 **specifically emails about Loop.**

15 *Q.* Pull up Defense Exhibit 3411.

16         ***THE COURT:*** These are not in evidence.

17         ***MS. HALL:*** Right.

18         ***MR. DOYLE:*** For identification purposes, 3411, if you

19 can pull that up.

20 *BY MS. HALL:*

21 *Q.* The date of that email is May 8th, 2020?

22 **A. Yes, ma'am.**

23 *Q.* That's from Robert to Jay Taylor, or Jeremy Taylor?

24 **A. Yes, from Mr. Lazerus to Jeremy Taylor.**

25 *Q.* And the subject, again, is "Opti-Harvest."  Is that right?

1    *A.* **Yes, ma'am.**

2    *Q.* All of these emails -- you can take it down.

3        All of these emails were concerning -- I believe you just

4    said they were concerning Opti-Harvest.  Right?

5    *A.* **The emails, yes, ma'am.**

6    *Q.* But you were not interested in Opti-Harvest.

7    *A.* **I don't know what you mean.**

8    *Q.* Well, your investigation was with regard to Loop; right?

9    *A.* **That's how the investigation was initiated, yes, ma'am.**

10   *Q.* The investigation was initiated to investigate Loop;

11   correct?

12   *A.* **That's the initiation, yes.**

13   *Q.* Mr. Lazerus's communications with you for the first three

14   months of your communication were with regard to Opti-Harvest.

15   *A.* **They were with regard to Loop Industries and Opti-Harvest.**

16   *Q.* Well, those emails all concerned Opti-Harvest; right?

17   *A.* **Well, you said "your communications."  So in phone calls and**

18   **chats, he did talk about Loop Industries.**

19   *Q.* Well, let's go to that.

20       Your first phone call was in May; right?

21   *A.* **Yes.  May 6th, yes.**

22   *Q.* That's about three months after February.

23   *A.* **Correct.**

24   *Q.* Right?

25       And before May, you had the emails; right?

1    **A.    The ones in February we looked at, and we just saw some in**
2    **May.  Yes, ma'am.**

3    *Q.*    And those were about Opti-Harvest?

4    **A.    The emails, yes, ma'am.**

5    *Q.*    So the first three months, you didn't have a phone call
6    about Loop.

7    **A.    We didn't have any phone call the first three months.**

8    *Q.*    Right.  The first phone call was in May, three months into
9    the investigation.

10   **A.    Yes, ma'am.**

11   *Q.*    And prior to that, the information you received from
12   Mr. Lazerus that we just reviewed was about Opti-Harvest.

13   **A.    The emails were about Opti-Harvest that I can recall.**

14   *Q.*    And you told Robert that you were interested in Loop.

15   **A.    Well, different points in time I told him I was interested**
16   **in anything he had.**

17   *Q.*    But you wanted to focus on Loop because that's the focus of
18   your undercover investigation; right?

19   **A.    That was one focus, yes, ma'am.**

20   *Q.*    Now, you testified on direct that you were the person who
21   first brought up money; is that right?

22   **A.    Yeah.  I am the first one that brought up how he got taken**
23   **care of.**

24   *Q.*    Right.  Because you told him that you wanted to make sure
25   that he was taken care of; right?

1    *A.*  **Correct.**

2    *Q.*  And you told him that you didn't expect to -- you didn't

3    expect him to talk to you for free.

4    *A.*  **Correct.**

5    *Q.*  Now, when you were first talking about paying him, you never

6    said to him, "I'm paying you for inside information."

7    *A.*  **Correct.**

8    *Q.*  You never said, "I'm paying you to tip me off."

9    *A.*  **Later in time, I might have said something to the effect of**

10   **that.  I can't recall.  But not in the beginning, nothing like**

11   **that.**

12   *Q.*  Certainly not on May 7th; correct?

13   *A.*  **No, ma'am.**

14   *Q.*  Instead you said, "I don't expect for you to talk to me for

15   free."

16   *A.*  **Correct.  That was not the whole statement, but yes, ma'am.**

17   *Q.*  I want to pull up Defense Exhibit 3459, just for

18   identification purposes.  And that is just for identification

19   purposes, 3459.

20       This is the search warrant that was one of the search

21   warrants in this case; is that correct?

22   *A.*  **This was one of the search warrants in this case, yes,**

23   **ma'am.**

24   *Q.*  Right.  It was signed by your co-agent, David Patterson; is

25   that right?

1   **A.  Yes, ma'am.**

2   *Q.*  But I believe you just told us how you guys would work

3   together to make sure that everything was being done correctly.

4   **A.  I knew he was looking to obtain this with the prosecutor.**

5   *Q.*  I'm sorry?

6   **A.  I knew he was working with the prosecutor to get the search**

7   **warrants.**

8   *Q.*  Well, you talked to him about what was going into the search

9   warrants; correct?  The affidavits.

10   **A.  I don't think we had to talk about what was going in this.**

11   **Everything was documented in the file.**

12   *Q.*  And you reviewed with Agent Patterson things that were

13   documented?

14   **A.  Not all the time, no.  If we were both in an interview, we**

15   **both reviewed the document before it gets documented in the**

16   **system.**

17   *Q.*  Can you go to page 32 of the affidavit.

18   Let me just -- let me get my hard copy to make sure that the

19   hard copy matches up with the digital.

20   *(Pause.)*

21   *BY MS. HALL:*

22   *Q.*  Let me just ask you to read the first paragraph on page 32

23   of the --

24   *MS. CHOPRA:*  Objection, your Honor.  It's not in

25   evidence.

1    **THE COURT:**  Sustained.  You can have him read it to

2  himself.

3    **MS. HALL:**  That's what I meant, I'm sorry.  Read to

4  yourself the first paragraph of page 32.

5    **THE COURT:**  First full paragraph or the first paragraph

6  that is not full?  The top of the page?

7    **MS. HALL:**  The very top of the page.

8    **THE COURT:**  Okay.

9    **MS. HALL:**  It would be above paragraph 64.

10    **THE WITNESS:**  All right.  I'm ready, ma'am.

11  **BY MS. HALL:**

12  **Q.**  Thank you.

13    In that paragraph, nowhere does it represent that it was you

14  who brought up the topic of payment.

15  **A.  I don't see anything in that paragraph that says that.**

16  **Q.**  That fact about the investigation, that it was the FBI agent

17  who introduced payment, was not included in the affidavit.

18  **A.  I don't see it in this paragraph, ma'am.**

19  **Q.**  It was omitted.

20  **A.  I don't see it in this paragraph.  That's all I can speak**

21  **to.**

22  **Q.**  And this paragraph talks about payment; correct?

23  **A.  It does.**

24  **Q.**  Going back to the previous page, 31, if could you read that

25  page to yourself.  Well, read that page to yourself.  Take as

1    long as you need.

2    **A.  Yes, ma'am.  Okay.**

3    *Q.*  Nowhere on that page does it mention that you were the first

4    person to bring up money.

5    **A.  No.**

6    *Q.*  And those two pages of the affidavit summarize the beginning

7    of that investigation.

8    **A.  I don't know that.  I'm just reading what I have here in**

9    **front of me.**

10   *Q.*  Well, it references --

11           *MS. CHOPRA:*  Objection, your Honor.  It's still not in

12   evidence.

13           *THE COURT:*  Sustained.

14   *BY MS. HALL:*

15   *Q.*  Nowhere in there does it mention that you were the one who

16   brought up money.

17   **A.  Not in the paragraphs you just had me read.  No, ma'am.**

18   *Q.*  The paragraphs that are about May 6th and May 7th.

19           *MS. CHOPRA:*  Objection, your Honor.  Still not in

20   evidence.

21           *THE COURT:*  I'll allow it.

22           *THE WITNESS:*  Certainly, these paragraphs discuss those

23   dates.

24   *BY MS. HALL:*

25   *Q.*  And they don't say that on the May 7th date, you brought up

1    money.

2    **A.  Not in what I just read.**

3    *Q.*  All right.  And that was the affidavit that went to a judge

4    who signed a search warrant.

5    **A.  I assume so.**

6    *Q.*  From the first page, that's what it appears to be; correct?

7    **A.  That's what it appears to be, yes, ma'am.**

8    *Q.*  It even has the file stamp on it; correct?  If you could go

9    to the first page, please.

10       Correct?

11   **A.  Yes.**

12   *Q.*  So that fact was omitted.

13   **A.  I'm just telling you what I read in those paragraphs you had**

14   **me read, ma'am.**

15   *Q.*  Right.  And I'm asking you if that fact was omitted in those

16   paragraphs.

17   **A.  That fact is not stated in those paragraphs.**

18          *MS. HALL:*  Your Honor, I'd like to cross on the prior

19   instance out of Los Angeles.

20          *THE COURT:*  Overruled.

21   *BY MS. HALL:*

22   *Q.*  You were a case agent on another investigation, white collar

23   investigation --

24          *MS. HALL:*  Did you overrule the objection?

25          *THE COURT:*  I overruled your attempt to put it in

1    evidence.

2           **MS. HALL:**  Thank you.  I'm sorry, your Honor.

3           **THE COURT:**  There was no objection.

4           **MS. HALL:**  All right.  I misunderstood the Court's

5    ruling.

6           **THE COURT:**  No, you may not.

7    **BY MS. HALL:**

8    **Q.**  I want to go now to the pressure that you put on Mr. Lazerus

9    to give you inside information.

10          On May 7th, 2020, that was one of your in-person meets; is

11   that correct?

12          **MS. HALL:**  Oh, and your Honor, if I may, we do have an

13   agreement as to the admissibility of these undercover clips that

14   the defense intends to admit.

15          **THE COURT:**  Okay.  Can you identify them for the

16   record?

17          **MS. HALL:**  Do you have the list?

18      **(Pause.)**

19          **MS. HALL:**  All right.  I'm sorry.  It's a long list, so

20   I'm going to try to get through and talk slowly enough so that

21   the court reporter and the court clerk can get that.

22          These are Defense Exhibits 3190, 3191, 3192, 3202, 3206

23   B that's boy, 3207, 3212, 3213, 3219, 3230, 3231, 3232, 3235,

24   3241, 3251, 3252, 3254; 3259A, as in "apple"; and 3259C, as in

25   "Charlie";

1    3260, 3267, 3268, 3270, 3271, 3272, 3273, 3279, 3265A

2    as in "apple"; 3265B, as in "boy"; 3259B, as in "boy"; and 3255

3    and 3253.

4         **THE COURT:**  Okay.  Is there a stipulation that those

5    may come into evidence, counsel?

6         **MS. CHOPRA:**  Yes.  So stipulated.

7         **THE COURT:**  Any objection from any of the defendants?

8         **MR. YOUNG:**  No, your Honor.

9         **MR. HALL:**  No, your Honor.

10        **THE COURT:**  Okay.  Those exhibits may be admitted into

11   evidence.

12        **(Exhibits admitted.)**

13   **BY MS. HALL:**

14   **Q.**  So going to your May 7, 2020, meeting.

15        That was a lunch meeting; is that right?

16   **A.  I believe that's right.**

17        **MS. HALL:**  I would ask that Defense Exhibit 3207 be

18   pulled up.  And go to Time Stamp 7:32 through 7:50.

19        **(Audio recording played.)**

20   **BY MS. HALL:**

21   **Q.**  Going to your meeting on June 18th, 2020.

22        Do you recall as you sit there whether that was an in-person

23   meeting or a taped phone conversation?

24   **A.  I know there was an in-person that month.  I can't be**

25   **positive when you give me one specific date.**

1    *Q.*  Right.  But this is in the first year of your meetings with

2    Mr. Lazerus.

3    **A.  Yes, ma'am.**

4    *Q.*  Right?

5        On June 18th, 2020, that's Defense Exhibit 3219.  And please

6    play from time stamp 3:05 to 3:19.

7        *(Audio recording played.)*

8    *BY MS. HALL:*

9    *Q.*  That was part of your conversation with Mr. Lazerus --

10   **A.  Yes, ma'am.**

11   *Q.*  -- where you're asking for news.

12       You're telling him you don't want to pay for something

13   that's not coming out.

14   **A.  Correct.**

15   *Q.*  And then again --

16   **A.  Or I don't want to buy stock when there's not going to be**

17   **news coming out.**

18   *Q.*  Okay.  And then I want to talk to you briefly about your

19   meeting.  Was it June 23rd, your meeting with Destler and the

20   other undercover agent?

21   **A.  Around that time sounds right.**

22   *Q.*  And at that meeting you discussed -- you discussed a person

23   named Jim Mahoney.  Someone brought up Jim Mahoney?

24   **A.  Yes, ma'am.**

25   *Q.*  You know who Jim Mahoney is; right?

1    *A.  I do.*

2    *Q.*  Who is Jim Mahoney?

3    *A.  What kind of answer do you want on that?*

4    *Q.*  How do you know Jim Mahoney?

5    *A.  He was known for running market manipulation schemes in*

6    *San Diego County for a long period of time.*

7    *Q.*  And you and the other undercover agent, during your meeting

8    with Jonathan Destler, brought up his name.

9    *A.  Correct.*

10   *Q.*  And in response, the two gentlemen, Mr. Lazerus and Jonathan

11   Destler, said they didn't want to do anything with Mr. Mahoney.

12   *A.  My recollection is that Mr. Destler at least sounded like he*

13   *didn't know the name, but it became clear Robert Lazerus already*

14   *knew who he was and didn't want to do any business with him.*

15   *Q.*  He said, "Let's just keep it clean."  Right?

16   *A.  Yeah.  I think that was referring to Jim Mahoney, yes,*

17   *ma'am.*

18   *Q.*  Meaning keep him out of it; correct?

19   *A.  Yes.*

20   *Q.*  Now, you threw Jim Mahoney's name out there because you knew

21   that he was involved in stock manipulation.

22   *A.  And we knew Robert Lazerus had dealt with people who had*

23   *dealt with Jim Mahoney, so they already had a history.*

24   *Q.*  But his response to you was, "We're not dealing with him."

25   *A.  Correct.*

1    *Q.*  Okay.  Now, the day after, you had a conversation with

2    Mr. Lazerus; right?  The 24th?

3    **A.  I believe that's right, yes, ma'am.**

4    *Q.*  And you talked about what happened when you brought up the

5    name Jim Mahoney.

6    **A.  Yes.  That's my recollection.**

7    *Q.*  Can you play Defense Exhibit 3235.

8         *FEMALE SPEAKER:*  In its entirety?

9         *MS. HALL:*  No, from 0:00 to 0:25.  From 0:00 to 0:25.

10   So this is 3235, Defense Exhibit 3235.  From zero -- is that

11   right?

12      *(Audio recording played.)*

13        *MS. HALL:*  Stop.

14        *THE COURT:*  Is now an okay time to break for lunch?

15        *MS. HALL:*  Can I just ask two questions to follow up on

16   that?

17        *THE COURT:*  Sure.

18   *BY MS. HALL:*

19   *Q.*  It was hard to hear, but at the end of that, you said some

20   of the oxygen went out of the room.

21   **A.  I did, yes, ma'am.**

22   *Q.*  What did you mean by that?

23   **A.  When the name was mentioned at the table, Mr. Lazerus got**

24   **quiet, and you could just see the gears turning in his head.**

25   *Q.*  Well, no one said anything; right?

1    *A.  I -- probably not.  I think there was some silence.*

2    *Q.*  Except that Mr. Lazerus, after the silence, said, "Let's

3    keep it clean."

4    *A.  I thought on a subsequent call, I don't think at the*

5    *in-person meeting.*

6    *Q.*  In person, he said, "We just want to deal with the two of

7    you."

8    *A.  That sounds right, yes, ma'am.*

9          *MS. HALL:*  Now is fine, your Honor.

10        *(End of requested testimony.)*

11        *(Remainder of testimony reported by James Pence-Aviles.)*

12                          ***

13              *REPORTER'S CERTIFICATE*

14        I, Anne Roldan, certify that I am a duly qualified
     and acting Official Court Reporter for the United States
15    District Court, that the foregoing is a true and accurate
     transcript of the proceedings as taken by me in the
16    above-entitled matter on August 6, 2024; and that the format
     used complies with the rules and requirements of the United
17    States Judicial Conference.

18    Date:  August 10, 2024

19    _____

20    *Anne Roldan, RMR, CRR, CSR 13095*

21

22    ///

23    ///

24    ///

25    ///