**Volume 3**

**Pages 168 - 323**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Cynthia Bashant, Judge

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | NO. 22-CR-02701-BAS |
| ) | |
| DONALD DANKS, JONATHAN ) | |
| DESTLER, AND ROBERT LAZERUS, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

San Diego, California
Friday, August 16, 2024

**PARTIAL TRANSCRIPT OF JURY TRIAL**

**(TESTIMONY OF DONALD DANKS)**

**APPEARANCES:**

For Plaintiff:

                    TARA K. MCGRATH
                    United States Attorney
                    880 Front Street, Room 6293
                    San Diego, California 92101
              BY:   **NICHOLAS W. PILCHAK, ESQ.**
                    **JANAKI GANDHI CHOPRA, ESQ.**
                    **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Donald Danks:
                    LAW OFFICE OF PATRICK Q. HALL
                    402 West Broadway, Suite 1560
                    San Diego, California 92101
              BY:   **PATRICK Q. HALL, ESQ.**
                    **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:   James C. Pence-Aviles, RMR, CRR, CSR No. 13059
               Official Court Reporter

**<u>APPEARANCES</u>:   (CONTINUED)**

For Defendant Jonathan Destler:

                          SNELL & WILMER
                          12230 El Camino Real, Suite 300
                          San Diego, California 92130
                 BY:  **ANDREW PHILLIP YOUNG, ESQ.**
                      **ATTORNEY AT LAW**


                          MILLER BARONDESS, LLP
                          2121 Avenue of the Stars, Suite 2600
                          Los Angeles, California 90067
                 BY:  **LOUIS "SKIP" MILLER, ESQ.**
                      **ATTORNEY AT LAW**

For Defendant Robert Lazerus:

                          LAW OFFICE OF MARTHA M. HALL
                          555 West Beech Street, Suite 508
                          San Diego, California 92101
                 BY:  **MARTHA MCNAB HALL, ESQ.**
                      **ATTORNEY AT LAW**


                          LAW OFFICE OF ADAM F. DOYLE
                          444 West C Street, Suite 310
                          San Diego, California 92101
                 BY:  **ADAM F. DOYLE, ESQ.**
                      **ATTORNEY AT LAW**

```
 1                        I N D E X

 2     Friday, August 16, 2024 - Volume 3

 3     DEFENDANT DONALD DANKS'S WITNESS              PAGE VOL.

 4     DANKS, DONALD (RECALLED)
       (PREVIOUSLY SWORN)                            172   3
 5     Cross-Examination (Resumed) by Ms. Hall      172   3
       Cross-Examination by Ms. Chopra              193   3
 6     Cross-Examination by Mr. Miller              310   3
       Redirect Examination by Mr. Hall             311   3
 7     Recross-Examination by Ms. Hall              319   3

 8                      E X H I B I T S

 9     GOVERNMENT'S EXHIBITS              IDEN   EVID VOL.

10      200                              257    258   3

11      202                              259    259   3

12      425                              247    248   3

13      475                              180          3

14      478                              268          3

15      483                              181    182   3

16      484                              182    183   3

17      485                              183    184   3

18      486                              184    184   3

19      497                              251    252   3

20      821                              204    205   3

21      822                              277    278   3

22      823                              281    288   3

23     DEFENDANTS' EXHIBITS              IDEN   EVID VOL.

24      3016                             190    190   3

25
```

**I N D E X**

**E X H I B I T S**

| DEFENDANTS' EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 3282 | 189 | 189 | 3 |
| 3473 | 321 | 322 | 3 |

| 1 | **Friday - August 16, 2024**                    **8:34 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | **---000---** |
| 4 | (Proceedings were heard in the presence of the jury:) |
| 5 | **THE COURT:**  Good morning. |
| 6 | **THE JURORS:**  Good morning. |
| 7 | **THE COURT:**  We are back on the record.  All jurors are |
| 8 | present.  All defendants are present.  All defense counsel -- |
| 9 | or all counsel are present. |
| 10 | You are reminded you are still under oath to tell the |
| 11 | truth. |
| 12 | Ms. Hall? |
| 13 | **MS. HALL:**  Thank you very much. |
| 14 | **DONALD DANKS**, |
| 15 | called as a witness for the Defendant Donald Danks, having been |
| 16 | previously duly sworn, testified further as follows: |
| 17 | **CROSS-EXAMINATION (RESUMED)** |
| 18 | **BY MS. HALL:** |
| 19 | **Q.**  You can have a seat, Mr. Danks. |
| 20 | Mr. Danks, when we left off yesterday, we were talking |
| 21 | about a couple of things.  But one thing we were talking about |
| 22 | is the absence of Mr. Lazerus's name on that big document, |
| 23 | 1219, which had a whole bunch of other names. |
| 24 | **A.**  Correct. |
| 25 | **Q.**  Mr. Lazerus is not a founder of Loop? |

**DANKS - CROSS / HALL** 157

| | |
|---|---|
| 1 | **A.**   No, he is not. |
| 2 | **Q.**   He was never on the Board of Directors? |
| 3 | **A.**   No, he wasn't. |
| 4 | **Q.**   I believe you started to say, in your testimony yesterday, |
| 5 | that you agreed with Holly Manion's description of |
| 6 | Robert Lazerus. |
| 7 | **A.**   It was a very accurate description. |
| 8 | **Q.**   He's not very sophisticated? |
| 9 | **A.**   In -- in the financial markets, yes, I would say that. |
| 10 | I -- I don't know him well enough to know if he's |
| 11 | sophisticated.  He might be a wine connoisseur or something.  I |
| 12 | don't know. |
| 13 | **Q.**   Right, but as far as the financial markets and your |
| 14 | dealings with him, he was not very sophisticated? |
| 15 | **A.**   No. |
| 16 | **Q.**   Did he sometimes get terminology and language mixed up? |
| 17 | **A.**   Similar to me. |
| 18 | **Q.**   Now, I'd like to go back to Defense Exhibit 3449.  That's |
| 19 | where I was having my problems yesterday. |
| 20 | **MS. HALL:**  We're going to try it using technology |
| 21 | first, Your Honor, but I do have a backup physical copy. |
| 22 | **THE COURT:**  Okay. |
| 23 | **MS. HALL:**  If you could scroll down to the first blue |
| 24 | bubble of this text thread. |
| 25 | /// |

157

 1 | BY MS. HALL:

 2 | Q.   Now, I believe that you talked briefly about this

 3 | yesterday, Mr. Danks.

 4 |      This is a text conversation between you and Mr. Lazerus;

 5 | is that correct?

 6 | A.   Yes, that's correct.

 7 | Q.   All right.  And it is marked as Defense Exhibit 3449.

 8 |      And in this first bubble, you're telling Mr. Lazerus that

 9 | you have something that's going to be released on Thursday; is

10 | that right?

11 | A.   Yes.

12 |      MS. HALL:  Would you scroll down, please.

13 | BY MS. HALL:

14 | Q.   Now, initially, Mr. Lazerus's response was perhaps a

15 | little vague.  He says, "It's okay.  I appreciate it, but I'm

16 | going to go right back in and start training" -- "trading once

17 | the news comes out"; is that correct?

18 | A.   Yes.

19 |      MS. HALL:  Can you scroll down a little bit more?

20 | BY MS. HALL:

21 | Q.   But you went ahead and sent him an attachment?

22 | A.   Could you scroll back down so I can just look at the

23 | other -- the other responses?

24 |      "Hopefully, the news release will come out sooner, but it

25 | won't be soon enough for me."

 1          THE COURT:  Okay.  That's not for the court reporter

 2    to take down.

 3          THE WITNESS:  I'm sorry.  I'm sorry.  Just -- no.  I

 4    wanted to see the one above that.

 5    BY MS. HALL:

 6    Q.   Sure.  Sure.

 7    A.   Yeah.

 8    Q.   Sure.

 9         And then this attachment -- it's an attachment that you

10    texted to Mr. Lazerus; is that right?

11    A.   Yes, it is.

12    Q.   Even though he said that that's okay; right?

13    A.   Yes.

14    Q.   Okay.  If you could scroll down, you can read the next

15    two --

16          THE COURT:  And just read it to yourself.

17    BY MS. HALL:

18    Q.   I'll ask you just to read it to yourself.

19          MS. HALL:  Keep scrolling.

20    BY MS. HALL:

21    Q.   And then you ask Mr. Lazerus in that top blue bubble,

22    "Were you able to open and read that attachment?"  Is that

23    correct?

24    A.   Yes.

25    Q.   And his response to you is that he didn't want to take the

 1  chance of opening and reading that attachment; correct?

 2  **A.**   Correct.

 3  **Q.**   That he didn't want to get in trouble with the SEC for

 4  insider trading?

 5  **A.**   Correct.

 6  **Q.**   And then he reiterated that he's just going to wait until

 7  the news is public, and then he's going to make his decision

 8  about trading?

 9  **A.**   That is what the text says, yes.

10        **MS. HALL:**   Okay.   We can take that down.

11        I would like to go to -- and I think that my team has this

12  ready, Government's Exhibit 458.

13        Thank you.

14  **BY MS. HALL:**

15  **Q.**   If you can scroll that down a little bit, can you identify

16  this as another text conversation between you and

17  Robert Lazerus?

18  **A.**   Just let me take a look real quick.

19        Yeah.   That's -- that's Robert's number, yes.

20  **Q.**   Right.

21        And then we see the blue bubble.   Is that you --

22  **A.**   Yes.

23  **Q.**   -- on the blue bubble?

24        And you're talking about -- you're asking Robert if Allan

25  can come into the market; is that right?

```
 1   A.   That's correct.

 2   Q.   Now, if we scroll down, we see that Robert's response is

 3   that he thinks Allan's all tied up?

 4   A.   Yes.

 5   Q.   So his response is, "Sorry.  That's a no on Allan"?

 6   A.   Correct.

 7           MS. HALL:  You can go ahead and take that down.

 8   BY MS. HALL:

 9   Q.   So I believe you were also talking to us yesterday about

10   your sort of team of people.  There were -- is that right?  You

11   were --

12   A.   Yeah.  Yes, I had a team.

13   Q.   Okay.  There were other people that you worked with to

14   reach out to investors other than Mr. Lazerus; right?

15   A.   Yes.

16   Q.   You worked with an individual named Coach?

17   A.   James Harrison, a.k.a. Coach.

18   Q.   And you also worked with an individual named -- let's

19   see -- Steve Scott; is that right?

20   A.   Steve Scott?

21   Q.   Uh-huh.

22   A.   I didn't work with Steve Scott.

23   Q.   What about Kathleen Rogers?  Did you work with her?

24   A.   I did not work -- work with Kathleen Rogers.

25   Q.   So your team was primarily Coach and Mr. Lazerus?  Were
```

1  there others?

2  **A.**   And occasionally Jon Destler.

3  **Q.**   Okay.  All right.  But we don't have Mr. Harrison sitting

4  at the table over there by Mr. Lazerus, do we?

5  **A.**   I do not see Coach at the table.

6  **Q.**   Okay.  Thank you.

7       Now, you know who Mr. O'Dowd is; is that right?

8  **A.**   Kevin O'Dowd?

9  **Q.**   Yes.

10 **A.**   Yes, I do.

11 **Q.**   Who is he?

12 **A.**   He was a wealth manager, and I can't remember -- I think

13 it was Brandon James where I met him, and he --

14 **Q.**   Did he eventually go to work for Loop?

15 **A.**   He eventually became, I think, an inside investor

16 relations executive at Loop.

17 **Q.**   So he was actually an employee of Loop?

18 **A.**   I believe he was an employee.  I'm not sure if he was an

19 employee or a consultant, but he worked with Loop.

20 **Q.**   And investor relations -- I mean, there's nothing illegal

21 about investor relations, is there?

22 **A.**   No.  It's a necessary part of all of this.

23 **Q.**   Okay.  It's reaching out to potential investors to seek

24 capital; is that right?

25 **A.**   Correct.

```
 1        (Court reporter requests clarification for the record.)

 2            MS. HALL:  "Seek."

 3   BY MS. HALL:

 4   Q.   Because you have to have capital in order to produce your

 5   product?

 6   A.   The lifeblood.  You need it.

 7   Q.   Right.

 8        And he would also prepare what's known as a deck or a

 9   sliding deck?

10   A.   I'm not sure -- I'm not sure if he was the one who

11   produced it, but he would need a deck to do his job.

12   Q.   Can you explain what a deck is?

13   A.   A deck is a -- it's a -- it's a series of -- of pages that

14   takes -- if anybody wants to learn about the company through --

15   the entire nature of the company, what it does, the size of the

16   market, some of the obstacles, some of the opportunities,

17   just -- it's a very -- it's a pretty detailed overview of the

18   company.

19   Q.   Public information?

20   A.   Public information.

21   Q.   Right.

22        There is a lot of public information that you can use to

23   promote the company; right?

24   A.   Yes.

25   Q.   Nothing illegal about that?
```

DANKS - CROSS / HALL

1    **A.**    No.

2    **Q.**    Right.

3        They might have videos and pictures like the ones that

4    we've seen so far in this trial?

5    **A.**    A paper deck wouldn't have videos, but an electronic deck

6    could have videos.

7    **Q.**    I want to take you back to the chats.

8        There were many occasions when you sent messages to

9    Mr. Lazerus, and he did not respond?

10    **A.**    That -- that did happen, yeah.

11    **Q.**    So let's look at Exhibit 472, and I'm going to try to go

12    through these fairly quickly.

13    **A.**    Okay.

14    **Q.**    Exhibit 472 -- that's a text message from you to Robert?

15    **A.**    Yes.

16        **MS. HALL:**  Scroll down.

17    **BY MS. HALL:**

18    **Q.**    And there's no response?

19    **A.**    No, there isn't.

20    **Q.**    Exhibit 475.

21        (Government's Exhibit 475 marked for identification.)

22        **THE CLERK:**  Counsel, I don't know if that is in.

23        **MS. HALL:**  That -- these are all in evidence.

24        **THE CLERK:**  I don't have 475.

25    ///

1   **BY MS. HALL:**

2   **Q.**   Exhibit 475 is a text message from --

3           **THE COURT:**  I do not have 475 in evidence.

4           **MS. HALL:**  Well, we can -- we can skip that one, then.

5   **BY MS. HALL:**

6   **Q.**   477.  That's a text message from you to Robert?

7   **A.**   Let me check his number.

8           Yes, that's Robert's number, and --

9           **MS. HALL:**  Scroll down.

10          **THE WITNESS:**  -- this is --

11          **MS. HALL:**  Scroll down, please.

12  **BY MS. HALL:**

13  **Q.**   And there's no response from Robert?

14  **A.**   I don't see a response.

15  **Q.**   Government's Exhibit 483.

16          **THE COURT:**  Is not in evidence.

17      (Government's Exhibit 483 marked for identification.)

18          **MS. HALL:**  I would -- oh.  Did I -- I think I said

19  483, or did I say --

20          **THE COURT:**  483 is not in evidence.

21          **MS. HALL:**  I'm going to move it into evidence.

22          **THE COURT:**  Okay.  You may show it, not to the jury.

23  **BY MS. HALL:**

24  **Q.**   Okay.  Again, you're texting to Mr. Lazerus; is that

25  right?

**DANKS - CROSS / HALL**

1   **A.**   Yes, I am.

2   **Q.**   And there's no response?  There's no green bubble?

3   **A.**   Scroll down.

4        Yeah, there's no green bubble.

5   **Q.**   And, in fact, there's even a missed phone call; is that

6   right?

7   **A.**   There -- yeah, there is a missed phone call.

8   **Q.**   Okay.  Let's go to Government's Exhibit 484.

9        (Government's Exhibit 484 marked for identification.)

10        **THE COURT:**  Not in evidence.

11        **MS. HALL:**  Do you object?

12   I would move it into evidence.

13        **THE COURT:**  You're moving 4- -- well, you didn't move

14   483.  Do you want 483 in evidence?

15        **MS. HALL:**  I do.

16        **THE COURT:**  Any objection to 483?

17        **MS. CHOPRA:**  No objection.

18        **MR. HALL:**  No objection.

19        **MR. MILLER:**  No.

20        **THE COURT:**  Okay.

21        (Government's Exhibit 483 received in evidence.)

22        **MS. HALL:**  I would move 484 into evidence.

23        **THE COURT:**  484.

24   Any objection?

25        **MS. CHOPRA:**  Let me look at it.

```
 1              MR. MILLER:  No.

 2              MS. CHOPRA:  No objection, Your Honor.

 3              THE COURT:  484 may be admitted.

 4          (Government's Exhibit 484 received in evidence.)

 5   BY MS. HALL:

 6   Q.   Again, is that a conversation between you and Mr. Lazerus?

 7   A.   It's a text to Mr. Lazerus.  I don't see a response.

 8   Q.   Thank you.

 9        That was my next question.

10   A.   Okay.

11   Q.   No green bubble; right?

12   A.   Right.

13   Q.   Government's Exhibit 485.

14          (Government's Exhibit 485 marked for identification.)

15              THE COURT:  Not in evidence.

16              MS. HALL:  I would move it into evidence.

17              THE COURT:  Any objection?

18              MS. CHOPRA:  Your Honor, let me look at it really

19   quickly.

20              MR. HALL:  Let me have a second, Your Honor.

21              MS. CHOPRA:  No objection, Your Honor.

22              MR. HALL:  No objection.

23              MR. MILLER:  No.

24              THE COURT:  485 may be admitted.

25   ///
```

```
 1          (Government's Exhibit 485 received in evidence.)

 2   BY MS. HALL:

 3   Q.   And, Mr. Danks, again, that's a blue bubble message from

 4   you to Robert Lazerus?

 5   A.   Correct.

 6   Q.   And, again, there's no response?

 7   A.   There is not.

 8   Q.   No green bubble; right?

 9   A.   No green bubble.

10   Q.   Government's Exhibit 486.

11          (Government's Exhibit 486 marked for identification.)

12             THE COURT:  Not in evidence.

13        Are you moving it in?

14             MS. HALL:  Yes, I am, Your Honor.

15             THE COURT:  Any objection?

16             MR. MILLER:  No.

17             MR. HALL:  One second, Your Honor.

18             MS. CHOPRA:  No objection, Your Honor.

19             MR. HALL:  No objection.

20             THE COURT:  486 may be admitted.

21          (Government's Exhibit 486 received in evidence.)

22   BY MS. HALL:

23   Q.   Again, you are texting Robert Lazerus?

24   A.   Yes, I am.

25   Q.   And, again, there is no response from Mr. Lazerus?
```

```
 1   A.   That is correct.

 2   Q.   463.

 3            THE COURT:  Is in evidence.

 4            MS. HALL:  Thank you.

 5   BY MS. HALL:

 6   Q.   And, again, that is a text message from you to

 7   Robert Lazerus; is that right?

 8   A.   Correct.

 9   Q.   And there is, again -- oh.  There's another message from

10   you.

11        And I believe we have to scroll down until we get to the

12   bottom of this text thread, where there is no response; is that

13   right?

14   A.   So that blue bubble is -- there's nothing below that?

15   Q.   Yes.

16   A.   Okay.

17   Q.   That's my question.

18   A.   Yes.  Yeah, there's no response to that.

19   Q.   Thank you.

20        I believe we've already discussed 458; is that right?

21            MS. HALL:  I would -- I would then ask for

22   Government's Exhibit 470.

23            THE COURT:  Which is in evidence.

24            MS. HALL:  Thank you, Your Honor.

25   ///
```

1    **BY MS. HALL:**

2    **Q.**    470 is, again, a text message from you to Robert Lazerus;

3    is that correct?

4    **A.**    Yes, it is.

5    **Q.**    Okay.  And if we look at the dates, there are two separate

6    dates.  There's a date that it was sent in the bottom

7    right-hand corner of the blue bubble.

8        Do you see that?

9    **A.**    I do.

10   **Q.**    And that is December 7th, 2018?

11   **A.**    Correct.

12   **Q.**    And then there's a date in the middle of the blue bubble,

13   which is under the word "Read."  Do you see that?  Do you see

14   that --

15   **A.**    Yeah.  Oh, yeah.  There it is, 12/11/2018.  Yes, I see

16   that.

17   **Q.**    Several days after the text message was sent?

18   **A.**    Correct.

19   **Q.**    And, again, there's no response?

20   **A.**    None.

21   **Q.**    Can we go to Government's Exhibit 478?

22        **MS. HALL:**  Is that in evidence?

23        **THE COURT:**  That is in evidence.

24        **MS. HALL:**  Thank you, Your Honor.

25   ///

1    **BY MS. HALL:**

2    **Q.**    And, again, we have a message from you to Robert Lazerus;

3    is that right?

4    **A.**    Correct.

5    **Q.**    And if you scroll down, initially, he does respond with a

6    green bubble that says, "Okay"; is that right?

7    **A.**    Yes.

8    **Q.**    And then you proceed to continue to -- to message him;

9    right?

10    **A.**    Correct.  Correct.

11    **Q.**    You, I think, send three separate text messages; is that

12    right?

13    **A.**    That's correct.

14    **Q.**    All in a row?

15    **A.**    Yes.

16    **Q.**    With no response?

17        Oh.  There's a fourth one.  So four text messages all in a

18    row; is that right?

19    **A.**    Yes.

20    **Q.**    With no response?

21    **A.**    Correct.

22    **Q.**    And then there are two missed -- three --

23    **A.**    Three.

24    **Q.**    -- missed phone calls?

25    **A.**    Three missed phone calls.

1    Q.    Okay.  Thank you.

2          **MS. HALL:**  You may take that down.

3    **BY MS. HALL:**

4    Q.    Now, I believe we also had some testimony yesterday from

5    you about Michelle Fiore and your arrangements with her.

6          You testified about setting up Ventanas as a business for

7    Ms. Fiore; is that right?

8    A.    I -- I assisted her in setting up her LLC, yes.

9    Q.    And then you also told us about a -- I guess a charade or

10   a disguise that you and Ms. Fiore came up for with regard to

11   Ventanas?

12   A.    I don't know if it's a charade.  She wanted an alter ego

13   to --

14   Q.    An alter ego?

15   A.    Yes.

16   Q.    And you referred to David Williams?

17   A.    Yes.

18   Q.    And you referred to Dagmar?

19   A.    That -- that was a name that she would use for this

20   business.

21   Q.    Okay.  And you also mentioned the guys at Ventanas?

22   A.    Yes.

23   Q.    Okay.  And this was deceptive?

24   A.    I guess it would be deceptive, yeah.  It was intended to

25   create --

1  **Q.**  An -- an illusion?

2  **A.**  An illusion, correct.

3  **Q.**  And you continued this deception with Robert Lazerus?

4  **A.**  Correct.  She wanted privacy, and I did.

5  **Q.**  So just -- I think we can get through these very quickly,

6  just -- Defense Exhibit 3282, if we can have you identify that.

7       I don't believe it's in evidence yet.

8       (Defendants' Exhibit 3282 marked for identification.)

9  **BY MS. HALL:**

10  **Q.**  Is -- is this a text message from you to Robert Lazerus?

11  **A.**  Yes, it is.

12  **Q.**  Okay.  Is that --

13       **MS. HALL:**  I would move it into evidence at this time.

14       **THE COURT:**  Any objection to 3282?

15       **MR. HALL:**  No objection, Your Honor.

16       **MS. CHOPRA:**  No objection, Your Honor.

17  **BY MS. HALL:**

18  **Q.**  Okay.  In this message from you to Robert Lazerus, you are

19  telling him that you talked to David Williams at

20  Ventanas Capital; correct?

21       **THE COURT:**  And just for the record, I admitted it.

22       **MS. HALL:**  Thank you.

23       I'm sorry, Your Honor.  Thank you.

24       (Defendants' Exhibit 3282 received in evidence.)

25  ///

DANKS - CROSS / HALL

BY MS. HALL:

Q.   You are -- you are telling Robert Lazerus that you talked to David Williams at Ventanas; is that right?

A.   Correct.

Q.   Okay.  But there is no David Williams at Ventanas?

A.   There is no David Williams.

        MS. HALL:  I would take that down and now ask for Defense Exhibit 3016 for identification purposes.

        (Defendants' Exhibit 3016 marked for identification.)

BY MS. HALL:

Q.   Is this another text message from you to Robert Lazerus?

A.   That's correct.

        MS. HALL:  I would move it into evidence.

        THE COURT:  Any objection to 3016?

        MR. MILLER:  No.

        MR. HALL:  No objection, Your Honor.

        MS. CHOPRA:  No objection, Your Honor.

BY MS. HALL:

Q.   Okay.  And, again --

        THE COURT:  It may be admitted.

        MS. HALL:  I'm sorry.  Jumping the gun.

        (Defendants' Exhibit 3016 received in evidence.)

BY MS. HALL:

Q.   And, again, you are telling Robert Lazerus that you talked to David Williams; right?

1    **A.**   Correct.

2    **Q.**   And you're telling Mr. Lazerus what David Williams is

3    willing to do and not do?

4    **A.**   Would -- what he's willing to do.

5    **Q.**   But there is no David Williams at Ventanas?

6    **A.**   Again, an alter ego for Michelle Fiore.

7            **MS. HALL:**  I would ask to take that down and ask for

8    Government's Exhibit 446.

9        Is that in evidence?

10           **THE COURT:**  It is.

11           **MS. CHOPRA:**  Yes.

12           **MS. HALL:**  Thank you.

13   **BY MS. HALL:**

14   **Q.**   Okay.  So this is another text message from you to

15   Mr. Lazerus; is that correct?

16   **A.**   That is correct.

17           **MS. HALL:**  Can you scroll down?

18       Does that have -- so it looks like maybe -- I may have put

19   this exhibit in the wrong column.

20       So I did.  I put -- I put this in the wrong column, I

21   think.

22       Oh.  Is it Page 10?

23           **PARALEGAL:**  Yeah.  I think -- yeah.

24           **MS. HALL:**  Page 10?

25       Here we go.  Finally, we found it.

1           Thank you.

2    BY MS. HALL:

3    Q.    I'm on Page 16 of Exhibit 446.

4           This is a text message from you to Mr. Lazerus; is that

5    right?

6    A.    That is correct.

7    Q.    And, again, you're referring to the guys from Ventanas?

8    A.    Correct.

9           MS. HALL:   And then, lastly, I would ask for

10   Exhibit 3280 -- that's a defense exhibit -- just to mark it for

11   identification.

12          THE COURT:   3280 has been admitted.

13          MS. HALL:   Thank you, Your Honor.

14   So we can publish this and just talk -- talk about it.

15   BY MS. HALL:

16   Q.    This is another text message, the bottom blue bubble,

17   where you refer to Dagmar Fiore --

18   A.    Correct.

19   Q.    -- is that right?

20          Not Michelle Fiore; is that right?

21   A.    Correct.

22   Q.    Thank you.

23          MS. HALL:   You can take those down.

24   BY MS. HALL:

25   Q.    So, Mr. Danks, you -- you were a founder of Loop; is that

1    right?

2    **A.**    Yes, I was.

3    **Q.**    And you were on the Board --

4    **A.**    Yes, I was.

5    **Q.**    -- of Directors --

6    **A.**    Yes.

7    **Q.**    -- for Loop?

8    **A.**    For Loop.

9    **Q.**    You -- you were an insider?

10   **A.**    Yes.

11           **MS. HALL:**  Nothing further.

12           **THE COURT:**  Ms. Chopra?

13                      **CROSS-EXAMINATION**

14   **BY MS. CHOPRA:**

15   **Q.**    One moment.

16   **A.**    Good morning.

17   **Q.**    Good morning.

18          Mr. Danks, you've been an entrepreneur for years; right?

19   **A.**    My whole life.

20   **Q.**    Your whole life.

21          Your -- your whole career?

22   **A.**    Except -- except for a few years when I worked for

23   Brooks Shoe Company, yeah.

24   **Q.**    Okay.  But ever since then?

25   **A.**    Before and then ever since then.

1    Q.    Okay.  And that's how you met Mr. Destler; is that right?

2    A.    I met him because he -- he was in a similar field, and I

3    was connected with him through a mutual friend.

4    Q.    Okay.  And that was back about 20 years ago or so?

5    A.    20 years is a good estimate.

6    Q.    And you consider yourself a business partner with

7    Mr. Destler; is that right?

8    A.    Yeah.  We had -- we formed, like I said, an informal

9    relationship through Touchstone Capital Advisors.

10   Q.    An informal relationship?

11   A.    Well, yeah.  There wasn't a real -- it wasn't a real

12   company.  It was just a brand name.  We had other projects that

13   we did independently, but we were informal business partners

14   and worked on projects together.

15   Q.    Okay.  And, in fact, generally, you consider him your

16   partner in everything; is that right?

17   A.    Everything that we did since 2012, I believe.  We worked

18   together on them, yes.

19   Q.    So everything since 2012, you consider Mr. Destler your

20   partner in everything?

21   A.    I'm just trying to think if there were any other projects.

22   Jon might do some consulting with other things, and I might do

23   some consulting on other things.  But -- but by and large,

24   the -- the thrust of our business was building these companies,

25   and we did that as partners.

1  Q.    Okay.  And you've also known Mr. Lazerus for quite some

2  time; right?

3  A.    Yes, I do -- have known him.

4  Q.    And how long was that again?

5  A.    To the best of my recollection, it's somewhere between

6  2010 and 2000- -- late 2011, sometime -- somewhere in there.

7  Q.    So approaching 15 years or so?  Does that sound --

8  A.    13 -- about 13 years, probably.

9  Q.    Okay.  And I think you testified that you talk to

10 Mr. Lazerus almost daily; is that right?

11 A.    I talk to him on a regular basis, not almost daily.

12 Q.    How often?

13 A.    It would go in stretches.  If we were in the middle of --

14 of doing a private placement, we would talk regularly.  There

15 would be a month's gaps where we weren't raising capital, and I

16 didn't talk to him much during that.

17 Q.    Okay.  And what about Mr. Destler?  How often would you

18 talk to him in the 20 years you've known him?

19 A.    In the 20 years?

20 Q.    Yes.

21 A.    Not very frequently.  Between 2000- -- say -- let's say we

22 met in 2003.

23 Q.    Uh-huh.

24 A.    Not very frequently between 2003 and 2011, but we did --

25 we did -- he worked for a company that my company had hired.

1    So I would -- but he -- he didn't have my accounts.  So I

2    didn't see him that often.  But since 2000- -- well, when we

3    started this partnership, we talked on a regular basis.

4    **Q.**    When you say "regular," what do you mean?

5    **A.**    Not daily, but I would say, on average, maybe three, four

6    times a week.

7    **Q.**    Okay.  And -- and you see him pretty often, too; right?

8    **A.**    Not that often.  I don't like driving to Los Angeles up

9    the 405.  So --

10   **Q.**    Well, don't you share an office space?

11   **A.**    No.

12   **Q.**    You don't?

13   **A.**    No.

14   **Q.**    Not in LA?

15   **A.**    No.

16   **Q.**    Okay.  How often do you see him in person?

17   **A.**    Could you repeat the question?

18   **Q.**    How often do you see him in person?

19   **A.**    Again, it depends on what we have going on, not -- I don't

20   see him that much because we do most things by phone.  We -- I

21   do see him when we have client meetings or if we're going to do

22   strategy sessions.  So, occasionally, we would get together,

23   but I didn't see him on a regular basis.

24   **Q.**    Okay.  And then -- I think you mentioned on direct that

25   Mr. Lazerus had worked with you on a prior company you were

1    pitching; right?

2    **A.**   Correct.

3    **Q.**   Was it just one -- besides Loop, was it just one prior

4    company or more than one?

5    **A.**   I think it was primarily on one company.  I might have

6    asked him for assistance on some other consulting stuff that we

7    were doing, but primarily one other company besides Loop.

8    **Q.**   And that -- that company was Trilogy?

9    **A.**   Trilogy PetroSource.

10   **Q.**   Okay.  That was the oil and gas project you were talking

11   about?

12   **A.**   Correct.

13   **Q.**   And you also mentioned, at some point, you built a team;

14   is that right?

15   **A.**   When we -- in -- in -- when we were doing Trilogy

16   PetroSource, there wasn't that much of a team because I had

17   just met Robert.  I didn't know him that well.  I didn't know

18   his capabilities.

19        I worked primarily with Jon Destler on that project and

20   did have some help from Coach on that, too.  I've been working

21   with Coach since 1999.  So he would be involved.  So it was

22   just the three of us.

23        **THE COURT:**  I'm just going to stop you for a minute.

24   I think you've answered the question.

25        **THE WITNESS:**  Okay.

1    BY MS. CHOPRA:

2    **Q.**    And then, in working with Mr. Lazerus on Trilogy, he

3    performed well; right?

4    **A.**    He brought a lot of very good investors.  Yes, he

5    performed well.

6    **Q.**    And so after that, you continued to work with Mr. Lazerus;

7    is that right?

8    **A.**    Yes.

9    **Q.**    And, eventually, you did build a team; right?

10   **A.**    Correct.

11   **Q.**    Okay.  And that team consisted of you; is that right?

12   **A.**    Yes.

13   **Q.**    And Mr. Lazerus?

14   **A.**    Correct.

15   **Q.**    And Coach?

16   **A.**    Coach.

17   **Q.**    Okay.  And also Mr. Destler?

18   **A.**    And also Mr. Destler.

19   **Q.**    The four of you?

20   **A.**    Pardon?

21   **Q.**    The four of you; is that right?  Is that four?

22   **A.**    The four of us, yes.

23   **Q.**    And what exactly was the purpose of this team of four that

24   you had?

25   **A.**    It was all focused on raising capital for the companies.

1   **Q.**   For various companies?

2   **A.**   For various companies.

3   **Q.**   Around when did you build this team?

4   **A.**   I think it came together on the Loop project.

5   **Q.**   So maybe 2014?

6   **A.**   Probably 2014.

7   **Q.**   And what was your role on this team?

8   **A.**   I -- I would consider myself cocaptain with Jon.

9   **Q.**   Cocaptain.

10   So what does that mean?

11   **A.**   Jon and I were the -- kind of the two driving forces

12   behind this.  Robert and James were mostly finders who would

13   introduce me or Jon to potential investors.

14   **Q.**   Got it.

15   So you and Mr. Destler were kind of the brains behind the

16   operation, the captains; is that right?

17   **A.**   That would probably be a fair characterization --

18   characterization.

19   **Q.**   Okay.  Sorry.  I didn't mean to cut you off.

20   And then Mr. Lazerus and Coach, or Mr. Harrison, would be

21   finders, as you say?

22   **A.**   That's primarily what they did, is -- is introduce us to

23   potential accredited investors.

24   **Q.**   And for their work as finders, did Mr. Lazerus and Coach,

25   or Mr. Harrison, get paid?

1   A.   They typically got stock, and sometimes they got cash, but

2   they did get compensated for their -- when they successfully

3   introduced an investor to the companies we were working on.

4   Q.   Like a commission?

5   A.   You know, I wouldn't consider it a commission.  I -- we

6   tried to create consulting -- kind of a consulting arrangement.

7   Q.   Uh-huh.

8   A.   So it would be more of a consulting.  Sometimes, it would

9   be stocks.  Sometimes, if they needed cash, they would be paid

10  in cash.  So it just varied.

11  Q.   And so let's talk about some of the companies that you

12  and -- and your team kind of worked on.

13       So at least some of you worked on Trilogy, it sounds like;

14  is that right?

15  A.   All four of us worked on Trilogy.

16  Q.   Okay.  And what about Dthera?  Did you work on that?

17  A.   I worked on it, yes.

18  Q.   Yes?

19       Okay.  And Loop, of course; right?

20  A.   Yes.

21  Q.   And, more recently, it seems like the three of you have

22  gotten behind Opti-Harvest; is that right?

23  A.   That's correct.

24  Q.   Okay.  And you find these all to be pretty successful

25  endeavors; is that right?

1   **A.**   Opti-Harvest?

2   **Q.**   All -- all of them, the four that we just mentioned.

3   **A.**   Dthera didn't work out.

4   **Q.**   So given the decade-plus of --

5   **A.**   Pardon?

6   **Q.**   Sorry.

7        Given the about-decade that you've had this team that

8   you're working with, do you have a certain template you use

9   each time when you want to grow a company or develop a company?

10  **A.**   I don't understand the question.

11  **Q.**   Okay.  So as a team, you're working together to build

12  companies or promote companies; right?

13  **A.**   Correct.

14  **Q.**   Okay.  So what steps do you take, as a team, to build

15  companies or promote companies?

16  **A.**   First, Jon and I do the majority of the work of looking

17  at -- we look at a lot of opportunities.  We do due diligence.

18  We eventually come to a decision whether it's a project that we

19  want to be involved with.

20  **Q.**   Uh-huh.

21  **A.**   And if it is a project we want to get involved with or --

22  and it's two different scenarios.  One is consulting, where

23  it's not a company that we founded, and the other is companies

24  we did find.

25       And then once we would have that opportunity in place,

1   where we had made the decision to go ahead and work with these

2   companies, then we would bring in James and Robert to become

3   finders and help us with capital.

4   **Q.**   Okay.  So it sounds like you find a company or maybe a

5   technology that you like; is that right?

6   **A.**   That's correct.

7   **Q.**   Okay.  Something that you want to stand behind?

8   **A.**   Something that's worth- -- worthwhile, has -- has more

9   than just money, that there's some other benefit, yeah.

10  **Q.**   Okay.  And that's kind of the first step in the whole

11  process?

12  **A.**   I didn't hear you.

13  **Q.**   That's kind of the first step in the whole process?

14  **A.**   That is the first step in the process.

15  **Q.**   And then it sounds like at least you and Jon, at the

16  beginning -- Mr. Destler -- you kind of worked to get your arms

17  around the technology or the company to help it succeed; is

18  that right?

19  **A.**   Again, I didn't understand you.

20  **Q.**   Well, when you're trying to build the company --

21  **A.**   I didn't understand -- I couldn't -- I -- I could hear

22  you, but --

23  **Q.**   Oh.

24  **A.**   -- I couldn't understand you.

25  **Q.**   That's okay.  I can repeat it a different way.

1    So when you and Mr. Destler were working together

2    initially, do you kind of, like, work together to kind of get

3    your arms around the technology or the company just to -- just

4    to make sure you understand everything that's going on?

5    **A.**   We would do a lot of due diligence before we got involved,

6    yes.

7    **Q.**   Okay.  And then -- and then you worked to kind of build

8    out the company around that tech or the idea that you had?

9    **A.**   Yeah.  There were a lot of steps in between that, but yes.

10   **Q.**   Okay.  And then when you have your arms around the

11   company, it sounds like you kind of get Mr. Lazerus and

12   Mr. Harrison to start working on promoting the company to get

13   investors; is that right?

14   **A.**   To make introductions to -- primarily to me and sometimes

15   to Jon, yes.

16   **Q.**   Okay.  And this is a similar kind of template that you use

17   with Loop?

18   **A.**   Yes.

19   **Q.**   You also testified that you had a mantra that you used

20   within the team; is that right?

21   **A.**   We had a lot of mantras.  So which one are you referring

22   to?

23   **Q.**   Okay.  The one that you were talking about yesterday

24   during your direct.

25   **A.**   I don't recall which mantra I -- I -- I talked about

1    yesterday.

2    **Q.**    Okay.  Well, within the team of four -- so I'm talking

3    about you, Mr. Destler, Mr. Harrison, and Mr. Lazerus -- tell

4    us the different mantras you had then because I only heard one

5    yesterday.

6    **A.**    To always be truthful, to -- I'm kind of -- I'm kind of

7    lost because I -- you know, we would -- we would have

8    motivational mantras, you know, like "Always be closing.  Make

9    the extra phone call."  There's a bunch of ones I don't -- I

10    can't remember which one I said yesterday.

11    **Q.**    Okay.  Yesterday, I think you said that you had a mantra

12    that everything stayed within the group.  Do you recall that?

13    **A.**    Oh.  As it relates to -- I thought you were talking

14    about -- all these projects were large.  If it's -- if it's a

15    public company --

16    **Q.**    Uh-huh.

17    **A.**    -- keep everything confidential.  Yes, that was the mantra

18    on public companies.

19        (Government's Exhibit 821 marked for identification.)

20    **BY MS. CHOPRA:**

21    **Q.**    Okay.  Okay.  I'd like to pull up Exhibit 821.

22        Do you see this in front of you, Mr. Danks?

23    **A.**    Yes, I do.

24    **Q.**    Okay.  And is it an email from -- at the top, an email

25    from you to Mr. Scott Jackson?

1   **A.**   Yes.

2   **Q.**   Okay.  And the date is April 1st of 2019?

3   **A.**   That's correct.

4   **Q.**   Okay.  And then, if we scroll below -- and, again, it's

5   not in evidence.  So let's not read it out loud.

6        But below, there's further emails between you and

7   Mr. Jackson; is that right?

8   **A.**   Yes.

9        **MS. CHOPRA:**  Okay.  Your Honor, we'd like to move --

10   move this into evidence.

11        **THE COURT:**  Any objection?

12        **MR. HALL:**  No objection, Your Honor.

13        **MR. MILLER:**  No.

14        **MS. HALL:**  No.

15        **THE COURT:**  It may be admitted.

16        (Government's Exhibit 821 received in evidence.)

17        **MS. CHOPRA:**  Can we scroll up to the top part?

18   **BY MS. CHOPRA:**

19   **Q.**   Okay.  I'm not going to have you read this whole thing,

20   Mr. Danks, but I did want to focus your attention on the -- the

21   third paragraph here in black and specifically the second

22   sentence here.

23        Can you see that it starts with, "In," and then it goes,

24   "In the meantime..."  Do you see that?

25   **A.**   It's another mantra.

1   Q.   Okay.  Could you just read that -- just that sentence to

2   the jury?

3   A.   "In the meantime, my mantra to everybody I talk to is 'Buy

4   more stock, if you can, and introduce me to people who do not

5   know the story and let me make them familiar with it.'  Thanks

6   for all your support and patience, Scott.  I'll talk to you

7   soon."

8   Q.   Okay.  So that's another mantra you guys had between your

9   team?

10  A.   To -- to always be talking to everybody, to -- to expand

11  our shareholder base, yes.

12  Q.   Yes, what it says right there.

13  A.   Yes, what it says right there.

14  Q.   Okay.  Let's kind of shift to some of the entities that

15  we've been talking about in this case.

16       MS. CHOPRA:  We can take that down.  Thank you.

17  BY MS. CHOPRA:

18  Q.   So we've -- we've talked about Capistrano Capital --

19  right? -- in this case?

20  A.   I -- I can't remember if we discussed Capital --

21  Capistrano Capital yesterday or not, but if -- if we -- I might

22  have talked about it yesterday.

23  Q.   And that is an entity that's owned by you?

24  A.   It's a single-member LLC owned by me.

25  Q.   Okay.  Only you?

1  **A.**  Only me.

2  **Q.**  Okay.  And then Vertical Leap Advisors is an entity owned

3  by you and Mr. Destler?

4  **A.**  Jon and I are 50/50 partners.  It used to be three people.

5  We sort of turned it into a two-man LLC, and we're 50/50 in

6  that.

7  **Q.**  Okay.  And then, of course, we've all heard about various

8  Touchstones in this case; right?

9  **A.**  Yes, there have been a lot of Touchstones.

10  **Q.**  There have been a lot.

11      I'm going to walk down that path with you.

12  **A.**  Okay.

13  **Q.**  So if I'm getting your testimony right -- and feel free to

14  correct me if I'm wrong -- it seems that no matter what

15  iteration of Touchstone we're talking about, whatever the name

16  is, it's your testimony that you're not an officer or owner of

17  any Touchstone; is that right?

18  **A.**  That's -- any official entity --

19  **Q.**  Yes.

20  **A.**  -- that's a Touchstone company, I am not.

21  **Q.**  The only one you -- I think you're testifying that what

22  you're associated with is the one that isn't really a

23  company -- right? -- Touchstone Capital Advisors?

24  **A.**  It's the -- the DBA, Touchstone Capital Advisors.

25  **Q.**  Okay.  And so you're not an owner or officer of

1    Touchstone Advisors, Inc.?

2    **A.**    No, I am not.

3    **Q.**    Okay.  Or Touchstone Holdings, LLC?

4    **A.**    No, I am not.

5    **Q.**    Or Touchstone Advisors, LLC?

6    **A.**    No, I am not.

7    **Q.**    Okay.  And for -- is it your testimony that Mr. Destler is

8    the owner of all of these Touchstones?

9    **A.**    To the best of my knowledge, I believe he is.

10   **Q.**    Just him on his own?

11   **A.**    Him and his wife, I believe.

12   **Q.**    Okay.  And so this is your testimony, even though -- and I

13   know we've talked about this a lot.  So bear with me -- even

14   though you signed the Touchstone/Loop consulting agreement as a

15   managing director for Touchstone Advisors, Inc.; right?

16   **A.**    I -- I did.

17   **Q.**    Okay.

18   **A.**    For the one we showed yesterday?

19   **Q.**    Yes.

20   **A.**    Yes, you -- I did.

21   **Q.**    You signed that one?

22   **A.**    Yes.

23   **Q.**    Okay.  And then you also later signed the termination of

24   that consulting agreement as a managing director of

25   Touchstone Advisors, Inc.?

1    **A.**    Correct.

2    **Q.**    Okay.  And just to be clear on that termination, that

3    termination was a termination between Touchstone and Loop;

4    right?

5    **A.**    Correct.

6    **Q.**    Not between you and Mr. Destler as part of Touchstone?

7    **A.**    Correct -- well, I wasn't part of Touchstone Advisors, but

8    it was between Loop and Touchstone Advisors.

9    **Q.**    But not between you and Mr. Destler?

10   **A.**    Not between me and Mr. Destler, but I didn't consider

11   myself a partner in Touchstone Advisors.

12   **Q.**    But you were partners with Mr. Destler at that time;

13   right?

14   **A.**    I was partners with him, yes.

15   **Q.**    Okay.  And then -- and then your LinkedIn profile states

16   that you've been the managing director of Touchstone Capital

17   Advisors since 2011; right?

18   **A.**    I believe that's when Jon and I started -- yeah, 2011

19   sounds like the right year.

20   **Q.**    Okay.

21   **A.**    Did you say -- did you say "Touchstone Capital"?  I just

22   want to make sure I have the right Touchstone that I'm

23   testifying to.

24   **Q.**    Yeah, of course.  No, I don't want to --

25   **A.**    Yeah.  Touchstone Capital Advisors is the one, I think, in

1   2011 on my LinkedIn profile.

2   **Q.**   Yes.

3   Touchstone Capital Advisors?

4   **A.**   Correct.

5   **Q.**   And then even in Loop's filings with the SEC, I believe

6   you held yourself out as managing director or partner or member

7   of Touchstone; right?

8   **A.**   I don't have that in front of me.  I can't remember

9   exactly how it was described.

10   **Q.**   Okay.  Well, in -- there's -- in Loop's 2016 --

11   February 2016 10-K, you were listed as the managing director of

12   a Touchstone, LLC since 2010; right?

13   **A.**   It -- if it says that in the 10-K, I'll take your word for

14   it.

15   **Q.**   Okay.  And then -- but later on, in May of 2018, about two

16   years later, there was a proxy statement filed with the SEC.

17   And then, at that time, you were listed as the managing

18   director of Touchstone Advisors, Inc. since about 2011, I

19   think; is that right?

20   **A.**   I wasn't a managing partner of that, but I might have

21   written that in the 10- -- is it 10-K?

22   **Q.**   The second one, I said, was a proxy statement.

23   **A.**   Oh.  Proxy statement.

24   Okay.  Yeah.

25   **Q.**   So those were incorrect?

```
 1   A.   That was an -- that's an incorrect -- I was not a -- of

 2   that entity.   I was the partner with him in Touchstone Capital

 3   Advisors.

 4   Q.   So were both of those incorrect, the 2016 10-K and the

 5   proxy statement in 2018?

 6   A.   Both of them were incorrect.   I made a mistake on both of

 7   those.

 8   Q.   Okay.   And those were filed with the SEC; right?

 9   A.   Yes.

10   Q.   Okay.   You also used email signatures -- or you've seen a

11   bunch of emails where you state you're the managing director or

12   partner of Touchstone Capital Advisors; right?

13   A.   Yes.

14   Q.   That's --

15   A.   That's the right one.

16   Q.   Yeah.

17        Take your -- take your time.

18   A.   Just making sure.   I just don't -- don't want to misspeak.

19   Q.   Yeah.   Of course.

20        And, in fact, in the emails, your signature block is the

21   same as Mr. Destler's signature block in his emails; right?

22   A.   That is correct.

23   Q.   Okay.   So you both use the same signature block?

24   A.   That's because our partnership was in Touchstone Capital

25   Advisors, yes.   We use the same signature block.
```

1    **Q.**   Okay.  And finally -- I know we've talked about -- you

2    talked about this in direct yesterday.  You filed a sworn

3    declaration with a court in a different matter where you stated

4    many times that you're the managing director of Touchstone

5    Advisors, Inc.; right?

6    **A.**   Yes.

7    **Q.**   Okay.  And I think, yesterday, I heard you kind of say

8    that that was a mistake?

9    **A.**   It was an absolute mistake.  I didn't pay attention to

10   that name.  It just -- it looked similar.  I didn't -- I didn't

11   look at it.  I was -- when I read through it after the attorney

12   prepared that, I didn't notice it was Touchstone Advisors, Inc.

13   **Q.**   Okay.  Well, Touchstone Advisors, Inc. -- you're listed in

14   there about 71 times as stating that you're a managing director

15   of Touchstone Advisors, Inc.; right?

16   **A.**   I believe that document was written and kept repeating

17   that phrase, yes.

18   **Q.**   Yes.

19        And you signed that document?

20   **A.**   I did sign that document.

21   **Q.**   Under penalty -- penalty of perjury?

22   **A.**   Under penalty of perjury.

23   **Q.**   And it was filed with the Court?

24   **A.**   And it was filed with the Court.

25   **Q.**   Okay.  But all of those statements about you being

1    managing director of Touchstone Advisors, Inc. were not true

2    then?

3    **A.**    That was -- that was inaccurate.  It was a mistake.

4    **Q.**    Okay.  So those were false statements filed with the Court

5    in a declaration?

6    **A.**    I believe it was a mistake.  I didn't intentionally file a

7    false document with the Court.

8    **Q.**    Okay.  And besides you and Mr. Destler, Mr. Lazerus had a

9    role with Touchstone; right?

10   **A.**    He was a finder for us.  He worked with us as a finder.

11   **Q.**    Okay.  Did he have an official title?

12   **A.**    He didn't have an official title.

13       (Court reporter requests clarification for the record.)

14          **THE WITNESS:**  He -- he didn't have an official title.

15       At one time, I think we were considering getting him some

16   business cards so he could, you know, have some more cache with

17   his -- his -- his clients, but I'm not sure if that ever

18   happened or not.

19   **BY MS. CHOPRA:**

20   **Q.**    You don't know if that happened?

21   **A.**    I don't know if that happened or not, and it would have

22   been through Touchstone Capital Advisors.

23          **MS. CHOPRA:**  Okay.  Could we pull up 642, please.

24       Okay.  This has been admitted -- admitted previously.

25   ///

1  BY MS. CHOPRA:

2  Q.    And in here -- actually, Mr. Danks, do you see it in front

3  of you?

4  A.    I sure do.

5  Q.    Okay.  And here, it's an email from you to Aaron Danks,

6  with Mr. Destler cc'd; is that right?

7  A.    That's correct.

8  Q.    And who is Aaron Danks again?

9  A.    Aaron is my son, who has worked for me for the last

10  15 years.

11  Q.    Okay.  And he also works at Touchstone?

12  A.    No.  He just -- he -- he assisted me.  He was just -- he

13  wasn't officially involved with Touchstone.

14  Q.    And in this email, which is dated 2018, it looks like

15  you're asking Aaron to place an order for business cards for

16  Mr. Lazerus?

17  A.    That's correct.

18  Q.    Okay.  And you've given Mr. Lazerus the title of VP in

19  Business Development; is that right?

20  A.    Yes.

21  Q.    Okay.  And then you're also asking for a Touchstone email

22  to be set up for Mr. Lazerus; is that right?

23  A.    Yes.

24  Q.    Okay.  And that's for all the work he has been doing for

25  the firm; is that correct?

```
 1   A.    That's correct.

 2   Q.    Okay.  Thank you.

 3              MS. CHOPRA:  You can take that down.

 4   BY MS. CHOPRA:

 5   Q.    So let's move on to Ventanas Capital.

 6   A.    Okay.

 7   Q.    Okay.  We've heard a lot about Ventanas Capital.

 8         Much of the paperwork for Ventanas has the name

 9   Michelle Fiore on it; right?

10   A.    Yes.

11   Q.    Okay.  And, obviously, I think you've testified that

12   you're very close to her?

13   A.    She's one of my best friends.

14   Q.    You know her pretty well?

15   A.    I know everything about her, yes.

16   Q.    So through your -- I'm sorry.  Through your close

17   relationship, you know that she does not have a finance

18   background; right?

19   A.    I know that she doesn't have a finance background.

20   Q.    Yes.  Okay.

21   A.    Correct.

22   Q.    And you know that she doesn't have much knowledge in

23   trading stock; right?

24   A.    No.  That's why I set trades for her, yeah.

25   Q.    And you know that she's not really an entrepreneur; right?
```

1   **A.**   Well, she is a little bit.  She's -- she's attempted to

2   start a few businesses herself.

3   **Q.**   Oh.  She has?  Okay.

4   **A.**   So she has had that -- before she had that -- the accident

5   in 2014 and, you know, further accidents later on -- she had

6   some severe accidents.  So -- but she did have very much an

7   entrepreneur -- entrepreneurial bent --

8   **Q.**   Okay.

9   **A.**   -- and tried to do some things, and I was trying to help

10  her get some things started over the years.

11  **Q.**   Okay.  But she's sort of not similar to you.  You have

12  considerable experience in entrepreneurship; right?

13  **A.**   Yes.

14  **Q.**   Okay.  More than her?

15  **A.**   I would say yes.

16  **Q.**   Okay.  You have at least a couple decades of -- not --

17  probably more than a couple decades; right?

18  **A.**   Yes.  I've been doing this since 1985.

19  **Q.**   Okay.  More than three decades.

20       And you have experience in trading stock?

21  **A.**   The only stock I usual -- that I personally would trade

22  would be my own company's when it was time to liquidate.  So I

23  don't know.  I'm not a very good trader.  I don't know much

24  about -- about trading.  I just -- I would have a broker sell

25  my stock whenever I needed cash.

1   **Q.**   And so it's your testimony that Ms. Fiore wanted to open

2   up Ventanas, and you helped her; is that right?

3   **A.**   Sorry.   I have -- I have to scratch my back.

4   **Q.**   Oh.   Take your time.

5   **A.**   Yes, I helped her.

6   **Q.**   Okay.   So you essentially set up the company for her; is

7   that right?

8   **A.**   We did it together.

9   **Q.**   Okay.   But she probably relied on your entrepreneurship

10  skills; right?

11  **A.**   Well, she didn't know much about LLCs, and she depended on

12  me to show her where to go, how to do it, how to set it up,

13  correct.

14  **Q.**   And you also went with her to open up her Schwab account

15  for Ventanas; right?

16  **A.**   Correct.

17  **Q.**   And you also managed the email accounts for Ventanas; is

18  that right?

19  **A.**   I -- I wouldn't say "managed it."   She never used email --

20  or -- yeah.   She very rarely used emails, and I -- I don't

21  think I used it that much except for a couple of times.

22  **Q.**   Okay.   But you used it, and she didn't really use it; is

23  that right?

24  **A.**   I don't -- I don't know how many times she accessed it.   I

25  don't know.

1  Q.   And at least for Ventanas, you conducted most, if not all,

2  of the trading related to Ventanas?

3  A.   Could you repeat the question, please.

4  Q.   With regard to Ventanas -- I should back up.

5       Ventanas held stock -- right? -- at Schwab?

6  A.   Correct.

7  Q.   Okay.  And you conducted most, if not all, of the trading

8  for that; right?

9  A.   I -- early on, I did all of them.  I think, later on,

10 she -- I think she got married, and she had a husband.  I think

11 she started doing some trading on her own.

12 Q.   Okay.  When you say "early on," what does that mean?  Can

13 you --

14 A.   Early on when -- it was set up in 2014.

15 Q.   Okay.

16 A.   She met her future husband in the middle of 2014.  And by

17 2017 or so, '18, you know, they -- she would be doing some

18 trading --

19 Q.   Okay.

20 A.   -- but -- but she -- yes.

21 Q.   But you also traded through that account?

22 A.   Yes, I also traded -- when she wanted to sell something, I

23 would set the trade for her.

24 Q.   And that account held Loop stock; right?

25 A.   It did hold Loop stock, but I never knew if she -- she or

1   her husband ever bought any other stock.  So I'm not sure.  I

2   never saw statements or anything.

3   **Q.**   And I think you just said it.  So Ventanas Capital was set

4   up in 2014; is that right?

5   **A.**   Correct.

6   **Q.**   Okay.  It was around February of 2014; is that right?

7   **A.**   Yeah.  I -- I learned it was February of 2014.  I didn't

8   remember that until I heard it yesterday.

9   **Q.**   But you were there when it was set up; right?

10  **A.**   Well, we were sitting in a restaurant, filling out the

11  paperwork and -- yeah.  So I was there.

12  **Q.**   Okay.  And just months later in 2014, around October,

13  that's when you had some of those introductory meetings with

14  Mr. Destler and Mr. Solomita and some other people at Loop;

15  right?

16  **A.**   Correct.

17  **Q.**   Okay.  I think that was October 2014; right?

18  **A.**   October --

19  **Q.**   2014.

20  **A.**   October of 2014, yes.

21  **Q.**   So was it just a coincidence that Ventanas was set up the

22  same year and just months before all those introductions?

23  **A.**   Ventanas was set up before I knew anything at all about

24  Loop.  I had not met -- had not met Daniel Solomita, had not

25  met Henry Lorin, Paul Cugno.  It was set up because I wanted to

```
1  started to build a financial vehicle for her to be able to

2  become more independent than just me lending her money and her

3  inability to get a job.

4       So I did that -- that was set up with zero -- zero

5  knowledge of Loop.

6  Q.   Okay.  And then we've talked about how you had limited

7  power of attorney over the Ventanas Schwab account; right?

8  A.   For a little while, I did.

9  Q.   Okay.  And did you say on direct that you went in and --

10 and signed that paperwork kind of in a hurry the same day the

11 account was opened?

12 A.   I was with her, and -- and at the end of the meeting, the

13 whole thing about the limited power of attorney came up.  And,

14 yeah, I was rushed, and that's what happened.  Yeah.

15 Q.   So I -- just so I understand what you're saying, on the

16 same day, in the same meeting, you opened the account, and you

17 became the --

18 A.   And -- and signed the limited power of attorney, yes.

19 Q.   Got it.

20      In reality, though, the Schwab account was opened in

21 January of 2017; right?

22 A.   I have no idea.  I didn't know that.  I thought it was

23 opened up that day.

24 Q.   Okay.  Okay.  And then the limited --

25 A.   Well, pardon me.  Could you say the date again that you
```

1    proffered?

2    **Q.**    January of 2017.

3    **A.**    I don't -- I don't remember setting up -- a Ventanas

4    account?  Ventanas didn't -- 2017, are you saying?

5    **Q.**    Yes.

6    **A.**    Okay.  I don't remember that early in 2017.

7    **Q.**    Okay.  We're talking about Schwab here, just to --

8    **A.**    Yeah.  I don't remember that.  I thought the account was

9    opened the day that I took her in there --

10   **Q.**    Okay.

11   **A.**    -- or I met her in there.

12   **Q.**    I see.

13         And then the limited power of attorney was not signed that

14   day; right?  It was a few months later in May of 2017; right?

15   **A.**    Well -- so you're saying -- I'm not aware that the account

16   was opened in January.  So -- I thought it was opened up in, I

17   believe, May.

18   **Q.**    Okay.

19   **A.**    Yeah.

20   **Q.**    But, anyways, it's not the same date that the account was

21   opened that you became limited -- limited power of attorney.

22   There was a separation in time; right?

23   **A.**    I thought it was all done on the same day.  I didn't know

24   there was a separation of time.

25   **Q.**    And you've accessed that Schwab account multiple times;

1  right?

2  **A.**   When I needed to set a trade, I would go access the

3  account, make the trade.

4  **Q.**   And you would access it under your name?

5  **A.**   Well, it was under her name.

6  **Q.**   Under her name?

7  **A.**   Yeah, under her name, and I had the password.  So I would

8  just -- she would call, say she needed money.  I would set the

9  trade, and that would be it.

10  **Q.**   And you accessed -- accessed it multiple times --

11  right? -- not just once?

12  **A.**   She was -- once she had money, she was kind of relentless

13  in wanting to sell and start, you know -- she was down in

14  Mexico buying horses and building her business, and so she did

15  call me quite often to set trades for her.

16  **Q.**   As often as 166 times in the period -- a span of about a

17  year and a half?

18  **A.**   Well, not all of those were setting trades.  I would -- I

19  would get communication -- "Could you check and see?  Could you

20  check and see?  Could you check and see?" -- even though she

21  would get alerts on her phone, which -- she never answered

22  emails.

23       So she would call me and have me check.  So I would

24  call -- I would access the account and check.

25  **Q.**   Okay.  You also had access to the Ventanas bank account;

1    is that right?

2    **A.**    No, I did not.

3    **Q.**    You did not have access?

4    **A.**    No, I did not.

5    **Q.**    Okay.  Did you move money into that account?

6    **A.**    Did I move money into that account?

7    **Q.**    Yes, the bank account.

8    **A.**    You mean, like, give her a check to put into there or

9    wires for money there?

10          **MS. CHOPRA:**  Can we pull up Exhibit 603?

11        This is in evidence.

12          **THE WITNESS:**  Yeah, I would -- I would take a check or

13    do a wire and have it put into the account.

14    **BY MS. CHOPRA:**

15    **Q.**    Okay.  And then would you take some of that money?

16    **A.**    In this one, I did take half of it to repay part of the

17    loan that I had with her.

18    **Q.**    Yeah.

19        Okay.  Let's talk about that loan.

20        So how much, in total, was that loan?

21    **A.**    First, it was a hundred -- excuse me -- 144,000.  And I

22    think a little while longer, it -- a little later on, in '16, I

23    loaned her some more money.  I don't know if it was 12,000 or

24    20,000.

25        And then I, through the forensic accounting -- that's the

1    only record that I have.  The forensic accountant thought that

2    there was another 37,000 that I had loaned her, a lot of it

3    personally.  Some of it came from VLA.  Some of it came from --

4    I think those were the only two places it came from, to the

5    best of my recollection.

6         So if you add all that up, it would be a couple hundred

7    thousand dollars.

8    Q.   Yes.

9         Close to 200,000, maybe; is that right?

10   A.   If you just do the math, it would be somewhere in there.

11   Q.   Okay.  And you said "VLA."  That's Vertical Leap?

12   A.   Vertical Leap Advisors.

13   Q.   Okay.  And so anytime that -- you're saying that anytime

14   that you took money out of Ventanas for yourself, it was to

15   repay yourself for this loan -- is that right? -- or --

16   A.   That is correct.

17   Q.   Or loans.  Sounds like it was more than one; is that

18   right?

19   A.   Yeah.  Reluctantly, she allowed me to take the money.

20   Q.   Okay.  And so you paid yourself multiple times through

21   Ventanas; is that right?

22   A.   Paid myself?

23   Q.   Yes.

24   A.   Well, if I -- if I had an obligation and I didn't have any

25   cash, and I knew she did have cash, I would have her give me a

1  check as part of the repayment.

2  **Q.**   Okay.  And so, for example -- and, actually, before I say

3  that, when did those loans start -- when did she first give you

4  a loan?

5  **A.**   When did she -- repeat --

6  **Q.**   I'm sorry.

7      When did you first give her a loan?  I apologize.

8  **A.**   When did I first give her a loan?  It -- it's a record on

9  that promissory note schedule.  I don't remember sitting here

10 right now.  It was probably the middle of 2014 sometime.

11 **Q.**   Okay.  And so after that, you started to repay yourself,

12 when you could, from Ventanas?

13 **A.**   I think it was a while before she started paying back

14 anything.

15 **Q.**   Okay.  So, for example, on December 1st, 2015 --

16 **A.**   December 1st --

17         **THE COURT:**  2015.

18         **THE WITNESS:**  2015.

19 **BY MS. CHOPRA:**

20 **Q.**   Yes.

21 **A.**   Okay.

22 **Q.**   2015.  It's a while ago.

23     From the Ventanas JPMorgan Chase account, did you wire

24 $8,000 to Capistrano Capital?

25 **A.**   I wouldn't remember that.

1  **Q.**   Okay.  And then on January 14th, 2016, did you withdraw

2  $21,000?

3  **A.**   I -- I wouldn't remember that, but I could have.

4  **Q.**   On January 2nd, 2018, did you withdraw a

5  hundred-thousand-dollar check for Capistrano Capital, again,

6  all through the Ventanas account?

7  **A.**   Yes.  I -- I was paying a hundred thousand dollars back.

8  **Q.**   Okay.  And then between about 2015 and 2021, did you also

9  receive checks in the amount of about $42,000 from Ventanas?

10 **A.**   I -- I wouldn't -- I wouldn't know.

11 **Q.**   Okay.  And then did you also -- I think you testified that

12 Aaron Danks is your son?

13 **A.**   Yes.

14 **Q.**   Okay.  Did you also pay Mr. Danks -- sorry -- your son

15 Mr. Danks through the Ventanas account?

16 **A.**   I think she lent him some money.  My son was struggling.

17 I think she lent him some money.

18 **Q.**   So you lent her money; is that right?

19 **A.**   I did.

20 **Q.**   And then she lent your son money?

21 **A.**   Yeah.

22        What was the date of that?

23 **Q.**   Between 2015 and 2016.

24 **A.**   Pardon?

25 **Q.**   Between 2015 and 2016.

1  **A.**   Okay.  Yeah.  She -- yeah.  She -- she -- because she had

2  cash and my son was looking for money, and part of -- part of

3  my -- I just -- I wasn't -- I wasn't wanting to lend my --

4  money to my son, and I asked her if she would.

5  **Q.**   Okay.  So all of this money that we're talking about adds

6  up to more than at least the initial 144,000 that you loaned

7  her; right?

8  **A.**   The total was more than 144,000, but all that does add up

9  to more than 144,000.

10  **Q.**   Okay.  So -- I'm sorry.

11       So Ventanas also traded Loop stock; right?  We've already

12  established that?

13  **A.**   Again, with your head down, it's hard for me to hear what

14  you're saying.

15  **Q.**   Oh.  I'm so sorry.

16  **A.**   That's all right.

17  **Q.**   I was looking at my notes.

18       Ventanas traded Loop stock; right?  We've already

19  established that?

20  **A.**   She would -- she was the seller of Loop stock, yes.

21  **Q.**   Okay.  And it -- it sold Loop stock to Allan Brennan;

22  right?

23  **A.**   She did.  She wanted to sell a chunk of stock, and as I

24  testified yesterday, any time there was -- yes, she did.

25  **Q.**   She sold Loop stock to Allan Brennan?

 1   **A.**   She sold stock to Allan Brennan.

 2         **MS. CHOPRA:**  Okay.  Can we pull up Exhibit 298?

 3         This is in evidence.

 4   **BY MS. CHOPRA:**

 5   **Q.**   So here is a stock purchase agreement between

 6   Ventanas Capital and Allan Brennan.  Do you see that,

 7   Mr. Danks?

 8   **A.**   I do.

 9   **Q.**   Okay.  And the date is June 23rd, 2015.  Do you see that?

10   **A.**   Correct.

11   **Q.**   Okay.  So you're saying that this sale happened because

12   Ms. Fiore wanted to sell stock to Allan Brennan?

13   **A.**   She want- -- she wanted to have money, and she -- she --

14   and the stock was hers, and she asked to sell it.  I sold it

15   for her -- I mean, called that on and then sold it for her.

16   **Q.**   Okay.  Allan Brennan was a connection that you learned

17   about through Mr. Lazerus; right?

18   **A.**   Yes.  I met him through Mr. Lazerus.

19   **Q.**   And Ms. Fiore did not work with him or deal with him;

20   right?

21   **A.**   Ms. Fiore didn't know anybody that she sold stock to.

22   They were all clients or associates of mine.

23   **Q.**   They were people that you knew?

24   **A.**   People that I knew.

25         **MS. CHOPRA:**  Okay.  And can we scroll to the end of

1  this?

2  **BY MS. CHOPRA:**

3  **Q.**  Okay.  Ms. Fiore didn't sign this document; right?

4  **A.**  Pardon?

5  **Q.**  Ms. Fiore didn't sign this document; right?

6  **A.**  Well, she had given me that -- she gave me a series of

7  electronic signatures that I kept.

8  **Q.**  Uh-huh.

9  **A.**  And because she was gone -- hard to get ahold of quite a

10  bit, I just put the electronic signature on for her.

11  **Q.**  So you signed her name as Michael Dagmar Fiore?

12  **A.**  That's a -- that's a typo I'm famous for.

13  **Q.**  So Michael Dagmar Fiore, as a person, does not exist;

14  right?

15  **A.**  Again, that was a typo.  It should have been

16  Michelle Dagmar Fiore.

17  **Q.**  So let's turn -- you can take that down -- to

18  David Williams.

19      The parties have stipulated in this case that

20  David Williams was someone that worked with you previously;

21  right?

22  **A.**  In our stipulation, it was somebody I had worked with,

23  like, 25 -- 20, 25 years ago.

24  **Q.**  Right.

25      Regardless, you knew a David Williams?

1  **A.**   I knew a David Williams.

2  **Q.**   And you worked with a David Williams?

3  **A.**   He was -- I worked a little bit with David Williams.  I

4  knew him through someone I worked with regularly.

5  **Q.**   Okay.  Ms. Fiore did not know a David Williams; right?

6  **A.**   No, she didn't.

7  **Q.**   Okay.  It was you who knew a David Williams?

8  **A.**   It was me who knew David Williams.

9        **MS. CHOPRA:**  Okay.  Can we turn to Exhibit 632?

10      This is in evidence, and if you can scroll down.

11  **BY MS. CHOPRA:**

12  **Q.**   So you can read it as we go along.

13      This is a text conversation between, I believe, yourself

14  and Ms. Fiore?

15  **A.**   That's correct.

16  **Q.**   Okay.  And the date of it is October 5th of 2022; is that

17  right?

18  **A.**   That is correct.

19  **Q.**   Okay.  That's about a week or so after the FBI showed up

20  at your house; right?

21  **A.**   You mean when the 15 FBI agents came to my house?  Is

22  that -- I didn't hear what you said.

23  **Q.**   I asked:  That's about a week or so after the FBI came to

24  your house; is that right?

25  **A.**   Oh.  The FBI -- yeah.  That -- it was about -- I think

1   they came on September 27th --

2   **Q.**   Okay.

3   **A.**   -- I believe, somewhere in there.  So that -- that would

4   be approximately a week.

5   **Q.**   Okay.  So after that, about a week later, it looks like,

6   from these text messages, that Ms. Fiore is asking you for

7   help; is that right?

8   **A.**   That's correct.

9            **MS. CHOPRA:**  Okay.  And if we can scroll down a little

10  bit.

11  **BY MS. CHOPRA:**

12  **Q.**   And this text message, the one that's darker gray right

13  here, where it says, "I've already sent John a message" -- do

14  you see that one?

15  **A.**   I do.

16  **Q.**   Okay.  Is that you speaking there?

17  **A.**   That is me.

18  **Q.**   Okay.  And John is who in that context?

19  **A.**   An attorney.

20  **Q.**   Okay.  And so are you working with Ms. Fiore to get her an

21  attorney?

22  **A.**   She had gotten a subpoena and freaked out and had -- had

23  never been in legal trouble before, and --

24  **Q.**   Uh-huh.

25  **A.**   -- she needed -- she needed -- needed an attorney after

1  getting that subpoena.

2  **Q.**   Okay.  So she turned to you for help?

3  **A.**   Yes.  At this point in 2022, she was pretty much

4  incapacitated, and she did need help.

5  **Q.**   Okay.  And then after that part about John, you say,

6  "Ventanas is your company 100 percent"; right?

7  **A.**   Correct.

8  **Q.**   Okay.  If Ms. -- if Ms. Fiore set up Ventanas and it was

9  her idea, why would she need a reminder that Ventanas is her

10  company a hundred percent?

11  **A.**   On -- on the telephone call that I had with her -- or it

12  might have been a meeting.  I think it might have been a

13  meeting, now that I think about it, with the -- with the -- was

14  it about the subpoena?

15  **Q.**   Uh-huh.

16  **A.**   There was an accusation that she -- I -- that I was using

17  her kind of as a mule for me to sell my stock through her

18  account, and she was -- she was screaming, "You don't own my

19  account."

20      And I just reinforced that, "The company is a hundred

21  percent yours."

22  **Q.**   But you had to distance yourself from that company; is

23  that right?

24  **A.**   I didn't -- I mean, I wasn't involved with that company

25  other than when I loaned her money or she -- you know, that was

1   it.

2   Q.   Okay.  Well, you were also a limited power of attorney on

3   that company.

4   A.   For -- for about 90 days, I think it was.

5   Q.   And you also traded stock through that company; right?

6   A.   I did set trades for her, yes.

7   Q.   And you also sent emails with that company's email

8   address; right?

9   A.   Yeah.  There -- there was some serious emails to create

10  some subterfuge for their husband, but that's another story.

11              MS. CHOPRA:  And we can take that down.  Thank you.

12       Can we put up Exhibit 531?

13       Okay.  This is in evidence.

14  BY MS. CHOPRA:

15  Q.   And, earlier, we were talking about you receiving money

16  from Ventanas Capital to Capistrano Capital.  Do you recall

17  that?

18  A.   Yes, I do.

19  Q.   Okay.  So in this -- in these -- in this chart here, there

20  are two text messages in blue -- do you see those? -- between

21  you and Mr. Lazerus?

22  A.   Yes.

23  Q.   Okay.  And in those messages, you tell Mr. Lazerus that

24  you talked to David Williams at Ventanas, and he's willing to

25  sell some shares; is that right?

1   **A.**   Again, I didn't -- I couldn't understand what you were

2   saying.

3   **Q.**   Okay.  In that first text message, you tell Mr. Lazerus

4   that you talked to a David Williams at Ventanas and that he was

5   willing to sell some shares; is that right?

6   **A.**   That is -- that is correct.

7   **Q.**   Okay.  And Mr. Lazerus agrees to take the shares; is that

8   right?

9   **A.**   That is correct.

10  **Q.**   Okay.

11  **A.**   Let me make sure.  Let me read through here.

12  **Q.**   Okay.  Take your time.

13  **A.**   Robert says, "I will take the whole" --

14          **THE COURT:**  You don't need to read it.

15          **THE WITNESS:**  I'm sorry.

16      Yeah.  So what was the question again?

17  **BY MS. CHOPRA:**

18  **Q.**   I think I was just waiting for you to read it.

19          **MS. CHOPRA:**  And, Your Honor, to clarify, this was a

20  demonstrative, and it's not in evidence.  Can I still show it

21  to him?

22          **THE COURT:**  Yes.

23  **BY MS. CHOPRA:**

24  **Q.**   Okay.  And so after those text messages, it looks like

25  there was a cashier's check from Allan Brennan --

 1          MS. HALL:  Actually, I'm going to object, Your Honor.

 2   She's just asking this witness to reiterate a

 3   Government-crafted demonstrative chart.

 4          THE COURT:  Okay.  Ask your question.  So instead of

 5   asking what's on this chart, if you have a specific question of

 6   this witness, why don't you ask it of this witness.

 7   BY MS. CHOPRA:

 8   Q.   There was a cashier's check that was then deposited into

 9   Ventanas Capital from Allan Brennan; right?

10   A.   Yes.

11   Q.   Okay.  And following this series of events, after that

12   cashier's check to Ventanas, there was a

13   hundred-thousand-dollar withdrawal from Ventanas to

14   Capistrano Capital; is that right?

15   A.   That is correct.

16   Q.   And you own Capistrano Capital?

17   A.   Yes.

18          MS. CHOPRA:  Okay.  We can take that down.

19       Thank you.

20   BY MS. CHOPRA:

21   Q.   So let's talk a little bit more about Loop.

22       You testified yesterday -- and, again, correct me if I'm

23   wrong, but you got involved in Loop because you believed in its

24   mission; is that right?

25   A.   Very much so.

1   **Q.**   And you believe in its technology?

2   **A.**   Yes.

3   **Q.**   Okay.  And the technology seems real to you?

4   **A.**   After the diligence we did, yes, it seems real to me.

5   **Q.**   And it seems pretty revolutionary; right?

6   **A.**   It seemed very revolutionary.

7   **Q.**   And it's something that would solve pretty much the

8   world's plastics recycling problem; right?

9   **A.**   If they weren't constrained by cash, it could solve the

10  world's plastic pollution problem.  You could -- there's enough

11  plastic in existence right now where you would never have to

12  use oil to make any new plastic.

13  **Q.**   And that's basically something that almost everyone can

14  get behind -- right? -- that kind of a mission?

15  **A.**   Correct.

16  **Q.**   Okay.  And so you mentioned the cash situation.

17      For such a Holy Grail product, for such a great product

18  that -- that Loop has, why is there trouble raising capital for

19  that kind of a product?

20  **A.**   The -- as I -- I think I testified yesterday, somebody

21  asked -- my attorney asked if this was a challenging project.

22  And I said, by a factor of, like, a thousand, it was the

23  hardest project to raise money for because every single person

24  I talked to was skeptical.

25      They didn't believe that a small company out of Montreal

 1  had somehow cracked the code on how to solve this problem when

 2  there was huge companies with huge staffs of scientists trying

 3  to do that.  So it was very challenging to raise money --

 4  **Q.**  So --

 5  **A.**  -- because of the skepticism.

 6  **Q.**  So you and your team of four, plus maybe Mr. Solomita,

 7  were left to raise the capital for this amazing product; is

 8  that right?

 9  **A.**  That's correct.

10  **Q.**  Okay.  Not something like Goldman Sachs or some other

11  giant company that could help?

12  **A.**  Could you repeat that again?

13  **Q.**  Not something like Goldman Sachs or other -- some other

14  giant, you know, hedge fund that could help?

15  **A.**  I -- I think Jon Destler made a few calls to -- to some of

16  the -- some of the larger institutional folks, and there was no

17  interest.  There was no proof of concept.  We didn't have a

18  pilot plant at that time.  It was -- it was a tabletop

19  experiment when we started until we raised the capital to build

20  the pilot plant.

21  **Q.**  So the four of you had to basically raise all the capital,

22  then?

23  **A.**  Right.

24  **Q.**  So kind of turning to that, to the creation of Loop, you

25  obviously met David Stephens; right?

1    **A.**    I did meet David Stephens.

2    **Q.**    And you met him when again?

3    **A.**    I'm not -- about -- I'm not sure, December 2nd, 2000- --

4    I'm not sure.  I don't know.  My best recollection might have

5    been December of 2014, when I physically met him in person, I

6    think.  It could be another date, but I'm not sure.

7    **Q.**    Did you talk to him on the -- on the phone before that?

8    **A.**    On -- I think on October 3rd, I had a pretty lengthy

9    conversation with him, and I don't know who else.  I can't

10    remember who was on the call, maybe -- maybe Daniel Solomita.

11    I'm not sure, but I had a lengthy conversation about the

12    technology.

13            **MS. CHOPRA:**  Can we bring up Exhibit 304, please,

14    which is in evidence.

15    **BY MS. CHOPRA:**

16    **Q.**    Okay.  Here, this is an email from Mr. Destler -- you're

17    on it -- to Mr. Solomita, and Dave Stephens is cc'd.  Do you

18    see that?

19    **A.**    Dave Stephens is what?

20    **Q.**    Cc'd?

21    **A.**    Cc'd.

22            Okay.  Dave@descapital, yes.

23    **Q.**    And then down below, Mr. Destler introduces Dave Stevens,

24    and he introduces him as "a close contact of ours."  Do you see

25    that?

1   A.    I do.

2   Q.    Okay.  So by -- by this date, October 3rd of 2014, was he

3   a close contact of yours and Mr. Destler's?

4   A.    No.  I don't think I was included in that "ours."  I think

5   it was Tom Puzzo, and -- and Jon might have met him through Tom

6   Puzzo.

7   Q.    Okay.  But Mr. Puzzo is not on this email; right?

8   A.    No, he's not.

9   Q.    You are, though?

10  A.    I am.

11  Q.    Thank you.

12          MS. CHOPRA:  We can take that down.

13  BY MS. CHOPRA:

14  Q.    So as you started to set up Loop, it sounds like you and

15  Mr. Stephens and Mr. Solomita and Mr. Destler kind of sat down

16  to -- to map out how you would develop Loop; is that --

17  A.    Could you repeat the question, please.

18  Q.    It sounds like you and Mr. Stephens, Mr. Solomita,

19  Mr. Destler sat down to kind of map out how you would develop

20  Loop; is that right?

21  A.    No.  We sat down and discussed a potential public dormant

22  shell.

23  Q.    Okay.

24  A.    I used all the words that time.

25  Q.    Dormant shell?

1    **A.**    A dormant -- dormant public company.

2    **Q.**    During that process -- so as you were working with a shell

3    and a dormant company, you learned that there were about

4    6.5 million free-trading shares in Loop; right?

5    **A.**    At some point, I did.

6    **Q.**    At some point?

7    **A.**    Yeah.

8    **Q.**    When?

9    **A.**    I can't remember.

10           **MS. CHOPRA:**  Okay.  Could we bring up Exhibit 300, I

11    believe it is?

12        Oh.  Actually, I think the attachment is first.

13    **BY MS. CHOPRA:**

14    **Q.**    Okay.  All right.  So, Mr. Danks, do you see this in front

15    of you?

16    **A.**    Just a second ago, I saw another --

17    **Q.**    Okay.

18    **A.**    -- email that had -- had the date -- I can see it, yes.  I

19    see it.

20    **Q.**    Just this one right now.

21    **A.**    I see it.  Yes, I do see it.

22    **Q.**    Sorry.  I pulled up the wrong one first.

23    **A.**    I'm sorry.  She had another document up there.  I didn't

24    know which one she wanted me to --

25    **Q.**    I apologize.  It had the wrong one first.

1          So this is an attachment to an email, and --

2                MS. CHOPRA:  And can we go back to the email, please.

3      BY MS. CHOPRA:

4      Q.   Okay.  Here's the email.

5           And, Mr. Danks, do you see that's from Mr. Solomita to

6      you?

7      A.   I sure -- yeah, I do.

8      Q.   And Mr. Destler as well; right?

9      A.   Let me take a look here.

10          Yes, Jon Destler is on the email.

11     Q.   Okay.  And so that attachment that we just saw -- was that

12     part of your initial discussions with Mr. Solomita when you

13     were talking about this dormant shell?

14     A.   No, it wasn't.

15     Q.   This was not?

16     A.   No.

17     Q.   Okay.  Even though you were on this email?

18     A.   Well, repeat your question again.

19     Q.   Was that attachment --

20                MS. CHOPRA:  Can we go back to the attachment?

21                THE WITNESS:  Yeah.

22          Okay.  That attachment?

23     BY MS. CHOPRA:

24     Q.   Was that attachment -- well, we can take a step back.

25          You said, at some point, that you learned that there were

1  6.5 million free-trading shares; right?

2  **A.**   At some point, I did.

3  **Q.**   Okay.  Would it be around this point, during the time this

4  email is floating around?

5  **A.**   Can you show the email again so I can look at the date?

6  **Q.**   Sure.  Of course.

7  **A.**   Repeat your question now that I've looked at it again.

8  **Q.**   Okay.  So around this time -- so this is in November of

9  2015.

10          **MR. PILCHAK:**   September.

11          **THE COURT:**   September.

12          **MS. CHOPRA:**   I'm sorry.  I can't read.

13  BY MS. CHOPRA:

14  **Q.**   September of 2015.

15       At this point, had you learned that there were 6.5 million

16  free-trading shares?

17  **A.**   I'm not sure if that was the time that I found out.

18  **Q.**   Okay.  At least as of -- as of this email, though, it

19  sounds like you knew; right?

20  **A.**   Well, in that email, there was that attachment, and it

21  said, "6.5 million shares."

22  **Q.**   Okay.  So at least as of September 22nd, 2015, you knew

23  that there were 6.5 million free-trading shares; right?

24  **A.**   Yes.

25          **MS. CHOPRA:**   Okay.  Can we go back to the attachment?

 1    I'm sorry, Alex.

 2    **BY MS. CHOPRA:**

 3    **Q.**    So going back to this attachment to that email, a few of

 4    the entities that you're associated with are on this

 5    attachment; is that right?

 6    **A.**    There's the Danks Family Trust, and I was getting some

 7    shares from Ventanas Capital -- Capital as well.

 8    **Q.**    Yes.

 9         And there's also Vertical Leap Advisors?

10    **A.**    Yes.

11    **Q.**    Okay.  So that's three entities that you're associated

12    with?

13    **A.**    Correct.

14    **Q.**    And then there's also, of course, Mr. Solomita, who you

15    know --

16    **A.**    Uh-huh.

17    **Q.**    -- right?

18         **THE COURT:**  That's a "yes"?

19    **BY MS. CHOPRA:**

20    **Q.**    And you know Mr. Destler?

21    **A.**    Yes.  Yes.

22    **Q.**    I'm sorry.  Yes.

23         And you know Mr. Destler, of course?

24    **A.**    Yes.

25    **Q.**    And you know Mr. Stephens, of course?

1    **A.**    Yes.

2    **Q.**    Okay.  And do you know Joe Yu?

3    **A.**    Yes.

4    **Q.**    And who was that again?

5    **A.**    He was our original seed -- our large original seed

6    investor.

7    **Q.**    Okay.  So you know, or you are in some cases, every person

8    on this list; right?

9    **A.**    I do know everybody on this list, yes.

10    **Q.**    Okay.  And this list comprises the breakdown of all

11    6.5 million free-trading shares; right?

12    **A.**    Assuming the math is right, it would be 6.5 million.

13    **Q.**    Okay.  This is an email that you were on with Mr. Solomita

14    back in 2015; right?

15    **A.**    Correct.

16    **Q.**    Okay.  So given this email and this attachment, it seems

17    that it was important to you and your team that you kind of

18    knew where all these free-trading shares were going; is that

19    right?

20    **A.**    That -- it wasn't important to me to know where all the

21    free-trading shares -- I was just concerned about the shares

22    that I wanted to buy.

23    **Q.**    Okay.

24    **A.**    Yeah.

25    **Q.**    But at some point, in an email that you're on, all of the

1  free-trading shares are mapped out in this way; right?

2  **A.**   They are.  They're right -- it's right in front of me.

3  **Q.**   Okay.  And then, consistent with this attachment, you

4  did -- you did receive Loop stock after the reverse merger;

5  right?

6  **A.**   I did.

7  **Q.**   And how much did you receive again?

8  **A.**   I think I ended up getting about 750,000 shares.

9       **MS. CHOPRA:**  Okay.  We can take that down.

10  Thank you.

11       **THE WITNESS:**  I believe that was it.

12  **BY MS. CHOPRA:**

13  **Q.**   Mr. Danks, you've heard of Blacklight; right?

14  **A.**   I've heard of what?

15  **Q.**   Blacklight.

16  **A.**   I only heard of Blacklight when this indictment came down.

17  **Q.**   You have never heard of Blacklight before?

18  **A.**   I hadn't heard of it before.

19  **Q.**   Okay.  So the indictment came down in 2022.  Before 2022,

20  you had never heard of Blacklight?

21  **A.**   I had never heard of Blacklight before 2022.

22  **Q.**   You received shares from Blacklight, did you not?

23  **A.**   I didn't notice that it was from Blacklight.

24       **MS. CHOPRA:**  Okay.  Can we pull up Exhibit 420,

25  please.

```
 1          Okay.  This is in evidence.
 2   BY MS. CHOPRA:
 3   Q.   Mr. Danks, this is an email from you to this email
 4   address, directors@cedar-DL.com.  Do you see that?
 5   A.   I do.
 6   Q.   Okay.  And it relates to a stock purchase agreement
 7   between Danks Roth IRA -- is that you or your IRA?
 8   A.   It's my individual retirement account, yes, my Roth.
 9   Q.   Okay.  So between your Roth account and Mediapark.  Do you
10   see that?
11   A.   I do.
12   Q.   Okay.  And then down below -- we don't have to read the
13   whole thing, but down below, it talks about the transfer of
14   post-split shares in the name of the Danks Family Trust.
15          Do you see that?
16   A.   Yes, I do see that.
17   Q.   And it's signed by, "Regards, Mediapark."  Do you see
18   that?
19   A.   I do see that.
20   Q.   And Mediapark is a Blacklight entity; right?
21   A.   I had no idea until this moment.  I don't -- I mean, maybe
22   I know the charts -- it was in a black box, but I have no idea
23   it was part of Blacklight.
24   Q.   Do you know who was behind Mediapark?
25   A.   I have no idea.
```

1  **Q.**  But you were doing a transaction with them, and you didn't

2  know who they were?

3  **A.**  I didn't.

4  **Q.**  Did you care to know who they were?

5  **A.**  The -- this reverse merger was being set up by

6  Dave Stephens and Tom Puzzo.  I got this email.  I figured it

7  was the company that owned the shares, and we did the

8  transaction.  I bought the shares.  I didn't really have a

9  great deal of concern going into the background of Mediapark.

10        **MS. CHOPRA:**  Okay.  I'd like to pull up Exhibit 425,

11  which is not in evidence yet.

12        (Government's Exhibit 425 marked for identification.)

13  **BY MS. CHOPRA:**

14  **Q.**  Mr. Danks, do you see this email in front of you?

15  **A.**  I do see an email in front of me.

16  **Q.**  Okay.  And it's an email chain, to be clear; right?

17  **A.**  It looked like it would be an email train [sic].

18  **Q.**  Okay.

19  **A.**  Yeah.

20  **Q.**  The topmost email -- and this is not in evidence, but the

21  topmost email is from you to another person; is that right?

22  **A.**  Yes.

23  **Q.**  Okay.  And if we scroll down, there are a couple more

24  emails between you and, I think, that same person.  Is that --

25  maybe you can take a look and just read it to yourself.

1    **A.**    Yeah, I see that.

2    **Q.**    And this is from 2017; is that right?

3    **A.**    August 4th, '17, yes.

4         **MS. CHOPRA:**  Your Honor, I'd like to move this email

5    chain into evidence.

6         **THE COURT:**  Any objection?

7         **MR. HALL:**  No objection.

8         **MR. MILLER:**  No.

9         **MS. HALL:**  No.

10        **THE COURT:**  It may be admitted.

11        **MS. CHOPRA:**  Thank you.

12        (Government's Exhibit 425 received in evidence.)

13        **MS. CHOPRA:**  Can you zoom out for a second?

14   **BY MS. CHOPRA:**

15   **Q.**    Okay.  Let's start with the bottom first, the first email.

16        Mr. Danks, this is an email from Anthony Killarney, whose

17   email address is Tony@BlacklightSA.ch, to you; is that right?

18   **A.**    That's correct.

19   **Q.**    Okay.  And then you go on to talk about an indemnification

20   for transfer of Loop stock, it looks like; right?

21   **A.**    Correct.

22   **Q.**    Okay.  And then down below, at the signature line, it

23   says, "Sincerely, Tony Killarney, Blacklight S.A."?

24   **A.**    Yes, it does.

25   **Q.**    Okay.  So this is an email communication you had with

1    someone who stated they're with Blacklight S.A.; is that right?

2    **A.**    It says it on the email at the time.  I don't remember it

3    saying, "Blacklight," and it meant nothing to me.

4    **Q.**    Okay.  But prior to 2022, you had some dealing with

5    Blacklight -- right? -- as evidenced in this email?

6    **A.**    This email did -- with Mr. Killarney did come through.  I

7    do remember that.  I don't remember ever seeing -- or

8    Blacklight registering in my head.  It -- it didn't -- it had

9    no relevance to me.

10        **MS. CHOPRA:**  Okay.  And can we zoom out?

11    **BY MS. CHOPRA:**

12    **Q.**    And it looks like, in the top two emails -- eventually,

13    you do respond to Tony at Blacklight; right?

14    **A.**    I -- I do respond.

15        **MS. CHOPRA:**  Okay.  Okay.  Can we zoom out for one

16    second?

17    **BY MS. CHOPRA:**

18    **Q.**    And real quick, if we can go back to the bottom email, in

19    the first line at the bottom of this email, it says that Tony

20    at Blacklight is writing to you when --

21    **A.**    Excuse me.  I didn't hear.  What was the first part?

22    **Q.**    It says that Tony of Blacklight --

23    **A.**    What -- what paragraph?

24    **Q.**    The first paragraph.

25    **A.**    Okay.

1    Q.    It says that Tony at Blacklight is writing to you on

2    behalf of Mr. Stephens.  Do you see that?

3    A.    I do.

4    Q.    Okay.  So at least here, in 2017, based on this email, you

5    had an idea that there was some connection between

6    Mr. Stephens, Blacklight, Loop, and the shares that you were

7    getting; right?

8    A.    That didn't touch my consciousness whatsoever, that there

9    was connections between them.

10   Q.    But you were buying -- I mean, at least you were --

11   A.    I got -- I got this email.

12   Q.    Yes.

13         You got this email --

14   A.    Yeah.

15   Q.    -- and it was about Loop stock; right?

16   A.    Correct, but could you -- but the question before -- could

17   you repeat it so I can make sure I answered it properly?

18   Q.    Yes.

19         I said -- I think it was the right question.  At least in

20   2017, you had an idea the connection between Mr. Stephens --

21   A.    Yes.

22   Q.    -- Loop, and Blacklight?

23   A.    Right, and that's where I answered it didn't touch my

24   consciousness whatsoever.

25   Q.    Okay.  Thank you.

1        MS. CHOPRA:  You can take that down.

2   BY MS. CHOPRA:

3   Q.   I think on direct -- and, again, correct me if I'm

4   wrong -- you said that you did not know a Rajesh Taneja; is

5   that right?

6   A.   I did not -- I didn't know him, no.  I don't know him.  I

7   know the name now, but I didn't know him.

8        MS. CHOPRA:  Okay.  Can we pull up Exhibit 497,

9   please, which is not in evidence.

10       (Government's Exhibit 497 marked for identification.)

11  BY MS. CHOPRA:

12  Q.   Okay.  Mr. Danks, this is not in evidence.

13       The top email is an email between you and Mr. Destler; is

14  that right?

15  A.   That is correct.

16       MS. CHOPRA:  Okay.  And then can we scroll down so he

17  can see the rest of it?

18  BY MS. CHOPRA:

19  Q.   And then there's further emails between Mr. Destler and

20  you, and then below that, there's emails between Mr. Destler

21  and another person.

22       Do you see that?

23  A.   Yes, I do see that.

24  Q.   Okay.  And this was from 2015; is that right?

25  A.   Let me look at the dates.

1        Yeah, October of 2015.

2            **MS. CHOPRA:**  Okay.  Your Honor, I'd like to move this

3   into evidence, 497.

4            **THE COURT:**  Any objection?

5            **MR. HALL:**  No objection.

6            **MR. MILLER:**  No.

7            **MS. HALL:**  None.

8            **THE COURT:**  It may be admitted.

9            (Government's Exhibit 497 received in evidence.)

10           **MS. CHOPRA:**  Can we scroll -- is this the bottommost

11  email in this one?

12  **BY MS. CHOPRA:**

13  **Q.**   Okay.  So this is -- Mr. Danks, if you can see it -- I'm

14  sorry.  We're scrolling a little bit.

15  **A.**   Uh-huh.

16  **Q.**   This is the bottommost email on this long chain --

17  **A.**   Uh-huh.

18  **Q.**   -- and --

19  **A.**   Sorry.

20  **Q.**   -- it says it's from Rajesh Taneja to Mr. Destler; right?

21  **A.**   That's what this email says, yes.

22  **Q.**   Okay.  And it talks about wiring the funds and shares

23  between Touchstone, Vertical Leap, and First American; is that

24  right?

25  **A.**   That is correct.

1    MS. CHOPRA:  Okay.  And then can we scroll up a little

2    bit?

3    BY MS. CHOPRA:

4    Q.   And then here, there's more conversations between

5    Mr. Destler and Mr. Taneja based on this email; right?

6    A.   I see that, yes.

7    Q.   Okay.  And then here, there's an email from Mr. Taneja to

8    Mr. Destler, who says that Mr. Taneja received a wire from the

9    Danks Family Trust.

10        Do you see that?

11   A.   Could you repeat the question?

12   Q.   Here, on October 16th of 2015, there is an email from

13   Mr. Taneja to Mr. Destler, where Mr. Taneja says, "Danks Family

14   Trust wire.  Well received."  Do you see that?

15   A.   Yes, I do see that.

16   Q.   Okay.  And Danks Family Trust is your entity; right?

17   A.   Danks Family Trust is my family trust.

18   Q.   Okay.  So by this email, Danks Family Trust wired

19   something, maybe money, to Mr. Taneja; is that right?

20   A.   Yes.  It says so in the email, yes.

21        MS. CHOPRA:  Okay.  Can we scroll up?

22   BY MS. CHOPRA:

23   Q.   And here, there is another conversation between

24   Mr. Destler and Mr. Taneja; right?

25   A.   Yes.

1    **Q.**    And here, they're talking about a Vertical Leap wire?

2    **A.**    Yes.

3    **Q.**    Okay.  And you're also part of Vertical Leap; right?

4    **A.**    Yes.

5              **MS. CHOPRA:**  Okay.  Can we scroll up some more?

6         Okay.  A little bit more.

7    **BY MS. CHOPRA:**

8    **Q.**    And then finally, here, on October 16th of 2015, the

9    preceding email chain is forwarded onto you from Mr. Destler,

10   who's asking for you to sign something; is that right?

11   **A.**    He asks -- are you talking about the October 16th at

12   1:25 p.m.?

13   **Q.**    Yes.

14   **A.**    Okay.  Yeah, I do see that.

15   **Q.**    Okay.  And then, finally, the topmost -- and, eventually,

16   you do respond a few days later about something that you might

17   have countersigned; is that right?

18   **A.**    Yes.  I -- I asked Jon, "You got this countersigned?"

19   Correct.  I'm assuming that I had sent the countersigned

20   document.

21   **Q.**    So based on this email, Danks Family Trust wired money to

22   Mr. Taneja or one of his entities; is that right?

23   **A.**    That's correct.

24   **Q.**    Okay.  And also, in 2015, although you were not on the

25   initial emails below, an email chain with Mr. Taneja's name was

1    forwarded on to you by Mr. Destler?

2    **A.**   Could you repeat that question again?

3    **Q.**   Okay.  In 2015, although you were not on the initial

4    emails below, an email chain between Mr. Destler and Mr. Taneja

5    was forwarded on to you?

6    **A.**   That's correct.

7    **Q.**   Okay.  Thank you.

8         **MS. CHOPRA:**  You can take it down.

9    **BY MS. CHOPRA:**

10   **Q.**   Okay.  So while you were working to get all these shares

11   in place for Loop, you also got on the Loop board; right?

12   **A.**   On -- when the company went public -- or when it did

13   the -- completed the reverse merger, I joined the board.

14   **Q.**   Okay.  And that was in June of 2015?

15   **A.**   June -- June -- it was June 29th, 2015.

16   **Q.**   And you also got on the audit committee; right?

17   **A.**   By default.

18   **Q.**   What does that mean?

19   **A.**   I have no qualifications with being on it.  So I -- we

20   needed an audit committee.  So -- and there's only two

21   directors.  So --

22   **Q.**   Were you the only person on the audit committee?

23   **A.**   I'm not sure if Dan -- well, Daniel -- I don't think

24   Daniel could be.  I'm not -- I'm not sure if Danny was or not.

25   **Q.**   Okay.  And I think you said on direct that you got on the

 1  board so that you could have greater visibility into the

 2  company; is that right?

 3  **A.**    That's one of -- one of the reasons.

 4  **Q.**    What's another reason?

 5  **A.**    In raising capital, there's an exemption for me to be able

 6  to raise capital without being licensed --

 7  **Q.**    Okay.

 8  **A.**    -- and it would give me more cache with the -- with my --

 9  the group of investors that I had developed over 30 years,

10  being on the board instead of just being an outsider,

11  especially because of, you know, the scale and potential of

12  this project.

13  **Q.**    Yeah.

14      You had to be able to see inside and be inside, make sure

15  it developed as well?

16  **A.**    Yeah.  I just wanted -- I just wanted to make -- make sure

17  that they were -- but the prior reason I joined boards early on

18  is on -- because I -- I -- I focus on capital raising, and I

19  have an exemption to be able to, you know, like, have all the

20  finders send the other clients to me, and I close them.

21  **Q.**    And why did Loop need an audit committee?

22  **A.**    I have no idea.

23  **Q.**    You don't know?

24  **A.**    I didn't know why an OTC bulletin board company needed an

25  audit committee.  I didn't -- I didn't know that was a

 1  requirement.

 2  **Q.**   But you were on it?

 3  **A.**   I -- I believe -- yeah, I was on it.

 4  **Q.**   Okay.  Did being on the board give you some level of

 5  control over the company, too?

 6  **A.**   Not at all.

 7  **Q.**   Not at all?

 8  **A.**   Not at all.

 9  **Q.**   Why is that?

10  **A.**   Daniel Solomita was the dominant shareholder and the

11  dominant personality that had complete control over the

12  company.

13  **Q.**   Okay.  And so in your -- in your time at Loop, was there

14  an insider trading policy that Loop --

15  **A.**   Yes, there was.

16  **Q.**   -- presented?

17       Okay.  Did you read that policy?

18  **A.**   I've read it.  It's very dense, and I've gone through it,

19  yeah.

20           **MS. CHOPRA:**  Okay.  Can we pull up Exhibit 200?

21       This one's not in evidence, I don't think.

22        (Government's Exhibit 200 marked for identification.)

23  **BY MS. CHOPRA:**

24  **Q.**   Mr. Danks, do you see this email?

25  **A.**   I do.

1   **Q.**   Okay.  The top one -- the topmost email is from you to

2   several other people; is that right?

3   **A.**   Yes.

4   **Q.**   Okay.  And this is while you were at Loop; right?

5   **A.**   This is while I was on the board at Loop.

6   **Q.**   Yes.

7          **MS. CHOPRA:**  And if we scroll down -- this is not in

8   evidence yet.

9   **BY MS. CHOPRA:**

10  **Q.**   I think you have been forwarded on -- here we go --

11  various policies, including an insider trading policy; is that

12  right?

13  **A.**   Amongst others.  There's a list of them.

14  **Q.**   Yes.

15  **A.**   Yeah.

16  **Q.**   Yes.

17         **MS. CHOPRA:**  Okay.  Your Honor, I'd like to move this

18  email into evidence.

19         **THE COURT:**  Any objection?

20         **MR. HALL:**  No objection.

21         **MR. MILLER:**  Nope.

22         **THE COURT:**  200 may be admitted.

23         **MS. CHOPRA:**  Thank you.

24      (Government's Exhibit 200 received in evidence.)

25         **MS. CHOPRA:**  Okay.  And then can we turn to

 1  Exhibit 202, which is not in evidence?

 2        (Government's Exhibit 202 marked for identification.)

 3  **BY MS. CHOPRA:**

 4  **Q.**   Okay.  Mr. Danks, do you see this document, at least the

 5  first page?

 6  **A.**   I do.

 7  **Q.**   Okay.  Do you recognize this as Loop's insider trading

 8  policy?

 9  **A.**   I do.

10  **Q.**   Was this likely the document that was attached and sent to

11  you in that prior email?

12  **A.**   Yes.

13        **MS. CHOPRA:**  Your Honor, I'd like to move this into

14  evidence, too.  It's 202.

15        **THE COURT:**  Any objection?

16        **MR. HALL:**  No objection.

17        **MR. MILLER:**  No.

18        **MS. HALL:**  No.

19        **THE COURT:**  It may be admitted.

20        (Government's Exhibit 202 received in evidence.)

21  **BY MS. CHOPRA:**

22  **Q.**   And, Mr. Danks, you said that you had a chance to read

23  this at some time previously; right?

24  **A.**   Probably back then, I probably glanced at it.  I was more

25  focused on raising capital and didn't spend a lot of time

 1  reviewing documents like this, but I did review it.

 2  **Q.**   Okay.  And so we're not going to read the whole thing with

 3  the jury, but can we go to Page 3 of the document?

 4          **MS. CHOPRA:**  That's the PDF Page 3.  Sorry.  I'm

 5  looking at 3 of the actual document, if you can scroll down.

 6      Okay.  A little bit further.  Just a tiny bit further.

 7      There we go.

 8  **BY MS. CHOPRA:**

 9  **Q.**   Mr. Danks, do you see -- I guess it's the bottom third of

10  the screen, at least my screen, and it says, "Applicability of

11  this policy after your departure"?

12  **A.**   Yes.

13  **Q.**   Okay.  And can you read just the first sentence that's

14  at -- of that paragraph?

15  **A.**   "You are expected to comply with this policy" -- "this

16  policy until such time as you are no longer affiliated with the

17  company and you would no longer possess material public" --

18  "nonpublic information subject to this policy."

19  **Q.**   Okay.

20  **A.**   More, or is that --

21  **Q.**   No.  That's -- that's great.

22  **A.**   Okay.

23  **Q.**   Thank you so much.

24      So based on this, at least, even after your -- you know,

25  you've lost your affiliation with the company, you could be

1  subject to this insider trading policy; right?  Is that right,

2  Mr. Danks?

3  **A.**    Repeat the question.

4  **Q.**    According to this, even after you've separated from the

5  company, you could still be subject to this insider trading

6  policy; right?

7  **A.**    I -- I don't see where it says that in that paragraph.  If

8  you can show it to me where it says that -- that after I leave

9  that I'm still subject to it.

10  **Q.**    Well, I think you read that first sentence.  I think

11  that's --

12  **A.**    "You are expected to comply with this policy until such

13  time" --

14      (Court reporter requests clarification for the record.)

15          **THE COURT:**  Sir --

16          **THE WITNESS:**  I'm sorry.  I'm sorry.  I thought you

17  wanted me to read it.

18          **THE COURT:**  -- wait a minute.  Read it to yourself.

19          **THE WITNESS:**  Okay.  Sorry.

20          **THE COURT:**  Just let him read it to himself.

21          **THE WITNESS:**  Do you want -- I -- just to be clear --

22          **THE COURT:**  Read it to yourself.  Read the first

23  sentence to yourself and then stop and wait for the question.

24          **THE WITNESS:**  Okay.

25          **THE COURT:**  Ms. Chopra?

1   BY MS. CHOPRA:

2   **Q.**   Okay.  So here, it says you're expected to comply until

3   you are no longer affiliated with the company; right?

4   **A.**   Yes.

5   **Q.**   Okay.  And you no longer possess any material nonpublic

6   information; is that right?

7   **A.**   That's correct.

8   **Q.**   So both things have to be true for you to comply with this

9   policy?

10  **A.**   That's correct.

11          MS. CHOPRA:  Okay.  If we can go on to Page 6 of the

12  document itself.

13  BY MS. CHOPRA:

14  **Q.**   Okay.  And, Mr. Danks, I'm focusing on the paragraph

15  that's right below.  It's, like, the bottom third right below

16  the "no trading or material" -- "on material nonpublic

17  information."

18  **A.**   Correct.

19  **Q.**   And it starts with, "Except as discussed..."  Do you see

20  that paragraph?

21  **A.**   Yes, I do.

22  **Q.**   Okay.  Can you read just the first sentence of that --

23          THE COURT:  Out loud or to himself?

24          MS. CHOPRA:  Out loud, just the first sentence.

25          THE WITNESS:  "Except as discussed in the section

1    entitled 'Limited Exceptions,' you may not directly or

2    indirectly, through others, engage in any transaction involving

3    the company's securities while aware of material nonpublic

4    information related to the company."

5    **BY MS. CHOPRA:**

6    **Q.**    Thank you.

7    **A.**    This --

8    **Q.**    Thank you.

9         So there, it says "directly or indirectly, through

10   others"; right?

11   **A.**    Yes.

12   **Q.**    Okay.  And then can we go to the last sentence on that

13   same page?

14        Okay.  The last sentence on that page -- do you see it,

15   Mr. Danks?

16   **A.**    The last sentence?

17   **Q.**    The very last sentence on this page.

18   **A.**    Yes, I do see it.

19   **Q.**    And it says, "You're prohibited from engaging in these

20   actions, whether or not you derive any profit or personal

21   benefit from doing so"; is that right?

22   **A.**    Yes.

23   **Q.**    Okay.  Okay.  And then, finally, could we go to Page 15 of

24   this document?

25        Okay.  So here -- and you've read this previously --

1    right? -- Mr. Danks, sometime in the last few years maybe?

2    Last decade?

3    **A.**    I -- I reviewed this just prior to the -- the -- this

4    proceeding.

5    **Q.**    Okay.  And so here -- we're not going to read this whole

6    thing with the jury, but you're advised of your obligations

7    under Section 16; right?

8    **A.**    This is a paragraph -- or a number of paragraphs about

9    compliance under Section 16, obligations under Section 16.

10   **Q.**    Do you have any understanding of that section and your

11   obligations under that section?

12   **A.**    I -- I couldn't tell you what they are --

13   **Q.**    Okay.

14   **A.**    -- without reading it again.

15   **Q.**    That's okay.

16       Does it deal with limitations on sales by directors or

17   officers?

18   **A.**    Yes, I see that.

19       **MS. CHOPRA:**  Okay.  We can take that down.

20       Thank you.

21   **BY MS. CHOPRA:**

22   **Q.**    So you mentioned a few times that you worked to raise

23   capital for Loop; right?

24   **A.**    Yes.

25   **Q.**    Okay.

1   A.   It was one of my primary responsibilities.

2   Q.   Okay.  And that's pretty important for a startup company;

3   right?

4   A.   Critical.

5   Q.   It's critical.

6        So you played a critical role at Loop?

7   A.   Yes.

8   Q.   Raising capital?

9   A.   Yes.

10  Q.   And to raise that capital, you needed to find investors;

11  right?

12  A.   Correct.

13  Q.   And so, in order to find investors, did you send or ask

14  Mr. Lazerus, Mr. Harrison to -- to find people?

15  A.   I asked for referrals from them, yes.

16  Q.   Okay.  And did you also go out and find your own people to

17  invest in Loop?

18  A.   I've -- I've developed --

19  Q.   Yeah.

20  A.   -- for -- for over 30 years, a large group of investors

21  that I've worked with, and I --

22  Q.   Okay.  And in raising that capital, was it important to

23  you to -- to get people interested in Loop and its technology

24  and the company that it is?

25  A.   Of course.

1  Q.   Okay.  You wanted people who were kind of interested and

2  maybe friendly with the company; right?

3  A.   Well, if they had money and they weren't friendly, I would

4  still take their money.

5  Q.   You would still take it?

6  A.   Yeah, I would.

7  Q.   That's fair.

8  A.   Yeah.

9  Q.   And did you -- and did you kind of find some key partners

10  along the way that were really interested in Loop?

11  A.   Describe "key partners."

12        MS. CHOPRA:  Okay.  Can we pull up Exhibit 761?

13     This is not in evidence.

14        THE CLERK:  You said 761?

15        MS. CHOPRA:  761.

16        THE COURT:  I have 761 is in evidence.

17        THE CLERK:  Yes.

18        MS. CHOPRA:  Okay.  Great.

19  BY MS. CHOPRA:

20  Q.   Mr. Danks, do you see this email in front of you?

21  A.   I do see this email.

22  Q.   Okay.  The topmost email is an email between you and

23  Mr. Destler; is that right?

24  A.   It's from me to Jon Destler.

25  Q.   Yes.

1    Okay.  And in the body of the email, you talk about

2  Mr. Lazerus and shares from Touchstone that should be going to

3  Mr. Lazerus, it sounds like; is that right?

4  **A.**   The first sentence?

5  **Q.**   Yes.  The first sentence, yep.

6  **A.**   Yes.

7  **Q.**   And then below the first -- after the second sentence, you

8  talk about needing to give Tim "50,000 of our Loop restricted."

9  Do you see that?

10  **A.**   I do see that.

11  **Q.**   Okay.  In that context, is that Timothy Joyce?

12  **A.**   That is Timothy Joyce.

13  **Q.**   Okay.  And after -- in the last sentence there, you say --

14  you say, "Keep our key partners fired up"; is that right?

15  **A.**   That is true, yes.

16  **Q.**   So that's kind of what I was getting at when you asked

17  about key partners.

18    Did you have certain key partners that were interested in

19  Loop that were buying Loop stock from you?

20  **A.**   Robert was a partner, and Tim Joyce has invested with me

21  since 1994, and I kind of lumped him into the partner category.

22  He had nothing to do with the company, though.

23  **Q.**   Okay.  Okay.  But you saw him as a key partner in Loop?

24  **A.**   Pardon?

25  **Q.**   You saw him as a key partner in Loop?

1    **A.**    Tim Joyce?

2    **Q.**    Yes.

3    **A.**    Not at all.

4    **Q.**    Well, who were you referring to that means the key -- key

5    partners --

6    **A.**    Mostly Robert and, colloquially, Tim.

7        (Court reporter requests clarification for the record.)

8        **THE WITNESS:**  Mostly Robert but, colloquially, Tim.

9    **BY MS. CHOPRA:**

10   **Q.**    Okay.

11   **A.**    He was strictly an investor.

12       **MS. CHOPRA:**  Okay.  Could we pull up Exhibit 478?

13       This is in evidence.

14       (Government's Exhibit 478 marked for identification.)

15   **BY MS. CHOPRA:**

16   **Q.**    Okay.  And I believe you testified about these chats on

17   direct.  We can scroll down so you can see them.

18       Do you recall testifying about these yesterday?

19   **A.**    I do.

20   **Q.**    Okay.  So I just wanted to follow up on some of these

21   chats.

22       This is a text conversation between you and Mr. Lazerus;

23   is that right?

24   **A.**    That's correct.

25   **Q.**    Okay.  And so in this -- this first text, at least, you

DANKS - CROSS / CHOPRA

1   asked Lazerus to get Allan to buy 4- to 5,000 shares a day for

2   the next week or so; is that right?

3   **A.**   I did.

4   **Q.**   Okay.  You did or didn't?

5   **A.**   I did.

6   **Q.**   You did.

7        And that's Allan Brennan; right?

8   **A.**   That is Allan Brennan.

9   **Q.**   Okay.  And the date on this is November 1st, 2017?

10  **A.**   That's correct.

11  **Q.**   Okay.  And then --

12       **MS. CHOPRA:**  If we scroll a little further.

13       Okay.  Right there.

14  **BY MS. CHOPRA:**

15  **Q.**   Here, you're asking Mr. Lazerus if he had any luck with

16  Allan because you needed the stock to firm up at 13 or 14; is

17  that right?

18  **A.**   That was my aspiration, yes.

19  **Q.**   Okay.  Why was that your aspiration?

20  **A.**   We were in the middle of doing a private placement and

21  just wanted the stock to be strong.  We had priced it at $12

22  and just wanted to have a strong stock price.

23  **Q.**   Okay.  So you're doing a private placement?

24  **A.**   Yeah, we were in the midst of a private placement.

25  **Q.**   Okay.  And in the midst of that, you needed the public

1  stock price to form up -- firm up to 13 or 14; is that right?

2  **A.**  That's correct.

3  **Q.**  Okay.  And did you need that so that -- if the -- if the

4  public price is 13 or 14, were you then able to kind of move up

5  the private price along with that?

6  **A.**  We had already set the private price.

7  **Q.**  Okay.

8  **A.**  Yeah.

9  **Q.**  And so if you had already set the private price, what's

10  the point of firming up the public stock price at 13 or 14?

11  **A.**  I'm -- I couldn't give an answer.  I don't know.  I don't

12  know what I was thinking at that time when I wrote that text

13  message, probably to have it there so the private -- the

14  private placement would be a discount to the public trading

15  price.

16      **THE COURT:**  I'm sorry.  I did not hear the answer.

17      **THE WITNESS:**  It would maybe be to have the private

18  placement be at a discount to the private placement.

19  **BY MS. CHOPRA:**

20  **Q.**  I'm sorry.  Can you say that one more time?

21  **A.**  So that the private place- -- placement price would be a

22  discount to the public.  I did it backwards the first time.

23  Sorry.

24  **Q.**  Okay.  That's what I thought.  Now I understand.

25  **A.**  Yeah.  Yeah.  Yeah.  That was my fault.  I'm sorry.  Yeah.

```
 1   It threw you off.

 2   Q.   Okay.  So you needed to get the public price up so the

 3   private price can be lower at a discount from the public price?

 4   A.   That was my -- that was my aspirational goal, yes.

 5   Q.   Okay.  But you had already set the private price?

 6   A.   We had -- the documents probably had already collected

 7   money.

 8   Q.   But you hadn't -- at least based on this text message,

 9   your aspirational goal of getting the 13 or 14 hadn't happened

10   yet then; right?

11   A.   I'm not sure where the stock was at that time.

12   Q.   Okay.  So theoretically, if you had already set the

13   private price and you hadn't firmed up at 13 or 14, it could be

14   that the private price is not a discount to the public price;

15   right?

16   A.   That could be.

17   Q.   Then why would someone buy that?

18   A.   Pardon?

19   Q.   Why would someone buy that if it's not a discount?

20   A.   They probably wouldn't.

21   Q.   Okay.

22   A.   Yeah.

23   Q.   But it sounds like you already had that set up, the

24   private --

25   A.   Well, we were doing the private placement, and I -- I
```

 1  believe there was -- might have been -- I can't remember

 2  exactly why -- why -- there could have been, like, pressure on

 3  the stock.  There could have been a number of things going on.

 4  **Q.**  Okay.  And so at the time that you needed to get this

 5  public price up, you reached out to Mr. Lazerus; is that right?

 6  **A.**  I reached out to Mr. Lazerus, yes.

 7  **Q.**  Okay.  And with the idea that he could get someone like

 8  Allan Brennan, in these text messages, to buy some stock to get

 9  the price up; is that right?

10  **A.**  I don't know if it was to get the stock up.  I didn't know

11  where the stock was, but I was -- I was always encouraging

12  Allan to buy shares --

13  **Q.**  Okay.

14  **A.**  -- because he said he wanted to buy shares.  So --

15  **Q.**  And sitting here, you may not know where the stock was.

16  But back then, if you were trying to raise the price of the

17  stock, clearly it was lower than what you wanted it to be; is

18  that right?

19  **A.**  I can't -- couldn't tell you for sure.

20  **Q.**  Okay.  Why else would you want to firm up the 13 or 14?

21  **A.**  To -- probably to close the private placement, and it

22  could have been 13 or 14 and up.  I'm not sure.  I don't

23  remember the details.

24  **Q.**  Okay.  So you needed to change that public number so you

25  could get your private deal done; is that right?

1  A.   I don't even need -- know if I needed to change it.  I

2  don't know what the stock was.

3  Q.   Okay.

4  A.   I don't -- I just needed -- on whether -- just wanted it

5  to have -- I'll try to say this -- to firm up with the price.

6  It may have been trading.  I'm not sure.  I'd have to look at

7  their stock chart and find out what's going on.  I'm not sure

8  at all.

9         MS. CHOPRA:  Okay.  Okay.  We can take that down.

10  BY MS. CHOPRA:

11  Q.   Yesterday, you talked about various text messages that

12  were read to you and disseminating material nonpublic

13  information.

14       Do you recall that?

15  A.   I do.

16  Q.   Okay.  Obviously, when you were on the board of Loop, you

17  were privy to a lot of nonpublic information; right?

18  A.   Pretty much all of it, yeah.

19  Q.   Pretty much all of it?

20  A.   Yeah.

21  Q.   In your critical role at Loop?

22  A.   Correct.

23  Q.   Okay.  And even after you were off the board, you

24  continued to receive nonpublic information; right?

25  A.   Occasionally.

1  **Q.**   Occasionally?

2  **A.**   Yes.  Yeah.

3  **Q.**   But over the years, you did?

4  **A.**   Well, occasion- -- it would primarily be when we were

5  trying to raise money.  So I would be aware of what's going on.

6  **Q.**   Okay.  So even after you were off the board at Loop, you

7  were still trying to raise money for Loop; right?

8  **A.**   Yeah.  I was continuing for the entire time.

9  **Q.**   And that was still over time, even after you were off the

10  board, a pretty critical role for Loop -- right? -- for you to

11  raise money?

12  **A.**   I -- I wasn't as critical because we had -- I think we had

13  raised enough capital to be able to get a lot of this stuff

14  done, and there were other people by this point becoming

15  involved with raising money.

16      So I wasn't the sole person.  The first, I'd say,

17  30 million -- 30, 40 million -- that was primarily what I did,

18  and then I just assisted after that.

19  **Q.**   Okay.  Okay.  And so even after you were off the board,

20  you gave material nonpublic information to people like

21  Fred Scott Jackson; right?

22  **A.**   If I -- if I knew something, I would share that with

23  Scott Jackson.

24  **Q.**   Okay.  And other -- other people, too, I'm sure; right?

25  **A.**   If they didn't have an NDA, I wouldn't share with them.

1  Q.   Okay.  And we saw several communications between you and

2  Mr. Jackson yesterday; is that right?

3  A.   Me and who?

4  Q.   Mr. Jackson, Fred Scott Jackson.

5  A.   Yes.  Yes.

6  Q.   And I think you said -- it was your testimony that,

7  although you were telling him material nonpublic information at

8  times, that he was not trading at that time, or you'd expected

9  him to not be trading?

10  A.   He told me he wasn't trading at that time.

11  Q.   He -- he told you he was not trading?

12  A.   Yeah.  I told him -- I told him he was an insider, he

13  couldn't trade, and he told me he wouldn't.

14       MS. CHOPRA:  Okay.  Can we first turn to Exhibit 651,

15  which is in evidence.

16       Okay.  And Page 11.  I think a little -- can we kind of

17  scroll down a little bit?

18  BY MS. CHOPRA:

19  Q.   Okay.  Mr. Danks, this is part of a fairly long chat

20  string between you and Mr. Destler.  Do you see at least these

21  couple of bubbles here?

22  A.   I do.

23  Q.   Okay.  And I'm focused -- focusing on the one at the

24  bottom from you to Mr. Destler.  Do you see that one?

25  A.   Yes.

1    **Q.**    Okay.  And in that one, you said, "Am I deluding myself to

2    hold the line at 7?"  Do you see that?

3    **A.**    I do see that.

4    **Q.**    Okay.  And that -- are you talking about holding the line

5    at $7 per share of Loop stock?

6    **A.**    That was what that -- the meaning of that text is, yes.

7    **Q.**    Okay.  Around this time, you were reaching out to some

8    investors to help you hold the line; is that right?

9    **A.**    I was -- I was trying -- we were being shorted pretty

10   aggressively, and I was -- I'm always trying to find buyers.

11   That's -- it's supply and demand at a different -- different

12   price.  If there's people flooding the market with short sales

13   and you don't respond, the stock could go to nothing.

14   **Q.**    Okay.

15   **A.**    That's their goal.

16   **Q.**    Okay.  So to combat that, you're getting in people to buy,

17   to hold the line on your end?

18   **A.**    I would -- I would try to get people to come and buy the

19   stock.

20   **Q.**    Okay.  And one of those people -- if you look at the text

21   above, it says, "Call TJ."  Is that Timothy Joyce?

22   **A.**    That's Tim Joyce, yes.

23   **Q.**    Yes.

24        And at that same time -- this is around May of -- May 1st

25   of 2019 -- you were also reaching out to Fred Scott Jackson; is

1    that right?

2    **A.**    I never reached out to Scott Jackson.

3    **Q.**    Okay.

4    **A.**    He reached out to me usually.

5    **Q.**    Okay.

6    **A.**    Yeah, usually.  I may -- I may have once or twice, but it

7    was 99 percent him calling me or texting me, emailing --

8    **Q.**    And --

9    **A.**    -- emailing me, yeah.

10    **Q.**    I was just going to say:  He emailed you, too; right?

11    **A.**    Email, yeah.  He emailed me, yeah.

12                **MS. CHOPRA:**  Can we show the witness Exhibit 822,

13    which is not in evidence yet?

14        (Government's Exhibit 822 marked for identification.)

15    **BY MS. CHOPRA:**

16    **Q.**    Mr. Danks, do you see this email chain in front of you?

17    **A.**    I do see the email chain.

18    **Q.**    Okay.  It's not in evidence.

19        It's between you and Mr. Scott Jackson; is that right?

20    **A.**    Yes.

21    **Q.**    Okay.  And it's a series of emails between the two of you?

22    **A.**    Uh-huh.

23    **Q.**    And it's around May 29th of 2019, at least the first one.

24    Do you see that?

25    **A.**    Uh-huh.

```
 1   Q.   And it's in regards to Loop; right?

 2   A.   Correct.

 3        MS. CHOPRA:  Your Honor, I'd like to move 822 into

 4   evidence.

 5        THE COURT:  Any objection?

 6        MR. MILLER:  No.

 7        MR. HALL:  No objection.

 8        MR. MILLER:  No objection.

 9        MS. HALL:  No.

10        THE COURT:  8- -- 822 may be admitted.

11        (Government's Exhibit 822 received in evidence.)

12        MS. CHOPRA:  So let's scroll down to the -- it's in

13   reverse chronological order.  So let's scroll down to the

14   bottom email.

15        I'm sorry.  Wait.  We can go a little further up.  A

16   little further up.

17   BY MS. CHOPRA:

18   Q.   Okay.  So here -- and we don't need to read the whole

19   thing to the jury, but here there's emails between you and

20   Mr. Jackson, and you're talking about someone named Daniel.

21        Is that Daniel Solomita?

22   A.   Yes.

23   Q.   Okay.  And then on April 1st, 2019, Mr. Jackson writes to

24   you and says, "Stock is still tanking.  What's going to

25   happen?"  Is that right?
```

DANKS - CROSS / CHOPRA

 1   **A.**   It says, "What is going to happen to save the stock

 2   price?"

 3   **Q.**   Yes.

 4        And is that in regards to Loop stock?

 5   **A.**   That is in regards to Loop stock.

 6   **Q.**   Okay.  And then if we can scroll up a little further, then

 7   you respond on April 1st, I think the same day?

 8   **A.**   Correct.

 9   **Q.**   And it's a fairly long email, but you tell Scott

10   essentially everything is being done, and then you kind of tell

11   him about some aspects of what's being done, such as analysts

12   and other meetings; is that right?

13   **A.**   That's correct.

14   **Q.**   Okay.  And that's, again, in regards to what's happening

15   within Loop; right?

16   **A.**   What's happening in Loop, in the market, and what we're

17   doing to strengthen -- strengthen -- trying to strengthen the

18   stock.

19        **MS. CHOPRA:**  Okay.  And if we can scroll up further.

20   **BY MS. CHOPRA:**

21   **Q.**   And then Mr. Jackson says, "$7.06.  Really low"; right?

22   **A.**   The shorts had driven it to that -- to that price, yes.

23   **Q.**   Okay.  And this is also at the same time as the other

24   conversation we just saw between you and Mr. Destler, where

25   you're trying to hold the line at $7?

1  **A.**   You spoke too fast.  I couldn't understand you.

2  **Q.**   I'm sorry.  I tend to talk fast.

3       This is the same time as the other email -- I'm sorry --

4  the other chat conversation between you and Mr. Destler that we

5  just saw where you were trying to hold the line at $7; right?

6  **A.**   I can't remember the dates on that, but if it was the same

7  date -- if you want to go back to it and show it to me, or if

8  you just tell me it was the same date -- I can't remember if it

9  was.

10  **Q.**   That chat conversation was May 1st, 2019.

11  **A.**   Which would be a couple days after this.  Yes.  Okay.

12  **Q.**   And if we scroll up -- and then, here, this is from you --

13  now we're at April 29th at 1:35 p.m. -- from you to

14  Mr. Jackson --

15  **A.**   Yep.

16  **Q.**   -- where you tell Mr. Jackson that you bought shares; is

17  that right?  Am I reading that right?

18  **A.**   I did.

19  **Q.**   Okay.  At $7 -- or at least you had a bid at $7, it sounds

20  like.

21  **A.**   I had a bid at $7, right.

22       **MS. CHOPRA:**  Okay.  Can we scroll up?

23  BY MS. CHOPRA:

24  **Q.**   And then here, Mr. Jackson tells you, "Great.  I bought

25  1,000 shares.  More later"; right?

1    **A.**    Yes.

2    **Q.**    Okay.

3    **A.**    And he shouldn't have bought those.

4    **Q.**    And what?

5    **A.**    I'm sorry.  I was just speaking to myself out loud.

6    Sorry.  I didn't mean to.

7    **Q.**    Okay.  So -- and here -- I think you said he shouldn't

8    have bought those; right?

9    **A.**    He shouldn't have bought those, no.

10   **Q.**    But he did; right?

11   **A.**    He did.

12   **Q.**    And he told you he did?

13   **A.**    He did.

14   **Q.**    Okay.  So you knew that he was buying stock basically on

15   the same day that you're telling him information about Loop;

16   right?

17   **A.**    Correct.

18          **MS. CHOPRA:**  Okay.  And can we turn to Exhibit 823,

19   which is not in evidence?

20        (Government's Exhibit 823 marked for identification.)

21          **MS. CHOPRA:**  And, Your Honor, is this the time for our

22   break, or should I keep going?

23          **THE COURT:**  How much more do you have?

24          **MS. CHOPRA:**  I probably have another 15, 20 minutes,

25   Your Honor.

```
 1              THE COURT:  All right.  Ladies and gentlemen, let's
 2    take a 20-minute recess.  You're reminded you're not to discuss
 3    the case or do any research, and we'll see you back in
 4    20 minutes.
 5        (Proceedings were heard out of the presence of the jury:)
 6              THE COURT:  And you may step down as well.
 7              MR. HALL:  Don, you can --
 8              THE WITNESS:  Okay.
 9              THE COURT:  They didn't shut the door.
10        We're now outside the presence of the jury.
11        You -- I have to say you both, Ms. Hall and Ms. Chopra,
12    woefully underestimated the amount of --
13              MS. CHOPRA:  I'm sorry.
14              THE COURT:  -- questioning you had left when we talked
15    about it yesterday, but we'll keep going.
16              MS. HALL:  Oh.
17        I thought I was fairly short.
18              MS. CHOPRA:  I'll move fast, Your Honor.
19              THE COURT:  Okay.  Stephanie is doing the final for
20    Monday.  I just need to know what time we're going to do the
21    jury instruction conference.
22              MR. HALL:  I couldn't change my earlier --
23              THE COURT:  Okay.
24              MR. HALL:  Can we do it at 3:30, Your Honor?
25              THE COURT:  Sure.
```

```
 1        You know what?  What's the 2:00 o'clock calendar?  It
 2   looks like --
 3            THE CLERK:  It's gone now.
 4            THE COURT:  Hmm?
 5            THE CLERK:  2:00 o'clock's gone, so 2:30.
 6            THE COURT:  So 2:30.
 7            THE CLERK:  You want to do 1:30?  Can we --
 8            THE COURT:  How about -- would 1:30 work?
 9            MR. HALL:  I --
10            THE COURT:  No.
11            MR. HALL:  Unfortunately, it won't.
12            THE COURT:  Okay.  3:30.  3:30, it is.  We'll do the
13   jury instruction conference at 3:30.
14        We'll see you then.
15            MR. HALL:  Thank you, Your Honor.
16            THE COURT:  Thank you.
17        20-minute recess.
18            THE CLERK:  Okay.
19            MS. HALL:  Oh.
20        Your Honor, may the defendants be excused for the jury
21   instruction conference?
22            THE COURT:  Yes.
23        The defendants -- do you wish for your defendant to be
24   excused as well, Mr. Young?
25            MR. YOUNG:  Yes, please.
```

 1          THE COURT:  And Mr. Hall as well.

 2          MR. MILLER:  Like I said yesterday, I may not come.

 3          THE COURT:  That's fine.

 4                   (Recess taken at 10:34 a.m.)

 5               (Proceedings resumed at 10:58 a.m.)

 6          THE COURT:  Okay.  We are back on the record outside

 7     the presence of the jury.

 8          MR. HALL:  Your Honor, I just want to put on the

 9     record that, at the break, I noticed that Andrew Fuller had

10     been sitting in the back of the courtroom and listening to a

11     portion of the testimony.

12       I don't think his testimony relates at all to what

13     Mr. Danks was saying, and it was a mistake, but --

14          THE COURT:  Okay.

15          MR. HALL:  -- the investigator didn't catch him.  I

16     just -- I had never seen him in person.  So I didn't recognize

17     him.

18          THE COURT:  Thank you for disclosing that.

19          MS. HALL:  Your Honor, I just had two matters, one

20     very minor.

21       But one is that, in light of the Court's ruling with

22     regard to Kevin O'Dowd, I have my investigator, Alan Stevens.

23     I think he's down at the Marshal's Office right now, but I

24     would like to call him to testify about the statements that

25     O'Dowd made in our one-hour-plus interview.

1    He has a signed declaration that he prepared both for the

2    proffer that we discussed at the Fifth Amendment hearing and

3    also to, you know, notify everybody as to what his hearsay

4    statements would be.  It would be very quick, and we can take

5    it up at the next break, but I just wanted to flag that.

6         And my other -- my only other comment, sort of

7    tongue-in-cheek, is that I checked with the court reporter, and

8    my estimate of my cross this morning was almost exactly right,

9    20 minutes yesterday.  It was 20 minutes.

10         **THE COURT:**  Oh.

11    I thought it was more like 30 today.

12         **MR. PILCHAK:**  And, Your Honor --

13         **THE COURT:**  Okay.

14         **MR. HALL:**  It just seemed that way.  No.

15         **MS. HALL:**  Ha, ha, ha.

16                        (Laughter.)

17         **THE COURT:**  Okay.  I wasn't clear whether you're

18    saying you want to put him on the record outside the presence

19    of the jury to make a record of what was said or if you're

20    asking to have him called in front of the jury.

21         **MS. HALL:**  I want to call him in front of the jury and

22    present the hearsay testimony for --

23         **THE COURT:**  Oh.

24    We'll have -- we'll have to take that up at a different --

25    different break.

1    **MR. PILCHAK:**  And -- and we'd request that the

2    declaration, if Ms. Hall has it, be provided to us so we can

3    evaluate it.

4    **THE COURT:**  Okay.

5    **MS. HALL:**  I will be able to do that as soon as

6    Mr. Stevens gets back.

7    **THE COURT:**  Okay.

8    **MR. YOUNG:**  And, Your Honor --

9    **THE COURT:**  Yes.

10    **MR. YOUNG:**  -- I just filed the supplemental briefing

11    that I mentioned yesterday, in case anybody's looking for it.

12    **THE COURT:**  Okay.  Thank you.  Thank you.

13    Let's bring the jury in.

14    (Proceedings were heard in the presence of the jury:)

15    **THE COURT:**  Okay.  We are back on the record.  All

16    jurors are present.  The attorneys and the defendants are

17    present.

18    Sir, you're reminded you're still under oath to tell the

19    truth.

20    Ms. Chopra?

21    **BY MS. CHOPRA:**

22    **Q.**   Mr. Danks, before the break, we were going through some

23    emails between you and Mr. Fred Scott Jackson; is that right?

24    **A.**   Yes.

25    **Q.**   Okay.  So you had just seen an email, before our break,

1  where you told Mr. Jackson news about Loop; right?

2  **A.**  Yes.

3  **Q.**  And that not only did you then go out and buy some Loop

4  stock after that -- right?  You bought some Loop stock after

5  that news that you told Mr. Jackson?

6  **A.**  Yes.

7  **Q.**  Okay.  So not only did you buy Loop stock, Mr. Jackson

8  then bought Loop stock based on what you told him; right?

9  **A.**  I don't know if it was based on what I told him, but he

10  did buy Loop stock.

11  **Q.**  Right after you emailed him; right?

12  **A.**  Right after the email, yes.

13  **Q.**  Okay.  At the price that you were trying to hold the line

14  at; right?

15  **A.**  Is this to Mr. Jackson's trade?

16  **Q.**  Yes.

17  **A.**  I can't remember if it stated the price that he bought it

18  at.

19  **Q.**  Okay.  He had emailed you that it was about $7; right?

20  **A.**  I don't have it in front of me, but -- I can't remember,

21  but if that's what he said, then that's what he said.

22  **Q.**  Okay.  And that's not the only time that you knew that

23  Mr. Scott -- or I'm sorry -- Mr. Jackson was trading after you

24  told him the news; right?

25  **A.**  I -- sitting here right now, I don't remember that.

```
 1              MS. CHOPRA:  Can we show the witness Exhibit 823?
 2       This is not in evidence.
 3   BY MS. CHOPRA:
 4   Q.   Mr. Danks, do you see this is an email between -- email --
 5   email chain between you and Mr. Jackson towards the end of
 6   April 2019?
 7   A.   Yes.
 8   Q.   And it's about Loop?
 9   A.   Yes.
10              MS. CHOPRA:  Your Honor, I'd like to move this into
11   evidence.
12              THE COURT:  Any objection?
13              MR. HALL:  No objection.
14              MR. MILLER:  No objection.
15              MS. HALL:  None.
16              THE COURT:  823 may be admitted.
17       (Government's Exhibit 823 received in evidence.)
18   BY MS. CHOPRA:
19   Q.   Okay.  So this is April 30th, 2019; right?
20   A.   Correct.
21   Q.   Okay.  It's one day after the last email chain that we
22   saw?
23   A.   Correct.
24              MS. CHOPRA:  Okay.  Can we scroll down to the first
25   email in the chain?
```

1          Okay.  Sorry.  We can go up.

2  **BY MS. CHOPRA:**

3  **Q.**   And, in fact, it looks to be a follow-on from that first

4  email that we saw before; is that right?

5  **A.**   Correct.

6          **MS. CHOPRA:**  Okay.  So let's scroll up.

7  **BY MS. CHOPRA:**

8  **Q.**   Okay.  And so here, on April 30th, you tell Mr. Jackson

9  some information about a shorting theory; is that right?

10  **A.**   Yes.

11  **Q.**   Okay.  And then -- and then you also tell Scott, in the

12  second paragraph here -- you say, "Scott, what you could do is

13  put up a bid for 2,000 shares at $7 and leave it there."

14  **A.**   Correct.

15  **Q.**   Is that right?

16  **A.**   Correct.

17  **Q.**   And you say, "We're building a wall at $7"; is that right?

18  **A.**   Yes.

19  **Q.**   Okay.  This is part of your whole plan about holding the

20  line at 7; right?

21  **A.**   I was -- I was trying to keep the stock from falling --

22  falling lower and lower and lower, yes.

23  **Q.**   Right.

24          So you had a great interest in keeping the stock from

25  falling lower?

1   **A.**   The company had a great interest in it.

2   **Q.**   Okay.  The company, Loop, did?

3   **A.**   Loop did, yes.

4   **Q.**   Okay.  And you were acting kind of on behalf of Loop at

5   this point because you also had an interest, it seems?

6   **A.**   Yes.  I -- and I had tens of millions of dollars of

7   shareholders' money in the company.  So that's what I was

8   primarily thinking of, is the company and all the people that

9   had money risk.

10  **Q.**   Okay.  So at the time that you saw that Loop stock might

11  be affected, it might go down, you reached out to people you

12  knew to help support the price; is that right?

13  **A.**   To have them take advantage of the low price, yes.

14  **Q.**   Well, not just take advantage.  If they get in and they

15  buy, it could affect the price and have it go up; right?

16  **A.**   Well, I wasn't asking them to run the stock up.  I was

17  just trying to help them take advantage of the price, but

18  that's fine.

19  **Q.**   Well, it would be help- -- oh.  I'm sorry.  I didn't mean

20  to misspeak over you.

21       But it would be helpful for you, given all the

22  shareholders, if stock did go up; right?

23  **A.**   It would help all shareholders if the stock went up, yes.

24  **Q.**   Yes.

25       Okay.  So once you saw that maybe the stock was

1    following -- following -- I'm sorry -- falling, you began, just

2    like in this email, to coordinate with other people to kind of

3    support the stock; right?

4    **A.**   I would ask people to go in the market and buy stock, yes.

5    **Q.**   Okay.  Well, it was more than just asking; right?  You

6    were asking them to go at a certain price; right?

7    **A.**   Well, yeah.  I suggested a price, yes.

8    **Q.**   Okay.  And at a certain time; right?

9    **A.**   Yeah, for -- for whatever that day it was that I was

10   communicating.

11   **Q.**   Okay.  So it's more than just asking someone to buy stock.

12   You're actually telling them how much to buy it at and when to

13   buy that?

14   **A.**   I'm asking them.  I'm not telling them.

15   **Q.**   Okay.  Well --

16          **MS. CHOPRA:**  And then if we scroll up a little further

17   and -- well, right there.

18   **BY MS. CHOPRA:**

19   **Q.**   At the bottom email, you then tell Mr. Jackson, "Scott,

20   can you put an order in at $7, 2,000 shares?  Let me know";

21   right?

22   **A.**   Correct.

23   **Q.**   Okay.  And Mr. Scott, without hesitation, responds very

24   quickly afterwards, within a half hour, and says, "Yes"; is

25   that right?

1   **A.**   That's correct.

2   **Q.**   Okay.  So this is another instance where you were talking

3   to Mr. Jackson about information about Loop; right?

4   **A.**   Correct.

5   **Q.**   Okay.  And then, on that same day, Mr. Jackson turned

6   around and bought Loop stock?

7   **A.**   Correct.

8   **Q.**   Okay.  And, in fact, you told him to go buy Loop stock?

9   **A.**   I asked him to.

10  **Q.**   Okay.  And -- and not only did you tell him to go buy Loop

11  stock, but you told him the price and how much; right?

12  **A.**   I suggested $7, yes.

13  **Q.**   And you also suggested 2,000 shares?

14  **A.**   A couple thousand shares, yes.

15  **Q.**   Yes.

16      Okay.  Based on the information that you were giving him

17  at that time; right?

18  **A.**   Based on the fact that the company was being heavily

19  shorted.

20  **Q.**   Okay.  Okay.  So not only did Mr. Jackson trade on

21  information that you knew about Loop -- right?  You traded?

22  **A.**   Correct.

23  **Q.**   Okay.  But you also did based on information --

24  **A.**   Yeah.  I was --

25  **Q.**   -- you knew about Loop?

```
 1   A.   Yeah.  I was a buyer, yes.

 2   Q.   You traded based on information you knew -- you knew about

 3   Loop?

 4   A.   I'm -- I'd have to go back and read what I wrote.  I don't

 5   know if it was all inside information, but I did buy on that

 6   day, yes.

 7   Q.   Okay.

 8   A.   Or put in a bid.  I don't know if I got filled or not, but

 9   I did put in bids.

10   Q.   Right.

11        And you don't know if it was all inside information, but

12   at least some of it was inside information; right?

13   A.   I'd have to go back and review it again.

14   Q.   We can scroll down.  You can review it.

15   A.   I don't think that was inside information.  I just kind of

16   told him about what the short theory was and then asked him to

17   buy shares.

18   Q.   Right.

19        And you also said, "My call with the company this morning

20   was very positive, and they are extremely excited"; right?

21   A.   Yes.

22   Q.   Okay.  So you had some information based on a call that

23   you had with the company that very day?

24   A.   That's correct.

25   Q.   Okay.  And then you traded on that?
```

1    **A.**   I did.  It appears I did, yes.

2    **Q.**   Okay.  And Mr. Jackson did, too?

3    **A.**   Pardon?

4    **Q.**   And Mr. Jackson did, too?

5    **A.**   If he said, "Yes" -- I don't -- I don't have any trade

6    confirmation, but he says that he did.

7    **Q.**   Okay.  Okay.  So we sort of -- we talked about you, at

8    least in these conversations, holding the line -- right? -- to

9    support the Loop stock?

10   **A.**   Correct.

11   **Q.**   Okay.  And then, during your direct, you also said that

12   you would come in sometimes at the close of the trading day to

13   also help the Loop stock -- stock; is that right?

14   **A.**   Well, I -- as I said yesterday, short seller strategy is

15   to hit the stock very hard.  So I was just trying to defend

16   against them just breaking the stock down even further at the

17   end of the day.

18   **Q.**   Okay.

19   **A.**   Yeah.

20   **Q.**   So to combat that, you would also come in at the end of

21   the day with whatever trading activity you wanted to do; is

22   that right?

23   **A.**   Well, I did it for -- I did a few days of that, yes.

24   **Q.**   Okay.  And -- and so you thought that that activity, seems

25   like marking the close, would effectively maybe combat the

1  short sellers; is that right?

2  **A.**   I was trying to prevent -- yeah.  If they were going to be

3  shorting strong, I wanted to be -- to having some support, you

4  know, against their short selling.  So I'm trading --

5  **Q.**   Okay.

6  **A.**   -- some buying against their short selling.

7  **Q.**   So you were also marking the close to combat that; is that

8  right?

9  **A.**   To -- say that again, please.

10  **Q.**   You were also marking the close to combat the short

11  sellers; is that right?

12  **A.**   I didn't realize it was called "marking the close," but I

13  was just trying to combat the short selling, yes.

14  **Q.**   At the end of the trading day?

15  **A.**   Near the end of the trading day, yes.

16  **Q.**   Okay.  And then I think you also talked about something

17  else you were doing to help support the Loop stock price.

18       **MS. CHOPRA:**  If we can pull up 693.

19       Here, this is a chart that came in during one of the

20  Government's witnesses.

21       **THE COURT:**  As a demonstrative?

22       **MS. CHOPRA:**  As a demonstrative.

23  **BY MS. CHOPRA:**

24  **Q.**   And here, it shows you and Mr. Lazerus buying and selling

25  at the same time.  Do you see that?

1   **A.**   I sure do.

2   **Q.**   Okay.  And so you were -- I think you talked about this on

3   direct.  It was your testimony that you engaged in this type of

4   trading activity to combat the shorts; is that right?

5   **A.**   That's what I was doing on the 12th of April, yes.

6   **Q.**   Okay.  So to combat the shorts, you thought it was a good

7   idea for you to buy while -- while Mr. Lazerus was

8   simultaneously -- simultaneously selling; is that right?

9   **A.**   I did not think that was a good idea.  I didn't know

10  Mr. Lazerus was selling.

11  **Q.**   You didn't know he was selling?

12  **A.**   No, I didn't.

13  **Q.**   Okay.  It was a coincidence that there were all these buys

14  and sells at the same time?

15  **A.**   Well, if you remember yesterday, these were a very small

16  fraction of all the trades that happened that day.  So

17  there's -- there's a good chance that, at the end, we were

18  trading several times -- that some of those trades would go to

19  me.

20  **Q.**   Sure.  Maybe.

21       Mr. Lazerus, though, was part of the team that you have;

22  right?

23  **A.**   Not to do something like this, no.

24  **Q.**   Okay.  Well -- but he is part of your team?

25  **A.**   He is part of the team.

1    Q.   And you talked to him regularly?

2    A.   I -- I talked to him, as I described earlier --

3    Q.   Yes.

4    A.   -- yeah, sometimes.

5    Q.   And even in 2019, you talked to him regularly?

6    A.   You know, when your head's down, it's hard for me to hear.

7    Q.   Okay.  I'm happy to repeat it.

8         Even in 2019, you talked to him regularly; right?

9    A.   We were -- we were still in contact, yes.

10   Q.   Okay.  And he was still part of your team that you had

11   that was --

12   A.   Yeah.  He --

13   Q.   -- developing and promoting companies?

14   A.   He was primarily working on Opti-Harvest by this point.

15   Q.   Okay.  But here, you guys are both selling -- or, I guess,

16   buying and selling Loop stock, not Opti-Harvest stock, Loop --

17   A.   Loop stock, correct.

18   Q.   -- right?

19        Okay.  So we're talking about Loop right now.

20   A.   Yep.

21   Q.   So given your interactions with Mr. Lazerus, you're saying

22   that it's just pure coincidence that all these trades happened

23   simultaneously on this single day?

24   A.   I absolutely say that.  It would make no sense for me,

25   battling the shorts, to ask somebody to sell shares.  It's the

1    last thing that I would want to happen.

2    **Q.**    Well, you wanted to support the price; right?  This was a

3    7-dollar price that you were trying to hold the line at around

4    this exact same time; right?

5    **A.**    But you have to understand that holding the line is all

6    supply and demand.  What drives the stock down is -- is, you

7    know, lots of supply and people selling.  I would not want

8    Robert Lazerus selling shares while we're trying to prevent the

9    shorts from breaking the stock down to nothing.

10    **Q.**    Okay.  But regardless, that's what's happening here;

11    right?

12    **A.**    Well, again, if you looked at the entirety of the day --

13    **Q.**    It's -- it's a yes or no.

14    **A.**    Sorry.  It looks like on this small chart, but I would say

15    it's very small -- it's a very small chunk of a very large

16    trading day.

17    **Q.**    Right.  Of course.

18        But at least on this chart, there were a number of trades.

19    There are cross-trades.  You're buying and Mr. Lazerus is

20    selling; right?

21            **MR. HALL:**  Well, object to the commentary by Counsel.

22            **THE COURT:**  Sustained.

23    BY MS. CHOPRA:

24    **Q.**    Okay.  Where Mr. Lazerus is selling and you're buying, at

25    least here?

1  A.   It shows that Mr. Lazerus was selling shares on that day,

2  yes.

3  Q.   And you were buying at the exact same time?

4  A.   I was buying shares that day as well, too.  I don't know

5  if they're all of the exact same thing.  These -- these are,

6  but I don't know what the rest of the day looks like.

7  Q.   Right.

8       These are at the exact same time; right?

9  A.   These -- these trades -- these ten trades are at the same

10 time.

11 Q.   Okay.  And so you're saying your efforts at least -- and,

12 you know, speaking for yourself perhaps, your efforts here were

13 to help support the Loop stock price?

14 A.   My efforts were to try to bring -- buy into the stock to

15 help -- help combat the short selling to break the stock down.

16 Q.   Okay.  And so -- and you obviously, we talked about, have

17 an interest in combating the shorts because of your interest in

18 Loop; right?

19 A.   My -- my interest was secondary --

20 Q.   Okay.

21 A.   -- to the company being able to continue to raise capital

22 because I've -- I've been on -- doing this a long time, and

23 I've seen stock -- when -- when heavy short attacks happen,

24 I've seen stocks break down and go to, you know, pennies.

25 Q.   Uh-huh.

**A.**   And so -- and we were at a critical point.  We need

capital all the time.  So I would not have asked Mr. Lazerus to

match trades with me.

**Q.**   Okay.  I think that was not my question, but --

**A.**   What was your question?  I'm sorry.

**Q.**   You had an interest in supporting the stock price of Loop.

Was that --

**A.**   I had an interest in supporting Loop, yes.

**Q.**   Yes.

     Okay.  So to do that, to support Loop, because of your

interest -- and did you actually -- you know, after you got off

the board in 2019, did you still feel like you had a duty

towards Loop?

**A.**   I didn't get off the board in 2019.  I got off the board

in 2018.

**Q.**   I know.

     So at -- you were off at this point.  So at -- in 2019,

did you still feel like you had some duty towards Loop to help

it?

**A.**   Absolutely -- absolutely, I did.

**Q.**   Okay.

**A.**   I was a strategic adviser with them.

**Q.**   Okay.  And so in your duty to Loop, even after you got off

the board, there were a series of things that you did to help

support the Loop stock price; right?

1    A.    I did -- I did a lot of things to help support the Loop

2    stock price.

3    Q.    One of them was holding the line?

4    A.    One of them was to bring in -- to bring in demand to

5    offset the short selling, yes.

6    Q.    And another was to mark the close that we were just

7    talking about; right?

8    A.    I was -- I was aware that, at the end of the day, short

9    sellers go hard.  I didn't know it was called "marking the

10   line," just -- I was just making sure that the stock didn't

11   take a deep dive at the end of the day, which would create

12   momentum for the next day to drive it down even further.

13   Q.    Okay.  And another was this activity that we're seeing on

14   April 12th, 2019?

15   A.    Pardon?

16   Q.    And another way you supported the Loop stock price was the

17   activity that we see here on April 12th, 2019?

18   A.    My -- my buys were supporting the stock.

19   Q.    Yes.

20   A.    Robert Lazerus's sales were --

21   Q.    I'm talking about you specifically.

22   A.    Okay.  Mine -- mine were supporting the stock.

23   Q.    Okay.  Okay.  So all of these measures you were doing --

24   I'm talking about you, not Mr. Lazerus -- you were doing to

25   help support the Loop stock price; right?

1    A.    Yes.

2    Q.    Okay.  And this was all in your efforts to combat short

3    sellers?

4    A.    Yes.

5    Q.    Okay.

6    A.    There was con- -- there was -- there was constant,

7    relentless short selling going on.

8    Q.    Okay.  Are you aware of any exception to the securities

9    laws that would allow you to do these kinds of tactics to

10    combat short sellers?

11    A.    I didn't think that there was anything wrong with

12    combating short sellers by -- by helping build demand for the

13    stock.

14    Q.    Okay.

15    A.    I thought, as a matter of fact, it's -- it's a choice

16    between letting the company stock go to zero and not be able to

17    raise capital and to have the tens of millions of dollars that

18    had been invested become worthless or go in and try to support

19    the stock by building demand.

20    Q.    Yeah.

21         So you wanted to do whatever you could to make sure the

22    company did not go --

23    A.    Yeah.

24    Q.    -- downhill?

25    A.    Exactly.

1  **Q.**   Okay.  That's sort of not my question here because you

2  weren't just helping the stock price by spreading the word.

3  We're talking about exactly what you were doing.

4        **MR. HALL:**  Objection, Your Honor, to the commentary.

5        **THE COURT:**  Sustained.

6     Ask a question.

7  **BY MS. CHOPRA:**

8  **Q.**  We were talking about exactly what you were doing.

9        So I asked you:  You held the line; right?

10  **A.**   I was attempting to build demand for the stock.

11  **Q.**   Okay.  Okay.  Well, in doing that, as we saw, you reached

12  out to potential investors that you knew, including through

13  Mr. Lazerus; right?

14  **A.**   I believe so, yes.

15  **Q.**   Okay.  And you kind of coordinated with them on when to

16  buy and what price to buy at; right?

17  **A.**   Well, Ms. -- I think, with Mr. Jackson, I did.

18  **Q.**   Okay.

19  **A.**   Yeah.

20  **Q.**   And with Mr. Lazerus, with Mr. Brennan; right?

21  **A.**   I didn't tell Mr. Lazerus when to buy or what to buy.  He

22  wasn't buying.  He was selling.

23  **Q.**   Okay.  We did see some chats where you were trying to get

24  Mr. Lazerus to get Mr. Brennan to come in and firm -- firm up

25  the stock at 13 or 14.

```
 1   A.   I would -- yeah.  I know that -- I knew that Mr. Brennan
 2   was a buyer --
 3   Q.   Uh-huh.
 4   A.   -- that he was always looking to buy stock.  And then I
 5   would ask Robert, in situations like this, if he could -- if he
 6   could ask Allan to buy, yes.
 7   Q.   Right.
 8        So boiling that down, it wasn't just getting investors
 9   interested.  You were seeking out investors to buy at certain
10   times; right?
11   A.   To buy at certain times?
12   Q.   Yes.
13   A.   There were times that I did ask --
14   Q.   Okay.
15   A.   -- certain times at a certain price, yes.
16   Q.   For -- for certain prices --
17   A.   Yeah.
18   Q.   -- is that right?
19        Okay.  To keep the stock price up?
20   A.   To combat the heavy shorting that was going on.
21   Q.   To keep the stock price up; right?
22   A.   To com- -- yes, to keep the stock price up from being --
23   Q.   Okay.
24   A.   -- pushed down to nothing by the short sellers.
25   Q.   To keep the stock price up -- right? -- just to make
```

1  clear?

2  **A.**   Yes.

3  **Q.**   Okay.  Okay.

4  **A.**   Yes.

5  **Q.**   All right.  Okay.  Finally -- so moving back to Ventanas

6  real quick -- and this is my final topic.

7  **A.**   Excuse me.  Moving back to what?

8  **Q.**   Ventanas Capital.

9  **A.**   Okay.

10  **Q.**   So in 2017, you were on the Loop board; right?

11  **A.**   Yes, I was.

12  **Q.**   Okay.  In 2017, Ventanas had its Schwab account --

13  right? -- as we've talked about?

14  **A.**   That's correct.

15  **Q.**   Okay.  And that Schwab account held Loop stock; right?

16  **A.**   That's correct.

17  **Q.**   Okay.  And during that time that you were on the board,

18  Ventanas sold Loop stock through its account; right?

19  **A.**   Yes.  They did sell stock through -- she sold -- she sold

20  stock through her account, yes.

21  **Q.**   Well, I believe you said that you were helping her sell

22  for that account.

23  **A.**   I set the trades for her.  She -- she would call, say that

24  she wanted to sell.  I would get on the computer, set the

25  trade, and walk away.

1    Q.   But you did the trade on the computer that --

2    A.   I -- I set the trade, yes.

3    Q.   Yes.  Okay.

4    A.   Yeah.  She -- she didn't -- she didn't know how to, and I

5    did it for her.

6    Q.   You did the trade; right?

7    A.   I set -- I set the trades for her at her direction, yes.

8    Q.   Okay.  And you knew at this time, being on the board for

9    Loop, that if you sold Loop stock yourself, that would be an

10   issue; right?

11   A.   I would just have to report it.

12   Q.   Right.

13        You would have to report it?

14   A.   Correct.

15   Q.   Did you report that you were selling Loop stock at that

16   time through Ventanas?

17   A.   No, I didn't.

18   Q.   Okay.  You did not report it?

19   A.   I didn't report it.  I didn't think I needed to.

20   Q.   Okay.  But you knew that if you didn't report it, there

21   could be some serious consequences; right?

22   A.   I didn't -- based on the conversation I had with the

23   broker, I didn't have to -- I didn't have to report sales,

24   being a limited power of attorney on the account.  The shares

25   weren't beneficially mine, and there was no reporting

1    requirement, according to the broker.

2    **Q.**    According to the broker?

3    **A.**    Yeah.

4    **Q.**    Okay.  But at that time, while you were on the board at

5    Loop, not only were you the power of attorney on the Ventanas

6    account -- right?  We've established that?

7    **A.**    Yes.

8    **Q.**    You had other parts in Ventanas that you controlled, like

9    the email account; right?

10    **A.**    Well, I had access to the email account.  I didn't control

11    it.

12    **Q.**    Okay.  You controlled most of the operations, in fact,

13    because Michelle Fiore couldn't do it; right?

14    **A.**    She doesn't -- she doesn't use technology.

15    **Q.**    Right.

16    **A.**    I don't think -- that's why it wasn't used very often.

17    **Q.**    So that kind of left you to control everything for

18    Ventanas because she couldn't do it; right?

19    **A.**    Not to control.  It was to execute on her behalf.  She

20    controlled -- she made every decision on -- when it comes to

21    trading.

22    **Q.**    She made every decision, including selling to people like

23    Allan Brennan, who she did not know?

24    **A.**    No.  What would happen there is she would call, say she

25    needed -- she -- because she had the stock that I had given her

1   in Ventanas.  She would say she would need X amount of money.

2       I have a pool of about 200 investors I worked with for the

3   last, you know, 10, 20, 30 years, and I can go to any one of

4   them now.  Allan Brennan had asked any time somebody wants to

5   sell shares, please run it by him first.  He would like access

6   to them.  So that's what I did.

7   **Q.**   Okay.

8   **A.**   You can take it -- and she -- she didn't know any of these

9   people.

10  **Q.**   Right.  Right.

11      So the trades were happening with people that you knew --

12  **A.**   Correct.

13  **Q.**   -- in the way that you needed it to happen because it was

14  people that you knew; right?

15  **A.**   What did you say before you said -- before people I knew?

16  **Q.**   In the way that you needed it to happen, you arranged it,

17  is what I'm trying to say.

18  **A.**   What I did is she would tell me how much money, what

19  the -- what price, and then I would just go to that person and

20  say, "If you want it, yes or no."

21  **Q.**   Okay.  I'd like to turn to Exhibit 431, which is in

22  evidence.

23      Okay.  This is an email between you and Mr. Jackson.  Do

24  you see that?

25  **A.**   Yep.

1    Q.    Okay.  And in the email -- there's an initial email on

2    November 5th where Mr. Jackson asks you if Daniel is selling

3    some of his stock.

4         Do you see that?

5    A.    Yes, I do.

6              MS. CHOPRA:  Sorry.  A little further up.

7    BY MS. CHOPRA:

8    Q.    Okay.  And that's Daniel Solomita; right?

9    A.    Yes.

10   Q.    Okay.  And you responded because you're aware of some of

11   the rules related to CEOs and directors selling stock; right?

12   A.    Uh-huh.

13   Q.    Okay.  So your response is -- well, maybe there's a typo,

14   but it says, "I'm sue [sic] he's not.  He'd be in jain [sic] if

15   he did"; right?

16   A.    Yeah.

17   Q.    Okay.  By "jain," do you mean jail?

18   A.    Might -- it might have been jain -- jail, yes.

19   Q.    Okay.  So you're well aware that an officer/director of

20   Loop, or of a company, could face some serious consequences if

21   they were directing the sale of Loop stock?

22   A.    If they were what?

23   Q.    If they were engaging in the sale of Loop stock.

24   A.    Without reporting properly, yes.

25   Q.    Yeah.  Exactly.

1          **MS. CHOPRA:**  Okay.  One second, please.

2      No further questions, Your Honor.

3          **MR. MILLER:**  I have one real brief -- which

4    Mr. Hall --

5          **THE COURT:**  Sure.

6          **MR. MILLER:**  -- has said is fine.

7                    <u>**CROSS-EXAMINATION**</u>

8    BY MR. MILLER:

9    **Q.**   Mr. Danks, you -- you were being asked about Blacklight.

10   You said, "It didn't enter my consciousness."  Do you remember

11   that line of --

12   **A.**   I -- I do remember that.

13   **Q.**   Can you explain to the jury what you meant by that,

14   please.

15   **A.**   What I meant is that all I wanted to do was get -- get the

16   stock out of the hands of people that weren't interested in the

17   company and get it into -- into the hands of people who

18   believed in the company or who contributed to the company and,

19   you know, would -- would -- would be -- that it would be

20   something that they would want to be involved with for a long

21   time and away from the shareholders that own the shell company.

22   **Q.**   Did you really -- did you know, or get to know, any of the

23   shareholders that -- that owned the shell before you -- before

24   the merger?

25   **A.**   I never spoke with any of them.

1          **MR. MILLER:**  All right.  Nothing further.

2     Thank you.

3          **THE COURT:**  Mr. Hall?

4          **MR. HALL:**  I have a little bit, Your Honor.

5                    <u>**REDIRECT EXAMINATION**</u>

6   BY MR. HALL:

7   **Q.**   Mr. Danks, do you wear a hearing aid?

8   **A.**   Yes.  Thanks a lot.  Yes, I do.

9   **Q.**   It's all right.

10  **A.**   I wear two of them.

11  **Q.**   But you're having some difficulty hearing today?

12  **A.**   Yeah.  I've been having some -- yeah.  I have -- I was

13  trying to blame it on -- on her, but mostly it was my -- my

14  hearing aid.

15  **Q.**   I didn't mean to embarrass you.  I just think it's

16  important --

17  **A.**   That's -- that's quite all right.  They're -- they're --

18  they're -- nobody ever notices -- nobody has asked -- ever seen

19  them before.  They're very well hidden.

20  **Q.**   All right.  You were asked some questions about some

21  emails with Mr. Jackson today.  We saw a couple of new ones.

22       How many emails do you think you received from 2015

23  through February of 2022?

24  **A.**   Thousands and thousands and thousands.

25  **Q.**   And when you get an email that is a forwarded chain, do

312

1  you always read the bottom portion, or do you read the top

2  portion?

3  **A.**   I -- I very rarely -- I have very little attention to

4  detail, and I usually just read the top.

5  **Q.**   Yesterday, you testified that you don't remember

6  Mr. Jackson trading.

7  **A.**   I didn't remember Mr. Jackson trading at all.

8       **MR. HALL:**  All right.  Can we get 822 up, please.

9       Thank you.

10  **BY MR. HALL:**

11  **Q.**   All right.  So when you were testifying yesterday, did you

12  remember getting this email from Scott Jackson saying, "Great.

13  I bought a thousand shares"?

14  **A.**   It -- to me, it appeared the first time I saw this email

15  was today.  I don't remember that email.

16       **MR. HALL:**  Can -- and -- and can we switch and go to

17  2131?

18  **BY MR. HALL:**

19  **Q.**   All right.  Do you remember seeing this chart that

20  Mr. Rondeau prepared regarding stock volume?

21  **A.**   Yes, I do.

22  **Q.**   All right.  And that email we just looked at -- do you

23  recall what that date was?

24  **A.**   April 20- -- let's go back to April -- April 29th, 2019.

25  **Q.**   All right.  Now, in April of 2019, was there a huge volume

 1  of short sale -- selling going on?

 2  **A.**    There was a lot of -- a lot of aggressive short selling

 3  going on, very aggressive.

 4  **Q.**    And were you buying shares to try and -- and stop the

 5  price from dropping?

 6  **A.**    I was -- that's -- that was paramount to me to try to

 7  stop.  I tried -- I bought and tried to get others to buy.

 8  **Q.**    Did you think that there was anything illegal or

 9  manipulative about you just buying shares in the market?

10  **A.**    I did not.

11  **Q.**    What about asking somebody else to buy shares?  Did you

12  think that that was fraudulent or manipulative?

13  **A.**    No.  The only people -- I didn't -- I didn't have a boiler

14  room.  I wasn't doing, you know, cold calling.  I had this big

15  group of investors that were heavily invested, and I would ask

16  them to try to come in and help.

17  **Q.**    All right.  So these emails that we have seen with

18  Scott Jackson -- were you asking him to trade on inside

19  information --

20  **A.**    No.

21  **Q.**    -- or were -- well --

22  **A.**    I'm sorry.  Pardon me.

23  **Q.**    -- or were you trying to get him to battle the shorts?

24  **A.**    I wanted him -- I was trying to get everybody I could to

25  try to battle the shorts.  That was my -- I was very, very,

1  very paranoid because there's a lot -- there was a lot of --

2  there's a lot of activity shorting, but there was also a lot of

3  information that I was getting that there was people intending

4  to try to drive this thing to nothing.

5  **Q.**  All right.  And it looks like, from February down to

6  beginning of May, the price dropped significantly from over $10

7  to about $7.  Is that --

8  **A.**  Yeah.  It lost about 40 percent of its value.

9  **Q.**  And why were you concerned with that?

10  **A.**  Again, if -- if short sellers -- left unattended in a

11  stock like this, it would be very easy to have them take it

12  down to a penny stock, and the company would not be able to

13  raise any more capital.  The money that had been raised to date

14  would be out the window.  The project would stop.

15  **Q.**  All right.  Let me switch topics.

16  You were asked some -- about a Schwab account by Ms. Fiore

17  in January of 2017.

18  Did -- to your knowledge, did Ms. Fiore have two different

19  accounts at Schwab?

20  **A.**  I knew she had a -- an account in her own name, and she

21  wanted to set up an account in Ventanas's name, and that's why

22  I went in with her to set up the Ventanas account.

23  **Q.**  And so on the day that you went in that you've talked

24  about, was that just -- was that after she had already set up

25  her account or not?

1    **A.**   Well, she had already set it up.  I don't know when she

2    had set it up, but she did have a Schwab account in her own

3    name, and she wanted one in Schwab's name -- in Ventanas's

4    name.

5    **Q.**   All right.  Ms. Chopra asked you some questions about the

6    loans that you made to Ms. Fiore --

7    **A.**   Uh-huh.

8    **Q.**   -- and there was a promissory note that we introduced

9    yesterday for 144,000.

10   **A.**   Correct.

11   **Q.**   But did you -- did you loan her money after that?

12   **A.**   I loaned her quite a bit of money after that, and I didn't

13   take the time to do a promissory note on it.

14   **Q.**   When --

15        **MR. HALL:**  Can we go to Demonstrative Chart 531,

16   please.

17   **BY MR. HALL:**

18   **Q.**   All right.  Ms. Chopra asked you some questions about this

19   and -- and, I think, was referencing that green bubble of

20   12/22/2017.

21   **A.**   Yes.

22   **Q.**   And I believe that she asked you the question, "Did you

23   own Capistrano Capital at that time?"  Do you recall that?

24   **A.**   Yes, she did.

25   **Q.**   All right.  But this chart is about Ventanas Capital;

1   right?

2   **A.**   Yes.   It's about Ventanas selling their -- their Trilogy

3   shares -- I mean -- yeah, their Trilogy shares.

4   **Q.**   There's nothing about Capistrano Capital on here?

5           **MS. CHOPRA:**  Objection.  Misstates the evidence,

6   Your Honor.

7           **THE WITNESS:**  The very -- the very last bubble has

8   "Capistrano Capital" on it.

9           **THE COURT:**  Sustained.

10  **BY MR. HALL:**

11  **Q.**   All right.  And -- and to be clear, though, did you --

12  were you the beneficial owner of Ventanas Capital?

13  **A.**   I was -- had -- had no ownership in Ventanas Capital at

14  all.

15  **Q.**   Okay.  You were shown --

16          **MR. HALL:**  Thank you.

17      You can take that down.

18  **BY MR. HALL:**

19  **Q.**   You were shown some emails in 2017 about -- that

20  referenced the name Blacklight.

21  **A.**   Yes.

22  **Q.**   Did Blacklight mean any- -- I think Mr. Miller asked this,

23  but I want to go a little bit further.

24      Did Blacklight -- Blacklight mean anything to you?

25  **A.**   It meant nothing to me at all.

1  **Q.**  Did you have -- when you saw that, did, you know, alarm

2  lights -- I'm having a hard time talking today.

3        Did alarms go off in your head that this is a

4  pump-and-dump?

5  **A.**  I never -- I never even remember reading Blacklight.  As I

6  told you, I'm not really attentive.  I just look at what I need

7  to look at, and everything else is just a blur, and I didn't --

8  don't remember ever seeing that name.

9  **Q.**  Back in 2017, you were on the board; correct?

10 **A.**  Correct.

11 **Q.**  And did you also have duties to help shareholders sell

12 their stock?

13 **A.**  Yes.

14 **Q.**  And did that include helping them get indemnification

15 letters that -- that exchange houses wanted?

16 **A.**  Regularly, I would help shareholders do that.

17 **Q.**  And so would any -- so if someone wanted to shell -- sell

18 their shares through an exchange house, would you regularly be

19 contacted about indemnification agreements?

20 **A.**  From my -- from our existing shareholders who had bought

21 stock?

22 **Q.**  Yes.

23 **A.**  Yes, I would help them.

24 **Q.**  And how often did that happen?

25 **A.**  You know, pretty regularly.

1    Q.   When you got this letter in 27 -- or this email in 2017,

2    did you pay any attention to it?

3    A.   Could -- could you show me the email again?

4         MR. HALL:   425, please.

5         I may have my dates switched, but -- no.  This one's --

6    yeah.

7    BY MR. HALL:

8    Q.   This one's -- do you see the date there?

9    A.   It's August 7th, 2017.

10   Q.   All right.  Have -- you already purchased your stock how

11   many years before?

12   A.   Well over two years.

13   Q.   Did you consider the stock that was owned by --

14        MR. HALL:   Thank you.

15        You can take that down.

16   BY MR. HALL:

17   Q.   Did you consider the stock that was owned by

18   Ventanas Capital as yours?

19   A.   No.  It was given to her, and it's her stock.  She had

20   control of it, and she got all the proceeds from the sales of

21   it.

22   Q.   What about Touchstone?  Did you consider the stock at

23   Touchstone yours?

24   A.   It was all Jon Destler's and Mrs. Destler's, and I had no

25   ownership whatsoever.

1    **Q.**    Thank you.

2            **MR. HALL:**  Nothing further.

3            **THE COURT:**  Anything further?

4            **MS. HALL:**  Just a few questions.

5                    **RECROSS-EXAMINATION**

6    BY MS. HALL:

7    **Q.**   Mr. Danks, during your cross-examination by the

8    Government, you mentioned accredited investors.

9    **A.**   Yes.

10   **Q.**   Do you remember mentioning that?

11   **A.**   I do.

12   **Q.**   An accredited investor is an investor who has significant

13   experience in the stock market?

14   **A.**   I wouldn't say -- I would say that they probably do have

15   significant experience.  But, more importantly, they have the

16   financial wherewithal to lose the entire investment.

17   **Q.**   And so they would be someone who, you felt comfortable,

18   could take a risky position?

19   **A.**   Absolutely.

20   **Q.**   Scott Jackson was an accredited investor?

21   **A.**   Yes, he was.

22   **Q.**   Chester Griffiths was an accredited investor?

23   **A.**   Yes.

24   **Q.**   And Allan Brennan was an accredited investor?

25   **A.**   Yeah -- yes, he was.

1  Q.   There have been some discussions throughout this case

2  about attorneys and referrals and whatnot.

3       You didn't pay my fees, did you?

4  A.   Not a dime.

5  Q.   In fact, before this case, you didn't know me?

6  A.   I didn't, but I'm glad I do now.

7  Q.   Thank you.

8       But -- but you have nothing to do with my representation

9  for Mr. Lazerus?

10 A.   Nothing at all.

11 Q.   Completely independent?

12 A.   Completely independent.

13 Q.   Now, you have talked a lot about battling the shorts and

14 trying to support the price.

15      Shorts can artificially deflate the price of a stock; is

16 that right?

17 A.   Quite easily, yes.

18 Q.   All right.  So if a group of sort of predatory shorters

19 come in and they take their positions and then the word goes

20 out and they're shorting, the stock price can go far below what

21 is a reasonable and supportable price?

22 A.   Correct.

23 Q.   And you were trying to support a price that you believed

24 was a fair and reasonable price?

25 A.   Yeah.

1       And can I add to that answer?

2   **Q.**   You can explain your answer.

3   **A.**   Yeah, fair and reasonable price, but most importantly --

4   and I've experienced this before -- if you -- if you ignore

5   them, your stock can go to pennies, and it happens all the

6   time.

7   **Q.**   And destroy the company?

8   **A.**   And destroy the company.

9   **Q.**   Just -- lastly, there's been a lot of discussion about

10  Daniel Solomita -- Solomita.

11          **MS. HALL:**  If you could pull up 3473.

12      (Defendants' Exhibit 3473 marked for identification.)

13  **BY MS. HALL:**

14  **Q.**   And I'll just ask the -- just for the witness -- ask you

15  to identify what you're seeing on the screen as soon -- soon as

16  it appears.

17          **MS. HALL:**  I don't see anything on mine.

18          **PARALEGAL:**  It's on.

19          **THE CLERK:**  Hold on.

20  **BY MS. HALL:**

21  **Q.**   Can you identify what's displayed in Defendants'

22  Exhibit 3473?

23  **A.**   A -- a Loop Evian bottle.

24  **Q.**   Okay.  And do you -- what about the individual?

25  **A.**   Oh.  That's secondary to the fact that we built that

 1    bottle.

 2          That's Daniel Solomita, the CEO --

 3    **Q.**   So --

 4    **A.**   -- and founder of the company.

 5              **MS. HALL:**  I would move this into evidence,

 6    Your Honor.

 7              **THE COURT:**  Any objection?

 8              **MR. HALL:**  No objection.

 9              **MS. CHOPRA:**  No objection, Your Honor.

10              **THE COURT:**  It may be admitted.

11              **MS. HALL:**  I'll show it to the jury.

12          (Defendants' Exhibit 3473 received in evidence.)

13    **BY MS. HALL:**

14    **Q.**   And just -- I just -- now that the jury has the photograph

15    in front of them, you're saying that this is Daniel Solomita

16    holding a -- a Loop bottle?  A bottle manufactured by Loop?

17    **A.**   A bottle that was made from -- from the Loop process.

18    **Q.**   Thank you.

19              **MS. HALL:**  No further questions.

20              **THE COURT:**  May this witness be excused?

21              **MR. MILLER:**  Yes, Your Honor.

22              **MR. HALL:**  Yes.

23              **THE WITNESS:**  Thank you, Judge.

24              **MS. CHOPRA:**  No further questions, Your Honor.

25              **THE COURT:**  Okay.

1          THE WITNESS:  Thank you so much.

2          THE COURT:  Thank you.

3               (End of partial transcript.)

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, September 18, 2024

_____/S/ James C. Pence-Aviles_____

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter