Pages 1 - 58

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Cynthia Bashant, Judge

UNITED STATES OF AMERICA,          )
                                   )
            Plaintiff,             )
                                   )
    VS.                            )        NO. 22-CR-02701-BAS
                                   )
DONALD DANKS, JONATHAN             )
DESTLER, AND ROBERT LAZERUS,       )
                                   )
            Defendants.            )
_____    )

                            San Diego, California
                            Tuesday, August 20, 2024

            <u>**PARTIAL TRANSCRIPT OF JURY TRIAL, DAY 14**</u>

                    **(CLOSING ARGUMENTS)**

**<u>APPEARANCES:</u>**

For Plaintiff:
                        TARA K. MCGRATH
                        United States Attorney
                        880 Front Street, Room 6293
                        San Diego, California 92101
                BY:  **NICHOLAS W. PILCHAK, ESQ.**
                     **JANAKI GANDHI CHOPRA, ESQ.**
                     **ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Donald Danks:
                        LAW OFFICE OF PATRICK Q. HALL
                        402 West Broadway, Suite 1560
                        San Diego, California 92101
                BY:  **PATRICK Q. HALL, ESQ.**
                     **ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:    James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                Official Court Reporter

1    **APPEARANCES**:    **(CONTINUED)**

2    For Defendant Jonathan Destler:

3                               SNELL & WILMER
                               3611 Valley Centre Drive, Suite 500
                               San Diego, California 92130

4                    BY:   **ANDREW PHILLIP YOUNG, ESQ.**
                         **ATTORNEY AT LAW**

5

6                               MILLER BARONDESS, LLP
                               2121 Avenue of the Stars, 26th Floor
                               Los Angeles, California 90067

7                    BY:   **LOUIS "SKIP" MILLER, ESQ.**
                         **ATTORNEY AT LAW**

8

9    For Defendant Robert Lazerus:
                               LAW OFFICE OF MARTHA M. HALL
                               555 West Beech Street, Suite 508

10                              San Diego, California 92101

11                   BY:   **MARTHA MCNAB HALL, ESQ.**
                         **ATTORNEY AT LAW**

12                              LAW OFFICE OF ADAM F. DOYLE
                               444 West C Street, Suite 310

13                              San Diego, California 92101

14                   BY:   **ADAM F. DOYLE, ESQ.**
                         **ATTORNEY AT LAW**

15

16

17

18

19

20

21

22

23

24

25

**I N D E X**

Tuesday, August 20, 2024 - Day 14

|                                          | PAGE | DAY |
|------------------------------------------|------|-----|
| Closing Argument by Ms. Chopra           | 4    | 14  |
| Closing Argument by Mr. Miller           | 32   | 14  |

```
 1   Tuesday - August 20, 2024                          1:01 p.m.

 2                       P R O C E E D I N G S

 3                            ---oOo---

 4   (Proceedings were heard in the presence of the jury:)

 5        THE COURT:  Okay.  We are back on the record.  Yes.

 6   All jurors are present.  All defendants and -- and attorneys

 7   are present.

 8        Ladies and gentlemen, at this time, the Government will

 9   make a closing argument.  You are reminded, as I said before,

10   if either -- if any of the attorneys misstates the law or the

11   evidence, you are to rely on the evidence as you remember it

12   and the law as I instructed you.  You must decide the case

13   solely on the evidence and the law.

14        After the Government makes its closing arguments, the

15   defense attorneys will be allowed to make their closing

16   arguments.  And then, because the Government has the burden of

17   proof, they're permitted to make a final rebuttal closing

18   argument.

19        Ms. Chopra?

20        MS. CHOPRA:  Yes, Your Honor.

21   Just making sure this works.

22        THE COURT:  Okay.

23                       CLOSING ARGUMENT

24        MS. CHOPRA:  At the beginning of this trial, my

25   co-counsel told you a proverb:  In clear water, you catch no
```

1  fish.

2       And these defendants -- Donald Danks, Jonathan Destler,

3  and Robert Lazerus -- worked hard, for seven and a half years,

4  to muddy up the waters to make sure that no one found out how

5  they were concealing their control of Loop stock.

6       Time and time again, they lied and lied and lied to

7  brokerages, to attorneys, and the investors, to make an end-run

8  around the natural forces of the stock market so that they

9  could cheat the stock market and artificially inflate the price

10  of Loop stock for their own benefit.

11       Why did they do this?  Greed, to line their own pockets to

12  the tune of $9 million.  And for their actions, these

13  defendants are guilty of conspiring to commit securities fraud

14  and actually committing securities fraud.

15       Sorry.  It is on.

16       Okay.  I'm sorry.  You know how the market is supposed to

17  work.  You heard from Peter Melley from FINRA.  He said that

18  there are rules and regulations in place that are enforced by

19  the SEC and FINRA.

20       The very purpose of those rules and regulations is to

21  create a free and fair market, a market that's controlled by

22  the natural forces of supply and demand, a market to make sure

23  that each individual investor is protected and to make sure

24  that no one is deceived.

25       Is that what happened in this case?  Absolutely not.

1  These defendants were not interested in a free and fair market.

2  Instead, they flipped the free and fair market on its head.

3  Between what they told investors, between what they told the

4  undercover, and between what Danks and Destler told you right

5  there from that stand, they didn't care about Loop or the

6  technology.

7       It was all a marketing pitch.  It was all lies, lies to

8  pull the wool over your eyes, to pull the wool over investors'

9  eyes, so that no one would see what they were actually doing

10  behind the scenes.

11      But the evidence in this case did show you what they were

12  doing behind the scenes, when no one -- when they thought no

13  one else was watching, what they were doing on their encrypted

14  communications, what they were doing in meetings with the

15  undercover.  And what they were doing was the only thing they

16  cared about: getting control of Loop stock, pitching the

17  revolutionary recycling bid to every single person they met,

18  investors, the undercover, and even you, from that very stand.

19      So how did they do this?  They turned the free and fair

20  market into one that's artificial and rigged and one that is

21  controlled from behind the scenes by them.  They formed a team.

22  You heard Danks talk about that team on the stand.  That team

23  consisted of Danks, Destler, Lazerus, and another person named

24  James Harrison, a.k.a. Coach.

25      They formed a team, and it was a team to defraud.  And you

1  heard that that team was not a team of novices.  They were

2  seasoned.  They had been working together from -- for -- to

3  form small company to small company to small company: Trilogy,

4  dThera, Fannatac, Loop, of course, and their new pitch,

5  Opti-Harvest.

6       You heard from Danks that he had been an entrepreneur for

7  a couple of decades -- decades or more, and through that, he

8  had met Destler.  And since 2012, he and Destler were partners

9  in everything, he told you.

10      Destler, for his part, said he was in the capital markets

11  arena, investor relations, and he had even taken the license to

12  be a stockbroker.  He had conveniently forgotten some of the

13  salient parts of that exam, like the antifraud provisions in

14  the securities markets.

15      And Lazerus -- you heard Lazerus tell the undercover that

16  he had worked on ten companies before, and he had done so well

17  on his work on Trilogy, with Danks, that Danks recruited him to

18  work on Loop with him.

19      So they formed a team, and Danks told you what all their

20  roles were on this team.  Danks and Destler were the

21  cocaptains.  They were the brains.  They helped form the

22  company and develop the company, and they had Lazarus and

23  Coach, who were deployed to find investors, to pitch people, to

24  get people to invest, people like Allan Brennan.  And for their

25  work, they received a commission.

 1    But what you didn't hear from either Danks's or Destler's

 2    testimonies was about the other people who were also part of a

 3    larger conspiracy.  The evidence showed you that there were

 4    other people outside of the United States -- David Stephens,

 5    Steve Bajic, people behind Blacklight -- that formed the

 6    beginning chapters of this pump-and-dump scheme that these

 7    defendants were a part of.

 8    In fact, for much of the trial, they tried really hard to

 9    distance themselves from all three of those people and those

10    entities.  But in reality, they played a critical role in the

11    beginning phases and set the table for the defendants to engage

12    in their pump-and-dump scheme for seven and a half years.

13    How?  Well, you heard directly from Steve Bajic.  He

14    already pled guilty to conspiracy to commit securities fraud,

15    and he told you that he's been part of a number of

16    pump-and-dump schemes, and he even told you that his actions

17    with regard to Loop were the beginning phases of these

18    defendants' pump-and-dump scheme.

19    He told you that he helped David Stephens get a shell, and

20    Stephens had one requirement.  He wanted a shell of which he

21    can get a hundred percent of the free trading stock.  Why?

22    Bajic told you, Agent Joyce told you, and even the defendant's

23    own expert, Weintraub, told you why that's important.  It was

24    important to get a hundred percent of the free trading stock

25    because they can control where the stock went and at what

1   price.

2        So eventually, Bajic set Stephens up with FAMG, and FAMG

3   was the perfect shell.  It was a shell that initially had

4   investors in foreign countries -- India and Lebanon -- far

5   away, essentially beyond the reach of anyone here, any reg- --

6   any regulators around here.  And once the reverse merger

7   happened, David Stephens was able to acquire the entire

8   6.5 million free trading shares with FAMG.

9        And what did he do?  Those shares were perfectly divided

10  up in companies controlled by Bajic, Sharp, and Blacklight, all

11  conveniently under 5 percent to avoid any disclosure

12  requirements.

13       Let's talk about muddying up the water.  This was a

14  concealing game from the very beginning, foreign investors,

15  foreign companies, and a perfectly mapped out group of entities

16  that all had less than 5 percent of the shares.

17       So where do the defendants come in in all of this?  The

18  defendants, for the most part, tried to distance themselves

19  from all of these players.  But you heard that, starting in

20  October of 2014, Destler, Danks, and Stephens arranged a phone

21  call in early October of 2014.

22       And following that phone call, Destler introduced Stephens

23  to Solomita.  And in that email, he introduced Stephens as a

24  close contact of Allan's.  In fact, they were so close to

25  Stephens at that point that, from that point forward, they set

 1   out to map out the shares of Loop stock amongst themselves and

 2   their friends.

 3        So how do they do this?  You saw this email, this

 4   attachment.  This was the idea the team had.  The team wanted

 5   to buy the shares between themselves -- Destler, Danks, their

 6   companies, Stephens, Solomita -- and friendly hands.  And you

 7   heard from Destler that it was important to get the stock into

 8   friendly hands.  Why?  Because they could control it then.

 9        Solomita thought this was a joke, but Danks definitely did

10   not, and what ended up panning out?  Pretty much exactly what

11   they had envisioned.  All of the free trading stock, all of the

12   stock that could be bought and sold in the market for Loop, was

13   divided up amongst these defendants, their companies,

14   David Stephens, Solomita, and friendly hands.  You heard from

15   some of those friendly hands, Chester Griffiths and Rob- -- and

16   Timothy Joyce.

17        Is this what you would consider the hallmark of a free and

18   fair market?  And defendants didn't want a free and fair

19   market.  They wanted to hide their control of the shares from

20   the market, and that's why they mapped it out just like this.

21        So what happened next?  They map out the shares, and then

22   they worked on acquiring those shells -- shares.  You heard

23   from much of this trial that these defendants distanced

24   themselves from Blacklight and anything to do with Blacklight.

25        But in reality, you saw emails from 2015, 2016, 2017

1  between Danks and Destler and Blacklight entities -- Mediapark,

2  Soloman AG, Tony Killarney -- and you also saw an email between

3  Destler and Bajic's associate, Rajesh Taneja.  They were all

4  intertwined, and they were all part of the same conspiracy to

5  get control of Loop stock.

6       David Bajic himself was only one touch away.  You heard

7  him testify that he was lockstep with Stephens through the

8  reverse merger that created Loop.  And during that process,

9  Stephens had mentioned to him that there was a California group

10  that was going to get shares with Loop.  Well, here they are,

11  the California group that got those shares, the ones that Bajic

12  had heard about, the ones that Stephens told him about.

13      So what happened next?  They got control of the shares,

14  and they had to conceal their control from the market, from

15  investors.  So they went about doing exactly what Stephens had

16  done, pushing their shares into various companies, just like

17  Stephens had done in his offshore entities.

18      These defendants had other companies.  You heard about

19  these throughout the trial: Capistrano Capital; Danks Family

20  Trust; Ventanas Capital, LLC, which we'll get back to;

21  Vertical Leap Advisors; and, of course, every iteration of

22  Touchstone, four iterations.

23      Okay.  So let's start with Touchstone.  I won't belabor

24  the topic because I think you've heard about three weeks of

25  testimony about all the different Touchstones that exist.

1   There's three Touchstones on paper, and there's a fourth

2   Touchstone, Touchstone Capital Advisors, that doesn't really

3   exist on paper but apparently is a dba and maybe is an

4   umbrella.

5       And you may be wondering, first, why there's so many

6   Touchstones.  Second, what do any of these Touchstones even do?

7   Both really good questions.  I think only one was answered in

8   the course of this trial.  The reason for so many Touchstones

9   is part of their concealment game.  They wanted to hide who

10  controlled what, how much shares were controlled, and who was

11  selling shares.  That was the whole point.

12      And then in terms of what these Touchstones did, no one

13  really knows.  You heard from two of the defendants' friends,

14  Chester Griffiths and Jason Carter, friend -- Jason Carter,

15  friends of Jonathan Destler.  They both had known Mr. Destler

16  for a long time.  Neither of them could tell you anything about

17  any difference between these Touchstones.  All they can say is

18  that they thought that Danks and Destler both controlled

19  Touchstone.

20      So what else do we know about these Touchstones?  On

21  paper, Jonathan Destler is on all of the Touchstones, and Danks

22  basically disavowed any connection with Touchstone during his

23  testimony or at any point.

24      But in reality, we know that all the evidence you've seen,

25  which I won't belabor -- declaration, consulting agreement,

1   termination of that consulting agreement -- in every iteration

2   of Danks's email signatures, that for certain, he is coequal

3   with Mr. Destler in any of these Touchstones, all of them,

4   because they all run together.

5        But he can't say that.  In fact, he was on the stand, and

6   in talking about his own declaration he filed with a different

7   court, he opted to tell you that he had perjured himself 71

8   times rather than tell you that he's --

9            MR. HALL:  Objection, Your Honor.  Misstates --

10           THE COURT:  Overruled.

11       Ladies and gentlemen, you're reminded that you're to

12  follow the law -- the evidence as you remember it, not as the

13  attorneys state it.

14       MS. CHOPRA:  He opted to tell you that he had perjured

15  himself instead of telling you that he's associated with

16  Touchstone.  That's how much he does not want to be a part of

17  Touchstone.

18       Why?  Because if he revealed he was part of Touchstone, it

19  would lay bare all of the paperwork that Touchstone filed with

20  Wilson-Davis, for example, because he would be seen as part of

21  Touchstone while he was on the board of Loop Industries, and

22  that would trigger additional disclosure requirements.

23       It would also lay bare all the trading that Touchstone was

24  doing of Loop stock while he was on the board, and they

25  couldn't have that.  That would unravel the entire scheme.

1    Next is Ventanas Capital, which you also heard a lot

2  about.  Ventanas itself was a concealment mechanism.  You heard

3  Donald Danks testify that he set up Ventanas for

4  Michelle Fiore.  Apparently, she wanted it, and he tried to

5  help her set it up.

6    But in reality, she was just a straw.  She was propped up

7  to be the nominal figurehead of Ventanas, and why wouldn't she

8  be?  She got some money out of it, but in reality, Donald Danks

9  controlled Ventanas the entire time.

10    You saw this document, which was a limited power of

11  attorney.  Donald Danks -- Danks said that he went with

12  Michelle -- Michelle Fiore to Schwab to fill this out.  And in

13  filling this out -- at this time, in 2017, he was on the board

14  of Loop.  Instead of declaring that on this document, he

15  checked a big X and said he wasn't the director of a publicly

16  held company.

17    He couldn't admit it because Ventanas was setting up to

18  sell Loop stock, and he couldn't do that without additional

19  disclosures while he was on the board of Loop.  So he had to

20  hide that.

21    And not only that, Danks controlled the finances of

22  Ventanas.  You heard Michelle Fiore testify that, even though

23  she's on the paperwork for Ventanas, she had no idea what

24  Ventanas -- Ventanas did.  She didn't know what its business

25  model was.  She didn't know what its operations was.

1    She had no hand in the finances.  She has no -- she had no

2  hand in trading stock.  She doesn't know how to trade stock.

3  She had no idea if she even worked there.  She didn't draw a

4  salary from there.  She didn't even know if it had an office

5  because it wasn't really hers.  She knew nothing about it

6  except the name.

7    Don Danks was the one who did everything.  He even had her

8  sign blank checks that he could later fill out for Ventanas.

9  He was pulling the strings from behind.  And you also heard

10  from Don Danks that any of the trades that went through

11  Ventanas were people that he knew, not Michelle Fiore, like

12  Allan Brennan.

13    He was coordinating trades with people that he knew at

14  times that he wanted to, and then maybe he would send some of

15  the money back to Michelle Fiore.

16    And when it came time that the FBI came to Donald Danks's

17  house, he got scared because he thought maybe this whole gig

18  was up.  He thought they'd figured who was really behind

19  Ventanas and what he was doing while he was on the board at

20  Loop.

21    So what did he do?  He reached out to Fiore and talked

22  about how the FBI and the DOJ were on his tail.  He said, "No,

23  but you're good.  They don't want you.  They just want me."

24  And he told her, "You're going to be able to help me."  He

25  still needed her on his side to conceal what was really going

1   on with Ventanas.

2       And on his side, he was -- you heard both of their

3   testimony, and he applauded her, saying that she wasn't a

4   scapegoat.  Of course not.  And in his texts, he even reminded

5   her on what their story was, that Ventanas was hers a hundred

6   percent.  That's exactly what she got up there and told you

7   when she got up on the witness stand.  That's exactly what

8   Donald Danks told you when he got up on the witness stand.

9       But if it was her company all along, why would

10  Donald Danks have to remind her, right after the FBI came, that

11  it was her company a hundred percent?  That doesn't make any

12  sense.  This was all part of their ploy to sync up to make sure

13  that she helped him at the end of the day.

14      And, of course, Donald Danks couldn't talk -- couldn't

15  disclose why -- couldn't disclose the fact that he controlled

16  Ventanas.  He knew what would happen.  He knew what the

17  consequences were if he sold Loop stock while he was on the

18  board of Loop.  He told F. Scott Jackson as much in an email in

19  2019, when F. Scott Jackson asked Don Danks if Solomita was

20  selling shares as CEO.

21      What did Don Danks tell F. Scott Jackson?  "I'm sure he's

22  not.  He'd be in jail if he did."  And that's exactly why

23  Don Danks had to use Michelle Fiore as a straw to sell Loop

24  shares through Ventanas.  And not only did they use all these

25  companies to conceal their control of Loop stock, they

1  concealed in other ways.  They lied.  They lied to their own

2  attorneys.

3      You heard testimony from a transfer agent and also from

4  Jason Carter, from Wilson-Davis, and they told you that

5  transfer agents and brokerages are kind of like these

6  gatekeepers.  They make sure that the stocks are unrestricted

7  in a certain way so they can be transferred into brokerage and

8  then be sold on the market.

9      And to do that, you have to follow certain rules and

10  regulations to make sure they're in compliance, and they have

11  to ask for certain documents to unrestrict shares.  One of

12  those documents is an attorney opinion letter, and what these

13  defendants did was that they repeatedly -- repeatedly lied to

14  their own attorneys to get attorney opinion letters to be able

15  to unrestrict Loop stock, to trade it on the market.

16      And this is one example.  In this email in 2017, Destler

17  is talking to his attorney, David Hunt, and he's trying to get

18  Loop stock deposited so that he can sell it.  And David Hunt

19  asks him, "Please confirm that no member of the Loop board is

20  an off-" -- "is a shareholder, officer, or director of

21  Touchstone.  Is Don Danks affiliated?"  He specifically asks

22  that question.

23      And what does Destler say in response?  "Dave, Don Danks

24  is not an officer, director, or shareholder of

25  Touchstone Advisors," even though, at that time, he was.  And

1   at that time, he was on the board of Loop.

2       And this wasn't just a mistake.  Destler wasn't just

3   confused by what he told David Hunt.  It wasn't just a one-off

4   thing.  He explained later exactly what he was doing.  The

5   whole point of this was to conceal from everyone -- attorneys,

6   brokerages, the market, investors -- what they were doing.

7       And he told Solomita as much in a later text message.

8   "You know better than to trust lawyers, especially when they

9   have no knowledge of everything behind the scenes."  And,

10  certainly, here, David Hunt had no knowledge in what these

11  defendants were doing behind the scenes.

12      The defendants also lied to their own brokerages.  You

13  heard from Jason Carter, a friend of Defendant Destler.  He's

14  from Wilson-Davis Broker- -- Brokerage, and he told you that

15  there are certain customer representation forms that they have

16  customers fill out.  Destler filled one out and signed one when

17  he deposited Loop stock for Touchstone at Wilson-Davis, and

18  those representation forms have the customer represent that

19  they will or will not do certain things.

20      So let's see how Destler made out on his representations.

21  We can go through a few of them.  One representation told

22  Destler that he could not solicit or arrange for the

23  solicitation of buy orders.  What did he do in connection with

24  this conspiracy?  He did the exact opposite.

25      He sends a text in 2019 when he tells Don Danks he got

1  someone fired up, he was giving him 1,000 shares of Loop, and

2  he was going to tell him to go at it with retail brokers.  He

3  did the exact opposite of what Wilson-Davis told him to do.

4       And here's another one.  Wilson-Davis had Destler

5  represent that he will not make any payment to any other person

6  in connection with the proposed sale of stock.  What did

7  Destler do?  Both Destler and Danks told you that they paid a

8  consulting fee to people like Lazerus to help them find

9  investors.

10      That's just a fancy, roundabout way of saying they paid a

11 commission to Lazerus.  They couldn't get up there and tell you

12 that, but that's what it was.  Lazerus found investors, and he

13 got a percentage back.  It was a commission.  It was the exact

14 opposite of what this representation told Destler to do.

15      The representation also told him not to possess any

16 material, nonpublic information and to immediately suspend

17 sales if he did.  What did Destler do?  He had a constant

18 stream of nonpublic information from Danks, from Solomita,

19 throughout the entire conspiracy.  You heard about that time

20 and time again.

21      And did he ever stop the sale of Loop stock?  No, he

22 didn't.  And here's just one example of where Danks fed him

23 material, nonpublic information.

24      And, finally, in the representation form, he told

25 Wilson-Davis that he would not coordinate the sale of Loop

1    stock with others.  What did he do?  Time and time again, with

2    Danks and Lazerus, he absolutely coordinated the sale of Loop

3    stock.  And here's just one example with Coach, James Harrison,

4    calling Coach to get the guys to come in.  That's what they

5    did.

6        So what's the next part of this scheme?  They got control

7    of the Loop stock.  They concealed their ownership of it.  They

8    lied to attorneys and brokerages.  The next part of this was to

9    pump stock.

10        Throughout this trial, you've heard about pump-and-dumps.

11   The defendants will have you believe there's only one kind of

12   pump-and-dump.  A steep climb, and the conspirators sell out

13   their shares at the top of the peak, and the peak falls.  But

14   Agent Joyce told you that there's more than just that one kind

15   of pump-and-dump.

16        There's another kind of pump-and-dump called the annuity

17   pump-and-dump.  That's what these defendants did.  It's a

18   pump-and-dump that lets defendants, the conspirators, ride the

19   waves of a stock chart.

20        They don't have to cash out at a certain point when the

21   stock is at the ultimate high.  They can keep going, and it

22   kind of becomes like their golden goose.  They keep profiting

23   over a series of years.  It's an annuity, and that's exactly

24   what these defendants did.

25        You even heard Jonathan Destler say that, unfortunately,

1  it became a long-term play.  Sure, it could be that these

2  defendants originally thought that Loop would be a short-term

3  play.  They would get the stock price up and then cash out and

4  be on their way to their next endeavor, maybe Opti-Harvest.

5       But that's not what happened here.  Loop became their

6  long-term play, and over seven and a half years, they promoted

7  it.  They pumped it up and made a profit.

8       So what was the first thing they did to promote it?  They

9  wanted to get uplisted into NASDAQ.  That was in 2017, and you

10  heard about why it was important for them to get uplisted to

11  NASDAQ.

12       Agent Joyce and even Peter Melley told you that getting it

13  uplisted gave Loop some more credibility, more legitimacy,

14  probably attract more investors that could get these defendants

15  more money into their pockets.  It was way better than Loop

16  being on the OTC market.  So they set out with the goal of

17  getting this uplisted to NASDAQ.  That was the goal all along.

18       And how did they do this?  The main way they climbed this

19  mountain up to its peak, at about $18, right before the

20  uplisting in November of 2017 was Allan Brennan, who you heard

21  about a ton in this case.  Allan Brennan was one of the main

22  investors that these defendants got to help the Loop stock

23  climb and climb and climb to get the right number of shares in

24  the market at the right price.

25       And by the time that the Loop -- by the time that Loop

 1  uplisted, Allan Brennan had plowed over $7 million into Loop,

 2  just him alone, and he was upwards of 20 percent from the

 3  volume of Loop.  That's how they climbed up and up and up to

 4  get uplisted.

 5       And once they were there, for the next several years of

 6  this conspiracy, they continued to ride the wave by promoting

 7  Loop stock and using various market manipulation techniques to

 8  get investors interested so that they could use any profits for

 9  themselves.

10       And how did they do this?  They got inside information

11  from Allan -- Allan Brennan and others, and they used this ammo

12  towards their investors, targeted them, and made sure that they

13  bought at the right times at the right prices, and they did it

14  as an all-hands effort between the team: Lazerus, Danks,

15  Destler, and Coach.

16       So what was one of the techniques they used?  You heard a

17  lot about firming up, and you saw these text messages more than

18  once during this trial, and these text messages -- this is a

19  lead-up to the NASDAQ uplisting.

20       Danks counted on Lazerus to get Allan Brennan in the

21  market, and what -- what they wanted was for Allan to come in

22  to buy 4- to 5,000 shares per day for about a week because they

23  needed to firm up at 13 to $14.  And they knew they could count

24  on Allan Brennan to do that.

25       You heard that, by this time, he had plowed at least

1    $7 million into Loop.  And what was the reason for that?  You

2    heard testimony about this from Don Danks.  They needed to set

3    warrant prices.  In fact, he told you that they had already set

4    a warrant price at $12, and so they needed to gin up the public

5    price higher than that so the $12 could be a discount.

6        That right there is a simple market manipulation

7    technique.  They needed to get the public price up so that they

8    could get the warrant price up.  It was very simple, and

9    Don Danks told you that was exactly what they were doing, and

10   that was exactly the reason they were doing it.

11       They also used laddering or walking it up.  In August of

12   2018, Lazerus reached out to Danks, and he said, "Would it help

13   to position orders anywhere, or should I just stay on the

14   sidelines?"

15       Just think about this text for a moment.  Is that a text

16   from someone that's just interested in buying Loop stock, your

17   average investor that wants to invest in that company?  No.

18   This is a text from a person that obviously has an angle, that

19   obviously is working with Danks because they want to get the

20   price of Loop stock up, and they have a way to do it.

21       What does Lazerus end up doing?  He gets in the market,

22   and he has buy orders that he puts in for a series of days in

23   August of 2018.  You might look at this and see that Lazerus is

24   essentially bidding against himself to get the price up.

25       In what world do you see someone haggling against

1  themselves to get the price higher for them to buy it from?  In

2  this conspiracy, they did because they needed to get the price

3  higher so that they can get the appearance that there is demand

4  in the market so that people will buy in, and they can cash

5  out.

6      They also held the line, which you heard about.  In this

7  series of text messages between Don Danks and Jonathan Destler

8  in 2019, the two of them talked about holding the line at $7,

9  and the reason for that was to support Loop stock -- Don Danks

10  even told you that -- when Loop stock was falling, and they

11  needed to figure out a way to hold the line at $7.

12      So what did some of that -- some of the things they did to

13  hold the line?  You heard about this chart, and there's a

14  longer version of this.  This is just one part of it.  But on

15  this day in 2019, close to this whole line of text, there was a

16  series of match trades or cross-trades between Danks and

17  Lazerus, in fact, 12 in one day.

18      Sure, the defendants have argued that there were many

19  other trades during that day, but it's no coincidence that

20  these two were part of the same team who talked regularly, who

21  coordinate about almost everything else for seven and a half

22  years.  There's no coincidence that they just happened to be

23  buying and selling at the same time, at the same time that

24  Danks and Destler were talking about holding the line at $7.

25      What price were they trading at?  About $7.  This is just

1  another tool they used in their toolkit to make sure that the

2  price of Loop didn't tank, make sure that it was supported by

3  their techniques.

4       And they also marked the close.  You heard this from

5  Don Danks.  He didn't know it was called "marking the close,"

6  but he told you that he would come in at the end of the -- at

7  the end of the market day and trade, and he wasn't coming at

8  the end of the day because he was busy, and he was working, and

9  he had to trade late in the day.

10       No.  He said he purposefully came in -- came in at the end

11  of the day because he knew that would help support Loop stock.

12  And he tried to tell you that it was all for the good of the

13  company; he wanted to support the company; he wanted to make

14  sure the company was doing well.  But in reality, what he was

15  doing was manipulating the market of Loop stock, and he did

16  this by marking the close.

17       And, finally, you heard a lot about insider information in

18  this case.  It was one of the techniques that the defendants

19  used time and time again to gin up interest and to make sure

20  that investors came in at the right times and the right prices,

21  and the defendants made sure that they had a constant flow of

22  information.

23       The constant flow at first came from Don Danks, who was on

24  the Loop board and, while there, had a fiduciary share in the

25  Loop and had a constant stream of information coming from

1   inside Loop and from Danny Solomita.

2       Don Danks even told you that he purposefully got on the
3   Loop board to have visibility, and he had this visibility.  He
4   received inside information, and he even told you that, even
5   after he got off the Loop board, he still had a stream of
6   inside information from Daniel Solomita.

7       And here, you see him talking to Lazerus, and they talk
8   about the IndoRama deal that's going to come out and L'Oreal,
9   and they specifically talk about people are thirsty for news.
10  That's how they kept people going.  They kept them thirsty for
11  news.

12      One person you heard about, and heard from, was
13  Chester Griffiths.  And Chester Griffiths came up here and told
14  you that he had plowed about $1.5 million in Loop.  He had
15  taken some out, and he was still about $1.2 million knee-deep
16  in Loop.

17      Destler knew, as a close friend of Destler, that
18  Chester Griffiths had drank the Kool-Aid.  He was all in on
19  Loop.  How could he not be?  He was over a million dollars in
20  on Loop, and he had to make sure that he could turn a profit.

21      So what did he do?  Even on the stand, he pitched Loop to
22  you, just like these defendants did, because he had no other
23  choice, because he had so much money in Loop.  He even put his
24  employees' pension plans into Loop.  He had to get out and
25  pitch that story.

1     But in reality, during this conspiracy -- not in front of

2   you, but during this conspiracy, he knew what was going on with

3   Loop.  He told Jon Destler that Loop was like a

4   pump-and-dump -- in fact, it was worse than a bad

5   pump-and-dump -- and even noticed the stock trends for Loop.

6   He noticed that every single time there was good news, the

7   stock plummeted, and that doesn't make any sense.

8     You heard from an expert today that when there's good news

9   that comes out, the stock should go up.  The price should go

10  up.  It shouldn't go up and then quickly fall.  The only reason

11  it quickly fell was because the price was built in -- because

12  the press release was built into the price because people like

13  Chester Griffiths and F. Scott Jackson and Holly Manion and

14  Paul Farendell all knew it was coming before it was even

15  announced.  Chester noticed this.  It is the weirdest stock

16  ever.

17    And you also heard about F. Scott Jackson a lot.  You saw

18  emails between Danks and F. Scott Jackson.  And time and time

19  again, Danks gave F. Scott Jackson news about Loop, even after

20  Danks was off the board because he continued to have a constant

21  stream.

22    In fact, Danks got up and told you that he was giving

23  F. Scott Jackson material, nonpublic information.  He said that

24  multiple times while he was up on the stand, but he swore to

25  you that F. Scott Jackson didn't trade on that information.  He

 1  wouldn't have traded.  In fact, there was an NDA, and there's

 2  no way that he would have traded.

 3      And you saw the reality of that.  That was a complete lie

 4  because you saw two emails between F. Scott Jackson and

 5  Don Danks where not only did Don Danks give F. Scott Jackson

 6  inside information, but Danks himself traded, and then he told

 7  F. Scott Jackson to trade, how many shares to buy of Loop stock

 8  and at what price.

 9      So what about the unwitting investors?  Not the people

10  that knew what was going on, not the Chesters, not the

11  Paul Farendells, not the Holly Manions, not the

12  F. Scott Jacksons.  What about the unwitting ones?  How did

13  they pan out?

14      You heard a lot about Allan Brennan.  Allan Brennan was a

15  relationship that Robert -- Robert Lazerus cultivated.  And

16  overall, Allan Brennan got about $8 million deep in Loop stock.

17  And you heard that, at a certain point in 2020, his family got

18  worried.  Brennan was aging.  He had health problems.  He had

19  mental health issues.

20      And his family saw what an effect Lazerus had on

21  Allan Brennan.  They saw that Lazerus had eked his way into

22  Allan -- Allan Brennan's personal confidences.  He even whisked

23  him away to lunches at Islands.  And his family eventually,

24  concerned about Allan Brennan, finally took over the financial

25  reins from Allan Brennan for the first time in his life.

1    At that point, Gary Brennan took over.  And when

2 Gary Brennan took over in 2020 and started selling Loop stock,

3 it was the first time in years that the family realized any

4 profits from the $8 million that they had put into Loop.  The

5 defense would have you believe that because of that, because of

6 the profits that they gained -- that the Brennans actually

7 weren't victims, that they were not victimized by Mr. Lazerus.

8 But that's not true.

9    You heard from Steve Bajic.  He told you that, indeed,

10 these types of pump-and-dump schemes -- even people who make

11 money can be victims.  They just got lucky.  That's exactly

12 what happened with Gary Brennan, but Allan Brennan wasn't as

13 lucky during his lifetime.  He was seen as a human ATM to these

14 defendants.

15    Time and time again, whenever they needed money, he was

16 there.  He needed $8 million and more for all the investments

17 they asked him to put his money into -- Loop; Trilogy; the new

18 one, Opti-Harvest; dThera -- and even just cold cash that these

19 defendants wanted, about $300,000 to Lazerus and $200,000 to

20 Touchstone, all from Allan Brennan.

21    He didn't come out on top.  He gave a lot to these

22 defendants, and time and again, these defendants profited from

23 Allan Brennan.

24    This is just one example of Ventanas Capital, Danks's

25 entity, brokering a deal between Allan Brennan and Loop.  And

1    then the proceeds of that deal get funneled out to who?  Not

2    Michelle Fiore.  These defendants, Danks, Destler, Lazerus.

3    They used Allan Brennan like this time and time again to line

4    their own pockets.

5        And then you heard from Ken Rogers.  He got up there and

6    told you he was a retired public schoolteacher, and in his

7    retirement, he decided to invest in some stock.  He heard from

8    a friend of a friend about Loop.  He's the classic example of

9    these defendants' downstream investors.

10       He got some of that news from a friend of a friend, news

11   that they pumped out, and he decided that putting $90,000 of

12   his own money into Loop was a good idea.  He wanted to make

13   some profit so that he could pay for other tech he had, but he

14   sat up there and told you that he thought he was out $90,000 on

15   Loop and didn't really expect to get it back.

16       He did tell you that he traded a lot in Loop.  He said he

17   watched the stock chart go up and down, and he tried to make

18   educated guesses and timely trades to make money.  And in doing

19   that, he told you that he relied on that stock chart to be

20   fair.  He relied on it to be free and fair, like it's supposed

21   to be.

22       But that's not what it was because that's not what the

23   defendants ever intended the Loop stock chart to be.  So little

24   did Ken Rogers know that he was trading stock for a company --

25   with a company that these defendants actually controlled behind

1   the scenes.

2        So at the end of the day, these defendants, through all

3   their market manipulation, through their control of Loop stock

4   behind the scenes, profited.  And in gross proceeds, they

5   profited upwards of $9 million in open market sales and private

6   transactions with Allan Brennan and cash withdrawals --

7   withdrawals on margin.

8        Imagine there are two different ways to profit, to their

9   credit.  They could sell Loop shares, though that was a little

10  tricky.  That could burst their bubbles.  You heard that, in

11  the thinly traded stock that Loop was, when people like here,

12  Gary Brennan, decided to sell Loop stock, what happened?  It

13  was so thinly traded that the price of the stock collapsed.

14       So they figured out a better way to profit without making

15  the price in stock collapse.  They took out margin loans.  They

16  took out cash withdrawals on their Loop stock that they used

17  for themselves in different ways, including what Don Danks did.

18  He used the cash withdrawal and the margin on his Loop stock to

19  plow into his home on the Newport coast.

20       At the end of the day, you have to look no further than to

21  the defendants' own statements to people on the inside.  Here,

22  from Destler to Griffiths:  "Without our work, the stock would

23  be at $4, without question."

24       That's Destler taking credit for what this team had been

25  doing for seven and a half years, manipulating the stock of

1    Loop Industries to make sure that they got higher than $4, to

2    make sure they profited through an artificial price inflation

3    and through a stock market that they cheated.

4         These defendants are guilty of securities fraud.  Thank

5    you.

6              **THE COURT:**  Okay.  Thank you.

7         Mr. Miller, are you up first?

8              **MR. MILLER:**  I'm up, yes, Your Honor.

9              **THE COURT:**  All right.

10             **MR. MILLER:**  Is it okay if I move that lectern over

11   here?

12             **THE COURT:**  Absolutely.

13             **MR. MILLER:**  Thank you.

14                        **CLOSING ARGUMENT**

15             **MR. MILLER:**  Okay.  First, I want to thank everybody

16   for your patience, for your time, thank the Court, the court

17   staff.  It's much appreciated.  I know you've been here just

18   doing your civic duty, but it's much appreciated.

19        You know, I listened -- I listened closely to the

20   Government lawyer's argument, and I had this reaction:

21   Securities fraud is bad.  Conspiracy to commit securities fraud

22   is bad.  There's reasons that the securities laws are in place.

23   It's to protect people from getting cheated, from getting

24   ripped off.

25        You're going to have to decide.  This is a big deal.  This

CLOSING ARGUMENT / MILLER

1    is really important to my client.  This is his life.  It's his

2    family.  You're going to have to decide:  Did he defraud

3    somebody, did he cheat somebody, or was he a guy who found a

4    very promising new technology and did what he does, help bring

5    it to market, help with the financing, and, when things got

6    rocky a couple of years later with the short sellers, tried to

7    support the stock price?

8        In other words, you're going to have to decide:  Is it a

9    crime -- is it a crime to support your company?  Is it a crime

10   to -- to try to fight off the shorts -- the short sellers, who

11   I think are the real criminals here, by the way?  And I'm going

12   to do that.

13       So you have a very important task, ladies and gentlemen,

14   because we're -- we're two ships passing in the night on this.

15   They think there was a -- a scheme to defraud, and it was

16   perpetrated on the public markets, and people were harmed.  Our

17   position is day and night, did not occur.

18       I've got my prepared presentation.  Part of it is based on

19   the law that the judge -- the Court gave you.  I picked out

20   three or four critical principles of law that are within the

21   jury instructions, and what I'm going to do is I'm going to

22   weave the facts into the law because you have to follow the

23   law.  That's the way it works in court, but you have to judge

24   the facts.

25       Okay.  And then at the end of my presentation, I'm going

 1   to tell you what I think really happened here.  I'm going to
 2   put on my Sherlock -- Sherlock Holmes hat, and I'm going to
 3   tell you what I think -- where I think this really went -- this
 4   case went off because I don't think the case should have been
 5   charged.
 6       I don't think there was -- based on the evidence and the
 7   facts, I don't think there was fraud, a bad thing.  I don't
 8   think my client -- and I'm only speaking for Jon Destler,
 9   obviously.  The other lawyers are very capable, and they'll
10   speak for their client.
11       My client didn't cheat anybody.  He didn't defraud
12   anybody.  He just did what he does.  That's his business:
13   investor support, investor relations, find the promising young
14   companies, Opti-Harvest.  They actually criticized Opti- --
15   Opti-Harvest.  He's hoping that works, and that's his
16   retirement, and he's hoping that -- that Loop comes back.  Loop
17   is still very much in the hunt.
18       So with your permission, I'm going to -- I'm going to
19   start now.  It's -- could we turn so I can watch that one?  Can
20   we turn that over so I can watch it?  That would be great.
21   Thank you.
22       You can watch it on the little screen in front of you, or
23   you can watch it up there.  I'm going to watch it up there.
24   You know, I just want to -- I want to go back over -- this is
25   Loop.  Does this look like a scam?  It's obviously not, no.

1    We had -- Chester Griffith [sic] and his son went to visit

2    the factory, and here's the factory.  And by the way, that's

3    the small factory in Canada, Montreal.  They're building bigger

4    ones in Asia and in Europe.  That's the facility.

5                (Video was played but not reported.)

6        MR. MILLER:  That's what they call the feedstock.

7    Those are, you know, polyester, carpeting, bottles.  That's the

8    raw material.  It gets through -- it gets put through the

9    chemical process, this patented proprietary process.  And

10   that's what it comes out, the bottle on the right, pure

11   infinite Loop.

12       So it's the real deal.  This is not a scam.  I think we

13   can all agree on that.  I think even the Government agrees with

14   that.  I didn't hear anything to the contrary.

15       Okay.  Now, this is an important part of the jury

16   instructions.  Each defendant -- although they're being tried

17   together, each defendant must get separate consideration.  So

18   you've got to look and see:  What did Jon Destler do?  Did he

19   cheat anybody?  Did he rip anybody off?  Did he put out any

20   false statements to pump up the stock?  Did he -- did he then

21   dump his shares?

22       I've got the evidence.  You know, this is -- this is

23   court.  So it's all about hard evidence.  It's not about

24   throwing a bunch of emails or a bunch of text messages up and

25   then trying to criticize relationships like Mr. Danks had with

1   Ms. Fiore and so forth.  That's not -- that's not what this

2   case is about.  It's about hard facts and evidence for each one

3   of these defendants.

4       Now, this is what the case is.  It's a pump-and-dump stock

5   market case.  Pump -- a real pump-and-dump is bad news.  Okay?

6   I think we can all agree on that.  The question is:  Is there

7   evidence that a real pump-and-dump occurred here?  That's what

8   you've got to decide.  That's the first thing.

9       And the Government actually defined a pump-and-dump scheme

10  for us.  It's right out of the -- I took this right out of the

11  indictment.  Paragraph 11, a pump-and-dump scheme is a

12  fraudulent scheme typically involving the artificial

13  inflation -- inflation of stock price and trading volume,

14  artificial inflation.

15      Did Jon Destler artificially inflate the price?  Did he

16  put out some kind of a press release?  No.  That was the

17  responsibility of the company, not his.  Did he -- did he

18  disseminate false, misleading information?  There was no

19  evidence he did anything like that, nothing.

20      Okay.  So you've got to show -- the burden is on the

21  Government to show the pump, and then the individuals who

22  control a substantial portion of the company stock sell their

23  shares in an artificially high price.  They've got to show the

24  dump.  They pump up the value falsely with lies, and then they

25  dump, and they make a quick profit.  That's a pump-and-dump,

CLOSING ARGUMENT / MILLER

1    according to the Government.

2        Did that occur here?  I'm just going to zero you in on

3    the -- on the facts, just -- you know, just the facts.  And

4    they've got to prove these facts.  This is really -- this is

5    probably the most important jury instruction you're going to

6    get, the most important statement of the law from the judge.

7        You've all heard -- you watch *Law & Order*, or you watch,

8    you know, police shows, legal -- legal shows on television.

9    The Government has the burden to prove guilt beyond a

10   reasonable doubt.  The Government must prove, based on the hard

11   evidence, guilt beyond a reasonable doubt, not a -- not a bunch

12   of text messages, not a bunch of, you know, "We" -- you know,

13   "This is a great company."

14       There's no law in this country, at least not yet, that

15   prohibits me from going to you and saying, "Yeah, I've got this

16   company that came to my attention.  I love it.  It recycles

17   plastic.  It's got a proprietary chemical process.  They don't

18   use a lot of heat.  They don't use a lot of energy.  You should

19   buy it."  That's okay.  There's nothing wrong with that unless

20   you lie, unless you defraud somebody.

21       Okay.  So the Government has to prove a lie, a pump, and

22   then a dump.  So you're probably saying to yourself, "Okay.

23   He's telling us about proof beyond a reasonable doubt.  What

24   does that really mean?"  Well, in the jury instructions -- I

25   pulled this out of the jury instructions the Court gave you.

1      It means -- "proof beyond a reasonable doubt" means you've

2  got to be firmly convinced Jon Destler did these bad things.

3  Okay?  Bad things, cheated somebody, defrauded somebody, ripped

4  them off.  And I submit to you, based on the hard evidence,

5  which I'm going to show you now, that did not occur.

6      You know, there's an old saying that actions speak louder

7  than words.  You know, anybody can say anything to anybody;

8  right?  But you've got to look and see what they actually did,

9  how they acted.  And this is an exhibit, Exhibit 2128, that

10  shows -- do you see the blue line at the bottom?  That's

11  Mr. Destler's Loop shares.

12      He acquired close to 2 million shares.  He sold about

13  400,000 off in private transactions, not through the stock

14  market, not really in issue.  And guess what he did with the

15  rest?  He held them.  He sold about 40,000 of that million-6

16  because he needed money to pay bills.  He held 99 percent of

17  the shares.

18      So his actions speak louder than the Government's words.

19  His actions were, and are, "I support the company.  I believe

20  in the long-term liability and success of the company."  This

21  is what he testified to.  This is what Chester Griffith [sic]

22  testified to.  This is what a lot of witnesses testified to,

23  and -- and he held.  He didn't dump, no evidence of any pump by

24  Jon Destler.  And unrefuted, undisputed, he didn't dump.

25      Okay.  So much for the pump-and-dump.

CLOSING ARGUMENT / MILLER

```
 1        Okay.  This is -- this is a Government exhibit, I think,
 2   if I remember.  I'm not -- I think so.  I don't remember.  This
 3   is a pump-and-dump, Exhibit 2107.  I mean, you've all heard
 4   this now.  It's a company -- it's a company --
 5            MS. CHOPRA:  Your Honor, objection.  I'm not sure this
 6   is in evidence.
 7            THE COURT:  I'm checking right now.
 8            MR. MILLER:  It's a demonstrative, Your Honor, and
 9   that's how I'm using it.
10            THE CLERK:  It's a demonstrative.
11            THE COURT:  Hmm?
12            THE CLERK:  Demonstrative.
13            THE COURT:  It was admitted as a demonstrative?
14            MR. MILLER:  Yeah.
15            THE COURT:  Yes.
16        Okay.  It was.
17            MR. MILLER:  Okay.  Can I proceed, Your Honor?
18            THE COURT:  Overruled.
19        Yes.
20            MR. MILLER:  Thank you.
21        Okay.  This is a real pump-and-dump, the kind of flab
22   that -- you know, look at the blue line, green line, whatever
23   color that is.  There's a little peak and then a big peak, and
24   the whole thing peters out.  That's a pump-and-dump.  So the --
25   you know, the crooks, the one-time bad guys -- you know, they
```

 1    pump it up, they get that peak, they dump it, and they move on.

 2        Jon Destler didn't do that.  He's just a flatline guy.

 3    He's still got his stock.  He still thinks this thing is going

 4    to be better than sliced bread.  It's going to be great.  It's

 5    going to help solve the problems of the -- of the world being

 6    overwhelmed with plastic.

 7        Okay.  This -- I thought this was -- this is a Government

 8    exhibit.  It's in evidence, and this is a chart -- I thought

 9    this was really interesting.  This is a chart of Loop's stock

10    price over a four-, five-year period of time, up and down, up

11    and down, just like most stocks, like Apple and Disney and AT&T

12    and all these other stocks.

13        You know, the stock market is like a rollercoaster.  We

14    all know that, and we all try to make money on the stock

15    market.  But sometimes it works, and sometimes it doesn't.

16    Well, the same thing with Loop.

17        It's not that one-time spike that you saw in the prior

18    exhibit, in this.  It's not a one-time spike, and then the

19    whole thing peters out and goes away.  A pump-and-dump is that.

20    A real stock subject to the -- you know, subject to the pushes

21    and pulls and -- and what goes on in the stock -- that's a real

22    stock.

23        So if you compare the -- if you compare the charts, you've

24    got one that goes up and then one that goes up and down.

25    That's not a pump-and-dump stock.

CLOSING ARGUMENT / MILLER

1      And you-all heard the testimony that this is still very

2   much a viable concept, a viable company, and it's expanding,

3   and it's raised over a hundred million dollars in capital.

4   It's made deals in France and in South Korea and onward and

5   upward.

6      Okay.  So much for pump-and-dump, did not occur, not by

7   Jon Destler.

8      This is another -- I think this was a demonstrative --

9   another Government demonstrative.  They put a gentleman by the

10  name of Jonathan Joyce, an FBI agent, on the witness stand, and

11  he testified, "I have a lot of experience with pump-and-dumps.

12  I've worked on" -- I think he said a dozen cases.  "I know what

13  I'm talking about, and these are the criteria."

14     He said, "I don't know anything about this case," because

15  he didn't work on the case, "but these are the criteria" --

16  "these are the essential criteria for a pump-and-dump, common

17  aspects of a manipulative pump-and-dump scheme."

18     Okay.  Number 1, you've got to control the company and its

19  stock.  Well, you heard testimony that Daniel Solomita had

20  between 57 percent and 75 percent of the stock.  He controlled

21  the company.  Jon Destler had less -- approximately 2 million

22  shares.  He didn't control anything, wasn't on the Board of

23  Directors, wasn't an employee, didn't even work there.  So

24  scratch 1.

25     Number 2, Mr. Joyce testified about concealing control.  I

CLOSING ARGUMENT / MILLER

1    heard Counsel say, you know, "concealment," but I didn't really

2    hear any evidence, any facts to back that up. Jon Destler

3    transferred his stock back and forth through the transfer

4    agents, through the blue sheets, through the stock market, to

5    the extent -- you know, he sold the 40,000 shares. There was

6    no concealment. He wasn't trying -- he wasn't trying to pull a

7    fast one on anybody.

8        Number 3, false press releases and promotions. There's

9    not a stick of evidence in this case that Destler --

10   Mr. Destler did that. He wasn't in a position to do that.

11   Loop Industries put out its own press releases. Of course they

12   talked about what was going on in the company. Everybody was

13   well aware of the SK deal. They were aware of the IndoRama

14   deal, of the Evian deal. They talked about it, but he wasn't

15   trading on it.

16       You can talk -- it's a free country. You can talk about

17   what's going on, you know, on the inside of your company.

18   There's no law against that. What you can't do is then take

19   that information and -- and use it to make money in the market.

20   You can't do that. That's insider trading. That's a big

21   no-no, and there's no evidence he did that in this case, none.

22   He held. He stood pat.

23       Number 4, sell the stock. He didn't do that.

24       Number 5, distribute the proceeds. What proceeds?

25       Okay. So, you know, just to sum it up, we don't think

1    they can prove beyond a reasonable doubt.  We don't think

2    they've firmly convinced anybody that there was a pump-and-dump

3    securities fraud, and that's what this case is about.

4        Okay.  It's also about conspiracy.  It's -- there's two

5    claims, two counts, securities fraud and conspiracy to commit

6    securities fraud.  Security -- securities fraud, I want to talk

7    about in a minute in more detail, but I want to really zero in

8    on conspiracy.  You have to prove each of the elements beyond a

9    reasonable doubt.  That's the burden on the Government.

10       And the first element, Bullet Point Number 1, they have to

11   prove that there was an agreement.  They have to prove that

12   Mr. Destler -- not that he walked into a situation that -- they

13   have to prove that he entered into an agreement, an actual

14   agreement, with Stephens, Bajic, Blacklight, all these people.

15   They can't do that.

16       Bajic said he never even met -- never communicated with,

17   never had anything to do with -- with Mr. Destler.  They have

18   to prove that he entered into this conspiracy agreement,

19   knowing of its objects and intending to help accomplish it.

20   That just did not occur.  There's no evidence of that in this

21   case, and I'm going to get to that in a minute.  Don't take my

22   word for it.  It -- for me, it's all about the hard evidence,

23   the facts.

24       And then the last bullet point, an agreement to commit one

25   or more crimes.  That's conspiracy law, an agreement to commit

1   a crime.  Serious, bad thing.

2       Okay.  Let's look at the evidence.  I -- I cross-examined

3   Mr. Bajic.  I got him to admit -- to acknowledge -- and he

4   was -- you know, he was pretty nervous up there.  I mean, he

5   had to perform.  He's under a plea bargain.  He wants to get a

6   lighter sentence.

7       So I actually think he was telling the truth.  I really

8   do, even though he's admitted to -- to being a felon.  I asked

9   him, "Will you agree with me that since you never met him,

10  never had any dealings with him whatsoever, never communicated

11  in any way, shape, or form, that you, Steve Bajic, and

12  Jon Destler, my client, never entered into any kind of

13  agreement?"

14      And he said, "I agree."

15      There can't be a conspiracy without an agreement.  Okay?

16  There can't be.  You can't.  Just because Mr. Destler bought

17  some shares from some of these people that he, frankly, never

18  really dealt with -- all he did was buy their shares, which was

19  a good thing.

20      He wanted to take the prior, old shareholders out.  They

21  wanted to bring in friendly shareholders like

22  Chester Griffith [sic], like some of the other people you heard

23  from.  Just because you buy stock from somebody doesn't mean

24  you made an agreement to commit a crime.  An agreement to

25  commit a crime is a bad thing.  That did not occur here,

CLOSING ARGUMENT / MILLER

 1   according to their star witness, their star witness.

 2       Now, this is -- this is kind of a -- this is a Government

 3   chart, but I thought it really kind of highlighted the whole

 4   thing.  You've got, over to my left, the greens and the dark

 5   greens and the tans.  Okay?  Destler never dealt with those

 6   people.

 7       Okay.  Then you've got, in the middle, a guy named

 8   Dave Stephens.  I'll call it "greens," all the people that are

 9   in green and the ones that -- those are the Bajic people.

10   Those are the ones Bajic was helping to hide stock and nominee

11   names to get below the threshold so the regulators wouldn't

12   find it.

13       It's -- it's admitted.  It's undisputed.  Mr. Destler

14   never -- never really -- never had any kind of agreement with

15   them.

16       Then you've got this guy, Dave Stephens, in the middle.

17   And, remember, the burden of proof is on the Government to

18   prove a conspiracy agreement beyond a reasonable doubt.  Well,

19   where's Dave Stephens?  He's the guy in the middle.  They put

20   an email up.  It said that Mr. Destler was introducing

21   Dave Stephens to Daniel Solomita to help Loop with the -- you

22   know, "Find me a dormant public company to shell."

23       But that's not a crime.  To introduce Dave Stephens to

24   Daniel Solomita is not a crime.  That's not an agreement to

25   commit a crime.  Where is he?  Why -- why wasn't he up there?

1   Another failure of proof.  Bajic rebutted their case of a

2   conspiratorial agreement, and Stephens didn't even come in and

3   testify.

4        So you've got two clear breakpoints between Jon Destler

5   and Black- -- Blacklight and Bajic and Fred Sharp and all of

6   those people, just a very clear -- I won't walk over there.  I

7   don't think I'm supposed to -- but a very clear demarcation.

8   It didn't happen.  There's no -- there's no agreement to commit

9   a crime.

10       Okay.  Moving right along.

11       Okay.  I started my remarks by talking about securities

12   fraud.  Securities fraud -- this is the jury instruction.  You

13   have to basically -- you have to willfully defraud someone.

14   This is federal court.  My client's accused of serious felonies

15   that potentially carry years in jail.  Okay?  It's a big deal.

16   This will be -- if he gets convicted, it will be highly

17   disruptive to his life and his family.

18       So you've got to be sure.  You've got to be sure that he

19   committed fraud, bad, willful fraud -- willfully defrauded

20   someone.

21       Okay.  So they put forth Person A, a resident of Carlsbad.

22   This is right out of the indictment, Paragraph 5, a purchaser

23   of Loop -- of Loop stock and a victim.  Well, that was

24   Allan Brennan, A.B., Allan Brennan.

25       Now, when they filed this indictment -- I think it was in

 1   November of '22 -- did they know Mr. Brennan had made millions

 2   and millions of dollars in profits from Loop?  I don't know.  I

 3   want to talk about that at the end of my remarks because I have

 4   some real questions about that.

 5        Their position is that Allan Brennan was a victim of

 6   securities fraud perpetrated by Jon Destler.  That's their

 7   theory of the case:  Jon Destler defrauded Allan Brennan.

 8   Jon Destler had one dinner with Allan Brennan, and 99 percent

 9   of the discussion was about Opti-Harvest, tiny bit about Loop.

10   Okay?  That's the only time he ever talked to them,

11   communicated with them, met with them, anything.

12        Okay.  So somehow, the Government wants to transpose

13   Jon Destler into this scheme to defraud Allan Brennan.  I guess

14   the first problem I have with it -- I don't think the guy was

15   defrauded at all.  According to the Government's own chart --

16   just add up the numbers -- he made about -- this is as of

17   February 3rd, '22.  This is several months after he passed

18   away.  So by then, his son was in -- in charge.  He had

19   $484,000 of trading profits.

20        This is Exhibit -- this is the Government's own exhibit.

21   When I was going through the exhibits, preparing for trial, and

22   I found this, I went, "Oh, my God.  This guy made" -- you know,

23   his estate made a substantial amount of money here.  I wish it

24   could happen to me, you know?  He had market value, remaining

25   in the account, 2.248 million, and he had another 953,000 that

1    was in limbo with the transfer agent.  It's a little over

2    3.6 million.  I added it up.

3        So I'm going, "A victim of securities fraud?"  You should

4    only be so lucky to get cheated in that manner.  That's their

5    theory of the case, ladies and gentlemen.  You can have a fraud

6    where everybody makes out great and does what they like to do,

7    which takes me to the next aspect of Mr. Brennan.  I wish he

8    was here with us.  I really do.

9        Okay.  We've got his Merrill Lynch stock trading records

10   for 2017, the year the Government claims he was defrauded.  And

11   you know what they say?  This is our Exhibit 2022.  So

12   Government Exhibit 536 -- you've got to add the numbers up,

13   3.6 million dollars in profit.

14       And then our Exhibit 2022 shows you -- it gives you a

15   window into his mind, into his stock trading acumen.  It's,

16   like, a 45-page report.  It's -- you know, I discussed it

17   briefly, I think, in the opening -- my opening statement.  It's

18   got all kinds of stock trading in it.  It's got some Loop, not

19   much, but some, maybe a couple hundred thousand dollars of

20   Loop.

21       It's got all kinds of other companies -- Apple,

22   Anheuser-Busch, a bunch of companies -- but let's just take a

23   look and see what he did because I'm not going to go through

24   the whole thing.  If you read the -- I think it's the second

25   page.  He made about $200,000 in -- I highlighted it -- in

1  distributions and dividends, and he traded total volume in the

2  account, almost 33 million.

3       So you're probably saying to yourself, "Well, let's see

4  how he did.  Did he make money, or did he lose money?"  And

5  here, the numbers -- this is the proceeds from the broker and

6  barter exchange transactions.  He traded -- on the bottom

7  left -- my left-hand side, probably your right, he traded close

8  to 33 million.  He made -- I can't see it.

9       Can I walk over there and just look at it?

10           **THE COURT:**  Sure.

11           **MR. MILLER:**  Thank you.

12       This is much better.

13       Okay.  He realized proceeds of almost 33 million.  He --

14  he -- his costs were about 32 million, and his gain or loss --

15  his gain was 918,000 -- $918,000.  That's the year that this

16  man -- that the Government contends this man was cheated and

17  defrauded and taken advantage of.  I submit to you, he knew

18  exactly what he was doing.

19       He got a -- you know, a good opportunity came to him

20  through Robert Lazerus, and he took advantage of it.  He was a

21  sharp guy.  He was the CEO -- or the CFO, and he was marketing.

22  He knew what he was doing, and the results speak for

23  themselves.  Don't go with the innuendo.  Don't go with the --

24  the -- I call it "the soap opera."  Go with the hard facts, the

25  numbers.

1    Mr. Destler flatlined.  He didn't -- he didn't sell.  Go

2  with what was really going on in the case.  This is really

3  interesting.  There's been a lot of talk about insider -- you

4  know, inside information.  We discussed this just a minute ago,

5  inside information.

6    There's nothing wrong with talking about your company,

7  including inside information.  What's wrong is trading on that

8  information, profiting.  That's cheating because you're getting

9  information that other people in the market don't have access

10 to.  That's fraud.

11    Okay.  So my co-counsel, my very able co-counsel,

12 Andrew Young, was cross-examining Mr. Tarwater -- FBI Agent

13 Jeremy Tarwater, also known as Jay Taylor when he was recording

14 Mr. Lazerus.  And he asked him, "This is not an insider trading

15 case, is it?"

16    And he -- Mr. Tarwater said, "You want me to characterize

17 it?"

18    And then Mr. Young said, "Is it charged -- is this case

19 charged as an insider trading in a specific statute?"

20    And this is what Mr. Tarwater said -- and I agree with

21 him.  We -- we agree with the Government.  "I don't understand

22 it to be charged as an insider trading case."

23    Do you know why?  Because there was no insider trading.

24 That's why they didn't charge it.  They would have thrown the

25 book at us if they had found insider trading.  This would be a

```
 1    whole different discussion we'd be having right now if they had
 2    any evidence of insider trading by Jon Destler, did not occur.
 3    He knows better, would never do that.
 4         Okay.  I'm almost -- I'm almost at the end.
 5         I call this the phony 5 percent issue.  I remember there
 6    was -- there was some testimony, some allegation -- I think it
 7    was Wilson-Davis or somebody -- that Mr. Destler actually had
 8    more than 5 percent of the stock, and he wasn't -- he didn't
 9    make full disclosure.  That's just not true.  That's not what
10    happened.  I'll show you what happened.
11         Okay.  He sold about 400,000 shares privately.  Those
12    shares had not yet crossed into the transfer agent's records,
13    and it's right here.  He got a million shares.  He got a
14    million founder shares.  This is Trial Exhibit 2129, and I'm
15    sorry to be so technical, but this is -- I want to clarify this
16    point.
17         He got about a million shares, and then he sold them
18    privately.  He needed the money.  He's got, you know, kids
19    going to college, and so he needed the money, sold about
20    400,000 shares.  Then he bought the shares from the
21    shareholders of the shell, and he went back up to about a
22    million-6.
23         So it's these private share -- private shares that didn't
24    get processed through the system yet.  He wasn't trying to hide
25    it, wasn't trying to conceal it.  He didn't gain anything by
```

1  doing that.  That's what happened.  So there was no

2  misrepresentation, no misstatement, nothing about the -- that's

3  why I call it the phony issue.  It's a phony issue.  It's as

4  phony as a 3-dollar bill.

5      Here's who should have been charged, not Jon Destler.

6      Okay.  The shorts.  They were manipulating the market,

7  Hindenburg.  They were -- I want to use the right word.  They

8  were harming -- stronger language comes to mind, frankly.  They

9  were screwing the shareholders.  Okay?  They were harming the

10 shareholders of Loop because they were betting -- they were

11 betting to push the stock down, and that's how they make money,

12 and they should have been charged.  That's a manipulation.

13     And it wasn't just Hindenburg in the U.S. and our markets.

14 It was in South Korea.  Look at this.  Look at all these

15 companies.  This is around the SK deal.  They're shorting Loop

16 like crazy.  You've got all these companies.  This is

17 Exhibit 2132, all of these companies, all of these people in --

18 in South Korea.  Look at this.  They short it.  They make money

19 when it crashes.  They're the bad guys, not Jon Destler.

20     Jon Destler's whole goal here was just -- he goes along.

21 By that, I mean he makes a long-term investment.  He's like,

22 you know, Chester Griffith [sic], who -- who I thought was a

23 pretty good witness.  The Government called him.  I was kind of

24 surprised by that.

25     You know, he's a neurosurgeon.  He's actually a brain

```
 1   surgeon.  He's a, you know, very reputable, credible guy.

 2   These guys are in it for the long haul.  Their hope is their

 3   stock goes to 50, goes to 100.  That's going to take time.

 4   It's going to take years.

 5        That's Jon Destler.  These sharpies -- these are the ones

 6   that the Government should have charged, if they could get them

 7   in -- into a courtroom in this country.

 8        Okay.  Just a couple of other things, and then I want to

 9   tell you -- I want to tell you what I think happened here.

10   Okay?  And everybody's -- everybody tries to figure everything

11   out and so forth.

12        Touchstone.  Yes, there were three Touchstone entities.

13   That's because Jon Destler went to his lawyer, who said, "What

14   are you doing?  You're going to pay a double tax."  Money goes

15   into a Touchstone, Inc. -- I can't even remember -- remember

16   the names of them all -- and then when you take it out, it gets

17   taxed at the corporate level.  And when you take it out, you've

18   got to pay a personal income tax.

19        "Don't be a knucklehead.  Create an LLC, a limited

20   liability company, which is just a pass-through, so you only

21   pay tax once."  That's why there's three different Touchstones.

22   It's that simple, straightforward, nothing nefarious.

23        Okay.  I'm almost done.  I wish I could answer questions,

24   but that's not, you know, the way this process works.  But I

25   think I figured out what happened here.
```

 1    We had a witness that Martha Hall called at the end of the

 2   case, near the end of the case, by the name of -- let me find

 3   it.  Her name was Gina Stein.  She was a lawyer.  She's a

 4   probate state conservatorship lawyer, and she said -- she

 5   testified she had no ax to grind.  She didn't know anybody in

 6   the case.  You know, she's completely neutral.

 7    She goes, "Oh, yeah, I went to interview Allan Brennan

 8   in" -- I think it was late '19 or early 2020 -- "and he was

 9   okay.  The" -- "the Court asked me to do it because her

10   family" -- "his family," Mr. Brennan's family, "was seeking to

11   impose a conservatorship on him."

12    Conservatorship is a bad thing.  You only do that when

13   somebody has really lost it, and they can't make decisions;

14   they can't take care of themselves; they can't make financial

15   decisions.  It's a -- it's a drastic remedy, and so the courts

16   appoint lawyers to make sure that it's not abused.  I've

17   actually seen that happen.

18    Anyway, she goes to visit with Allan Brennan, and she

19   reports, "He's okay.  He's aging."  So are we all; right?

20   "He's aging, but he's" -- "he's got his wits about him."  And

21   she puts the kibosh on the conservatorship, and she says, "No."

22    And so I think what happened here -- just putting two and

23   two together, I think Gary Brennan, who made it very clear he

24   was concerned about his inheritance -- his, you know, father

25   had a lot of money.

1    I think he -- he then started talking to Agent Tarwater

2    and started telling him, "My father is being abused by this

3    Robert Lazerus person.  Robert Lazerus is draining my father's

4    estate," which was not true.  He wasn't draining the estate.

5    He was giving him information that he could use to invest and

6    he made money on.

7        And that fired up the FBI, and they started looking at

8    Loop.  And they realized that Loop came together through this

9    shell corporation, First American, which, at one point in time,

10    apparently was controlled by some bad guys, by Bajic and his

11    crew.

12        Okay.  And they then jumped to the conclusion -- this is

13    what I think happened.  The FBI, our FBI that protects us every

14    day, jumped to the conclusion that Jon Destler, Don Danks,

15    Robert Lazerus must be part of the Bajic bad guy group, the

16    First American Group, the people in Lebanon and wherever else.

17    And that's just not true.  It's not true.

18        They walked into this situation.  They meant well.  They

19    mean well now.  They bought stock.  There's no law against

20    that.  And all they had to do, ladies and gentlemen -- all they

21    had to do -- all Agent Tarwater had to do was go talk to

22    Allan Brennan and find out what Gina Stein found out.  Nobody

23    cheated him.

24        There's been no securities fraud here.  It's all he had to

25    do, but he took the witness stand, and he had all these

1   excuses.  "Well, I tried to get to him, you know, but I was

2   talking to Gary Brennan, and that was good enough."

3   Gary Brennan had his own agenda.  Gary Brennan wanted his

4   inheritance -- okay? -- which I don't quibble with.  You know,

5   everybody wants their inheritance.  That's fine.

6        But the FBI agent in charge here, Jeremy Tarwater, did not

7   push through, did not get to the real deal here.  If he had, he

8   would have heard from Allan Brennan, "No, Lazerus didn't" --

9   "he didn't" -- "he didn't rip me off.  I'm actually doing

10  pretty good in my investment with Loop.  Not only do I know

11  Destler, I had dinner with him one night.  We didn't really

12  talk about Loop."  That's what really happened.

13       We shouldn't be here.  We shouldn't be here, and you

14  know -- you know -- you know what brought me to this

15  conclusion?  Do you remember those FBI letters about -- I don't

16  know -- a year and a half, close to two years -- they're in

17  evidence.  I just don't remember the numbers.

18       About two years after the indictment, the FBI sends out

19  two letters.  I call them the "trolling for victim letters."

20  They sent out these letters looking for victims because you

21  know what happened?  You know what happened?  They realized

22  Allan Brennan was not a victim.  So they better go out -- they

23  better go out -- they darn well better go out and find some

24  real victims.

25       What they could have done, and what they should have done,

1    is say, you know, "This isn't such a good case.  There's no

2    real victim here."  So they send these letters out, which was

3    very unusual.  And usually -- when you file an indictment,

4    usually, the FBI has their act together.  You know, they know

5    what happened.

6        Okay.  So they send these letters out a couple of years

7    later, and who do they come back with?  These are the victims.

8    They come back with Gary Osterberg, who said he made $70,000 in

9    profit; and Ken Rogers, who said, "I was a day trader, and I

10   lost my profits."  Those are the victims?

11       So, yeah, you know, when I -- when I think about it all,

12   when I think about this whole thing, I get a little fired up.

13   I feel bad for my client.  You know, he's been through a lot.

14   He needs you to now vote not guilty, to acquit him, so he can

15   go back to his family, go back to his life, go back to

16   Opti-Harvest, which is not a scam.  You saw it.  It's the real

17   deal.  That's -- that's where he's coming from.  That's all he

18   wants, is a fair shake from you, ladies and gentlemen.

19       So thank you, thank you, thank you.  I appreciate it.

20           **THE COURT:**  Okay.  Ladies and gentlemen, we have two

21   more defense closing arguments.  I'm not going to make you

22   stick around and then do that since I told you I would release

23   you at 2:30.

24       So I will send you on your way.  Tomorrow morning, we will

25   finish up with the trial, and you will begin your

1  deliberations.

2       So you are ordered to be back tomorrow morning at 8:30,

3  and I'm going to stick -- have Juror Number 11 stick around,

4  but the rest of you are excused until 8:30 tomorrow morning.

5  We'll see you then.

6       Since we haven't heard all the closing arguments yet, I

7  want to make sure you keep an open mind until you hear all the

8  closing arguments and you're back in that jury room

9  deliberating.

10       So thank you.  You can go.

11                    (End of partial transcript.)

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Friday, March 14, 2025

/S/ James C. Pence-Aviles

James C. Pence-Aviles, RMR, CRR, CSR No. 13059
U.S. Court Reporter